## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re: APA Assessment Fee Litigation | No. 1:10-cv-1780-JDB<br>(consolidated with No. 1:10-cv-1898-JDB) |
| ELLEN G. LEVINE, *et al.*,<br><br>      Plaintiffs,<br><br>    v.<br><br>AMERICAN PSYCHOLOGICAL<br>ASSOCIATION, INC. and AMERICAN<br>PSYCHOLOGICAL ASSOCIATION PRACTICE<br>ORGANIZATION,<br><br>      Defendants. | ORAL HEARING REQUESTED |
| ERIC S. ENGUM,<br><br>      Plaintiff,<br><br>    v.<br><br>AMERICAN PSYCHOLOGICAL<br>ASSOCIATION, INC. and AMERICAN<br>PSYCHOLOGICAL ASSOCIATION PRACTICE<br>ORGANIZATION,<br><br>      Defendants. |  |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE PLAINTIFFS' REQUEST FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants American Psychological Association ("APA") and American Psychological Association Practice Organization ("APAPO") respectfully move to dismiss the Consolidated Class Action Complaint (ECF No. 15) for failure to state a claim upon which relief can be granted.  The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities and in the Exhibits attached to the Declaration of Jonathan E. Paikin.

In the alternative, APA and APAPO respectfully request that this Court strike plaintiffs'

request for a jury pursuant to Federal Rules of Civil Procedure 12(f) and 39(a)(2), because the

Consolidated Complaint asserts only equitable claims that do not give rise to a federal right to a

jury trial.

Pursuant to Local Rule 7(f), APA and APAPO respectfully request an oral hearing on

their motion.

Dated:  March 2, 2011

Respectfully submitted,

/s/ David W. Ogden

_____
David W. Ogden (D.C. Bar No. 375951)
Jonathan E. Paikin (D.C. Bar No. 466445)
Francesco Valentini (D.C. Bar No. 986769)
Natalie Hirt Adams (D.C. Bar No. 993439)
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: david.ogden@wilmerhale.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: APA Assessment Fee Litigation | No. 1:10-cv-1780-JDB (consolidated with No. 1:10-cv-1898-JDB) |

ELLEN G. LEVINE, *et al.*,

      Plaintiffs,

      v.

AMERICAN PSYCHOLOGICAL
ASSOCIATION, INC. and AMERICAN
PSYCHOLOGICAL ASSOCIATION PRACTICE
ORGANIZATION,

      Defendants.

---

ERIC S. ENGUM,

      Plaintiff,

      v.

AMERICAN PSYCHOLOGICAL
ASSOCIATION, INC. and AMERICAN
PSYCHOLOGICAL ASSOCIATION PRACTICE
ORGANIZATION,

      Defendants.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
TO STRIKE PLAINTIFFS' REQUEST FOR A JURY TRIAL
OF DEFENDANTS AMERICAN PSYCHOLOGICAL ASSOCIATION AND
AMERICAN PSYCHOLOGICAL ASSOCIATION PRACTICE ORGANIZATION**

David W. Ogden (D.C. Bar No. 375951)
Jonathan E. Paikin (D.C. Bar No. 466445)
Francesco Valentini (D.C. Bar No. 986769)
Natalie Hirt Adams (D.C. Bar No. 993439)
WILMER CUTLER PICKERING HALE AND
  DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ..................................................................................... vii

FACTUAL BACKGROUND ............................................................................................4

   I.  Parties.....................................................................................................................4

   II.  The Special Assessment/Practice Assessment......................................................5

   III. The APA Bylaws And Rules .................................................................................7

   IV. The Billing Of The Special Assessment/Practice Assessment ............................8

   V.  Procedural History ..............................................................................................10

LEGAL STANDARDS ...................................................................................................11

ARGUMENT ...................................................................................................................13

   I.  Plaintiffs' Unjust Enrichment Claim Is Foreclosed By The Parties' Membership
      Contracts And By Plaintiffs' Failure To Allege Any Facts Supporting
      A Reasonable Inference Of Unjust Enrichment.................................................13

      A.  The Plaintiffs' Membership Contract With APA Precludes Plaintiffs'
         Unjust Enrichment Claim ............................................................................14

      B.  Plaintiffs Fail To Allege Any Facts Suggesting That APA Or APAPO
         Retained The Benefit Of The Practice Assessment ......................................16

      C.  Plaintiffs Fail To Point To Any Misstatements By APA Or APAPO .........18

   II.  APA's And APAPO's Conduct Is Categorically Exempt Under The District Of
      Columbia Statute That Governs Plaintiffs' Claims And, In Any Event, Plaintiffs
      Have Failed To State A Cause Of Action Under The California Statutes.........23

      A.  District Of Columbia Law Governs Plaintiffs' Statutory Claims................23

      B.  APA's And APAPO's Activities At Issue Here Are Categorically Exempt From
         The District Of Columbia Consumer Protection Procedures Act................25

      C.  In Any Event, Plaintiffs' Allegations Do Not State A Cause Of Action
         Under The California Statutes ......................................................................26

1.  Plaintiffs Fail To State A Claim Under The "Fraudulent Business Act Or Practice" Prong Of § 17200 (Count II) Or Under § 17500 (Count III) .................28

2.  Plaintiffs Fail To State A Claim Under The "Unfair Business Act Or Practice" Prong Of § 17200 (Count II)..................................................................................29

3.  Plaintiffs Fail To State A Claim Under The "Unlawful Business Act Or Practice" Prong Of § 17200 (Count II)..................................................................................30

III. Plaintiffs Are Not Entitled To A Jury Trial On Any Of Their Claims And Their Request For A Jury Trial Should Be Stricken...........................................................31

CONCLUSION....................................................................................................................33

# TABLE OF AUTHORITIES[*]

## CASES

Page(s)

*4934, Inc. v. District of Columbia Dep't of Employment Servs*,
605 A.2d 50 (D.C. 1992) ............................................................................................15, 32

\* *Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).............................................................................2, 11, 12, 16

*Bank of the West v. Superior Court*,
833 P.2d 545 (Cal. 1992) .......................................................................................33

\* *Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................2, 11, 12

*Bloomgarden v. Coyer*,
479 F.2d 201 (D.C. Cir. 1973) ...........................................................................3, 15, 17

*Brock v. Pierce County*,
476 U.S. 253 (1986) ...........................................................................................20, 21

*Byars v. SCME Mortg. Bankers, Inc.*,
135 Cal. Rptr. 2d 796 (App. 2003) ....................................................................30

*California ex rel. Lockyer v. Dynegy, Inc.*,
375 F.3d 831 (9th Cir. 2004) .............................................................................31

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.*,
973 P.2d 527 (Cal. 1999).................................................................................26, 29, 30

*City Athletic Club v. United States*,
242 F.2d 43 (2d Cir. 1957).................................................................................22, 23

*Colgan v. Leatherman Tool Grp.*,
38 Cal. Rptr. 3d 36 (App. 2006) ........................................................................33

*Committee on Children's Television, Inc. v. General Foods Corp.*,
673 P.2d 660, 668 (Cal. 1983), *superseded by statute on another point
as stated in Californians for Disability Rights v. Mervyn's, LLC*,
138 P.3d 207 (Cal. 2006) ...................................................................................28

*Curtis v. Gordon*,
980 A.2d 1238 (D.C. 2009) ...............................................................................19

---

[*]      Authorities on which Defendants chiefly rely are marked with asterisks.

*Daly v. Castro Llanes,*
   30 F. Supp. 2d 407 (S.D.N.Y. 1998)...............................................................13

*Daugherty v. American Honda Motor Co.,*
   51 Cal. Rptr. 3d 118 (App. 2006) ...................................................................27

*District of Columbia v. Coleman,*
   667 A.2d 811 (D.C. 1995) .........................................................................24, 25

*Doe v. HCA Health Servs of Tenn., Inc.,*
   46 S.W.3d 191 (Tenn. 2001)...........................................................................14

*Durell v. Sharp Healthcare,*
   108 Cal. Rptr. 3d 682 (App. 2010) .................................................................30

*Emerine v. Yancey,*
   680 A.2d 1380 (D.C. 1996) ............................................................................15

*Farmers Ins. Exch. v. Superior Court,*
   826 P.2d 730 (Cal. 1992) ..........................................................................30, 31

*Francis v. Mead Johnson & Co.,*
   No. 10-cv-701, 2010 WL 5313540 (D. Colo. Dec. 17, 2010) .........................13

*Global Tech. & Trading, Inc. v. Satyam Computer Servs Ltd.,*
   No. 09-cv-5111, 2011 WL 308162 (N.D. Ill. Jan. 28, 2011)..........................13

*Gowens v. DynCorp,*
   132 F. Supp. 2d 38 (D.D.C. 2001) ...................................................................4

*Granfinanciera, S.A. v. Nordberg,*
   492 U.S. 33 (1989).........................................................................................32

*Harrington v. Trotman,*
   983 A.2d 342, 346 (D.C. 2009) ......................................................................14

*Hercules & Co. v. Shama Rest. Corp.,*
   566 A.2d 31 (D.C. 1989) ................................................................................24

*Howard v. Riggs Nat'l Bank,*
   432 A.2d 701 (D.C. 1981) ..............................................................................25

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   295 F. Supp. 2d 30 (D.D.C. 2003) ..................................................................15

*Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.,*
   870 A.2d 58 (D.C. 2005) ................................................................................14

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .................................................................12, 29

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941).....................................................................................23

*Korea Supply Co. v. Lockheed Martin Corp.*,
    63 P.3d 937 (Cal. 2003) .........................................................................26, 32

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ..............................................................12, 13

*Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.*,
    51 Cal. Rptr. 2d 622 (App. 1996) .................................................................14

\* *Lavie v. Procter & Gamble Co.*,
    129 Cal. Rptr. 2d 486 (App. 2003) ....................................................27, 28, 29

*Levine v. Blue Shield of Cal.*,
    117 Cal. Rptr. 3d 262 (App. 2010) ...............................................................14

*Louisville Country Club, Inc. v. Gray*,
    178 F. Supp. 915 (D. Ky. 1959), *aff'd*, 285 F.2d 532 (6th Cir. 1960) .............22

*Macharia v. United States*,
    238 F. Supp. 2d 13 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (D.C. Cir. 2003)..........33

\* *Meshel v. Ohev Sholom Talmud Torah*,
    869 A.2d 343 (D.C. 2005) .........................................................................2, 15

*Moore v. Ronald Hsu Constr. Co.*,
    576 A.2d 734 (D.C. 1990) .............................................................................23

*National Cable Television Ass'n., Inc. v. Copyright Royalty Tribunal*,
    724 F.2d 176 (D.C. Cir. 1983) ......................................................................21

*News World Commc'ns, Inc. v. Thompsen*,
    878 A.2d 1218 (D.C. 2005) .....................................................................16, 17

*OFAC v. Voices in the Wilderness*,
    329 F. Supp. 2d 71 (D.D.C. 2004)................................................................21

*Okura & Co., Inc. v. Careau Grp.*,
    783 F. Supp. 482 (C.D. Cal. 1991) ...............................................................33

*Oryszak v. Sullivan*,
    565 F. Supp. 2d 14 (D.D.C. 2008) ...............................................................12

*Parsons v. Bedford*,
   28 U.S. (3 Pet.) 433 (1830) ......................................................................32

*Perez v. Nidek Co.*,
   657 F. Supp. 2d 1156 (S.D. Cal. 2009) ....................................................31

*Peterson v. Cellco P'ship*,
   Cal. Rptr. 3d 316 (App. 2008) .................................................................14

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
   __ F.3d __, No. 10-1686, 2011 WL 183163 (7th Cir. Jan. 21, 2011)..............12

*Roberts v. Sears, Roebuck & Co.*,
   617 F.2d 460 (7th Cir. 1980) ...............................................................32, 33

*Save Imaculata/Dunblane, Inc. v. Imaculata Preparatory Sch.*,
   514 A.2d 1152 (D.C. 1986) .....................................................................25

\*  *Schiff v. American Ass'n of Retired Persons*,
   697 A.2d 1193 (D.C. 1997) ............................................................. *passim*

*Shaw v. Marriott Int'l, Inc.*,
   474 F. Supp. 2d 141 (D.D.C. 2007) ..........................................................24

*Steinberg Moorad & Dunn Inc. v. Dunn*,
   136 Fed. Appx. 6, 9 (9th  Cir. 2005) .........................................................33

*Stewart v. National Educ. Ass'n*,
   471 F.3d 169 (D.C. Cir. 2006) ...................................................................4

*The Benedicts v. United States*,
   234 F. Supp. 1 (D.C.N.C. 1964) ..............................................................22

*Tull v. United States*,
   481 U.S. 412 (1987)................................................................................32

*United States ex rel. U.S.-Namibia (Sw. Africa) Trade & Cultural Council, Inc. v. Africa Fund*, 588 F. Supp. 1350, 1351 (S.D.N.Y. 1984) .............................31

*United States v. BCCI Holdings*,
   46 F.3d 1185 (D.C. Cir. 1995) .................................................................33

*United States v. Taylor*,
   867 F.2d 700 (D.C. Cir. 1989) .................................................................33

*USA Waste of Maryland, Inc. v. Love*,
   954 A.2d 1027 (D.C. 2008) .....................................................................14

*Washkoviak v. Student Loan Mktg Ass'n,*
    900 A.2d 168 (D.C. 2006) .......................................................................24, 25

*Witherspoon v. Philip Morris Inc.,*
    964 F. Supp. 455 (D.D.C. 1997) ......................................................................12

## CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const. art. VI.........................................................................................31

U.S. Const. amend. VII .................................................................................32

26 U.S.C. § 501 .......................................................................................4, 31

26 U.S.C. § 4241 (1964) ...............................................................................22

26 U.S.C. § 4242 (1964) ...............................................................................22

26 U.S.C. § 7401 ..........................................................................................31

Fed. R. Civ. P. 12 .........................................................................................26

Fed. R. Civ. P. 39 .........................................................................................32

Fed. R. Evid. 201 ............................................................................................4

D.C. Code § 28-3905 ...............................................................................25, 26

Nonprofit Organizations Oversight Improvement Amendment of 2007,
    D.C. Act No. 17-33, 54 D.C. Reg. 4085 (May 4, 2007)...................................25

Cal. Bus. & Prof. Code § 17200 .......................................................... *passim*

Cal. Bus. & Prof. Code § 17203 ....................................................................33

Cal. Bus. & Prof. Code § 17500 .......................................................... *passim*

Cal. Bus. & Prof. Code § 17535 ....................................................................33

## OTHER AUTHORITIES

Black's Law Dictionary (6th ed. 1990)............................................................15

Hopkins, The Law of Tax-Exempt Organizations (9th ed. 2007) ............................4, 31

Restatement (Second) of Contracts § 157 .........................................................19

Restatement (Second) of Conflict of Laws § 145................................................24

Webster's Third New International Dictionary (2002).......................................19, 20

## PRELIMINARY STATEMENT

The American Psychological Association ("APA") is a non-profit scientific and professional organization comprised of more than 150,000 members, including scientists, researchers, academics, and practicing psychologists.  Since 1985, APA has made it a professional obligation for those of its members who are licensed healthcare practitioners to pay an annual assessment (called a "Special Assessment" or "Practice Assessment") to fund advocacy concerning matters of interest to practitioners.  For the last ten years, the Practice Assessment has funded the American Psychological Association Practice Organization ("APAPO"), a non-profit organization created in 2001, whose mission is to advocate and lobby lawmakers on issues of importance to practicing psychologists.  Accordingly, APA's dues forms have stated that APA members who are licensed practitioners "must pay" the Practice Assessment that supports APAPO's advocacy activities.

The three plaintiffs here assert that they paid the Practice Assessment for some of the years between 2001 and 2010.  They bring this putative class action against APA and APAPO asserting claims for (1) unjust enrichment (Count I) and (2) violations of California's Unfair Competition and False Advertising Laws, Cal. Bus. & Prof. Code §§ 17200, 17500, (Counts II and III) and seeking, among other relief, the refund of all the Practice Assessment payments they have made since 2001.  Plaintiffs do not claim confusion about the distinct roles of APA and APAPO or the fact that the Practice Assessment funds APAPO and its advocacy on behalf of professional psychologists.  They do not dispute that these funds have been devoted to precisely these purposes.  Nor do they deny having received benefits from APAPO's advocacy.  Instead, they allege fraud because they were told that they "must pay" the Practice Assessment when, instead, APA allegedly all along considered the payment to be "purely voluntary."  (*E.g.*, Compl. ¶ 22).  But plaintiffs have pled no facts suggesting that APA did not—or does not—consider it to

be a duty of its practicing members to support the profession by paying the Practice Assessment. Indeed, all the APA and APAPO statements cited in the Consolidated Complaint confirm that APA has consistently described payment of the Practice Assessment as obligatory. (*See* Compl. ¶ 16, 17, 18, 19, 20, 23, 24, 26, 27).  To be sure, APA has not expelled members who failed to live up to this professional responsibility.  But it is not in any way improper—and certainly not fraudulent—for APA to impose a professional duty on its members without expelling those who do not comply, and thus plaintiffs' claim that APA viewed the Practice Assessment as "purely voluntary" is an entirely unsupported conclusion.  For that reason, plaintiffs fail to state a claim under the standard set forth by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)—much less under the "who, what, where, when" particularity requirement for fraud allegations established by Federal Rule of Civil Procedure 9(b).

Moreover, apart from the plaintiffs' failure to allege a plausible claim, each count of the Consolidated Complaint is foreclosed by fatal threshold defects.  Plaintiffs invoke (in Count I) this Court's equitable powers and the *quasi*-contract doctrine of unjust enrichment.  In addition to being unsupported by sufficient allegations, this claim fails for two reasons.  First, there can be no claim for unjust enrichment where an *actual* contract exists, and "[i]t is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members."  *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).  Because plaintiffs' relationship with APA and APAPO is already governed by an *actual* contract—a valid contract that plaintiffs have themselves acknowledged in this action and do not now contend has been breached—Count I is squarely foreclosed by the D.C. Court of Appeals' decision in *Schiff v. American Association of Retired Persons,* 697 A.2d 1193, 1194

(D.C. 1997).  Second, for a claim of unjust enrichment "it is not enough for … plaintiff[s] to prove merely that [they have] conferred an advantage upon the defendant, but [they] must demonstrate that *retention* of the benefit *without compensating* the one who conferred it is unjustified."  *Bloomgarden v. Coyer*,  479 F.2d 201, 211 (D.C. Cir. 1973) (emphases added).  Here, there are no allegations that APAPO fails to utilize these funds for the benefit of practitioner psychologists, including plaintiffs and those whom they purport to represent.  Therefore, plaintiffs fail plausibly to allege that APA or APAPO "retains the benefit" of the Practice Assessment "without compensating" plaintiffs.

Similarly, plaintiffs have failed to state a legally valid statutory claim against APA and APAPO.  Plaintiffs do not even attempt to state a claim under the controlling statute, the District of Columbia Consumer Protection Procedures Act, and instead invoke California's Unfair Competition and False Advertising Laws, Cal. Bus. & Prof. Code §§ 17200, 17500 (Counts II and III).  But any statutory claim in this case is governed by the law of the District of Columbia, the location in which—as plaintiffs conceded—APA and APAPO are headquartered; their principal activities are undertaken; and in which "significant events giving rise to this case took place."  (Compl. ¶¶ 2, 3, 9, 13).  And, the District of Columbia has made a clear judicial and legislative choice that membership issues of this kind are *not* actionable under the controlling Consumer Protection Procedures Act.  Moreover, even if California law applied, plaintiffs have failed to plead an actionable violation of the California statutes.

For all of these reasons, and as discussed further below, the Consolidated Complaint ("Complaint") must be dismissed in its entirety.

## FACTUAL BACKGROUND

"In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Stewart v. National Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).[1]  The allegations of the Complaint are accepted as true for purposes of this motion.

## I.   PARTIES

Based in Washington, D.C., defendant American Psychological Association ("APA") is a scientific and professional organization that represents psychology in the United States.  It has more than 150,000 members active in all fields of the psychological profession: research, academia, and clinical practice.  (Compl. ¶¶ 2, 15).  APA is a non-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code.  (*Id.* ¶¶ 2, 13).  Its mission is to advance the creation, communication, and application of psychological knowledge to benefit society and improve people's lives.

Defendant American Psychological Association Practice Organization ("APAPO") is a legally separate companion organization to APA that is also based in Washington, D.C.  (Compl. ¶ 3).  It was established as a Section 501(c)(6) organization under the Internal Revenue Code to advocate and lobby lawmakers on behalf of its practicing psychologist members.  (*Id.* ¶¶ 3, 5).[2] Most of APA's scientific and academic members do not belong to APAPO.

---

[1]     *See also Gowens v. DynCorp*, 132 F. Supp. 2d 38, 41 n.2 (D.D.C. 2001) (court considering motion to dismiss under Rule 12(b)(6) can properly rely on document that "is referred to in the complaint and forms the basis for plaintiff's claims"); Fed. R. Evid. 201(b)-(c).

[2]     It is common for § 501(c)(3) organizations to have companion § 501(c)(6) organizations. *See* HOPKINS, THE LAW OF TAX-EXEMPT ORGANIZATIONS 997-998 (9th ed. 2007) ("There are … circumstances where, in an in-tandem relationship between two tax-exempt organizations, the parent exempt organization is a noncharitable organization and the subsidiary is a charitable organization.  This arrangement can, however, be reversed. ...  For example, a charitable organization may be concerned about the extent of its legislative activities and thus elect to

There are three named plaintiffs: Ellen G. Levine, Ruth Fallenbaum, and Eric S. Engum. Drs. Levine and Fallenbaum are residents of California, and Dr. Engum is a resident of Tennessee. (Compl. ¶¶ 10-12). Each of these individuals "during the relevant time period paid special or practice assessment fees" that are the subject of this lawsuit. (*Id.*) The Complaint is silent as to which years the plaintiffs paid (or did not pay) the Assessments.

## II.     THE SPECIAL ASSESSMENT/PRACTICE ASSESSMENT

The Practice Assessment (referred to as a Special Assessment until 2005) is billed to licensed practicing psychologists who are members of APA, and has funded APAPO since APAPO was founded in 2001. (Compl. ¶ 15). The Complaint quotes from APAPO's website, which explains the nature of the Practice Assessment: "'In addition to APA dues, members who are licensed practitioners pay the annual 'Practice Assessment' that supports the [w]ork of the [APAPO].'" (*Id.* at ¶ 20 (quoting APAPO's website)). As APAPO has explained, "'the Practice Assessment monies support the work of the APA Practice Organization, a legally separate entity with different IRS status than APA. As a result, Practice Assessment payments are not part of … APA membership dues, although they are billed on [the] APA dues statement[s].'" (*Id.* (quoting from APAPO's website)).

Although APA's dues statements changed over time in certain minor respects not relevant here, APA's descriptions of the Practice Assessment remained substantially the same

---

operate them out of an exempt social welfare organization. ... [T]he IRS ruled that a public charity, to provide broader services to its members and more vigorously engage in legislative activities, may form a related business league." (footnotes omitted)). An example of a professional organization with similar relationships is the ALA-APA Organization for the Advancement of Library Employees, which is a 501(c)(6) companion organization to the 501(c)(3)-organized American Library Association. *See* http://ala-apa.org/about-ala-apa/governing-documents/501c6-tax-status/ (last visited Mar. 1, 2011).

between 2001 and 2010.[3]  Taking the 2001 dues statement as an example, four distinct elements

appear on the form: (1) "Regular APA Dues"; (2) "Special Assessment of Licensed Healthcare

Professionals"; (3) "Division Dues and Assessments"; and (4) "Voluntary Contributions."  (*See*

Exhibit A at A1).

In the section related to the payment of the Special Assessment, the dues form stated

immediately below the header: "For the APA Practice Organization, a companion organization

created by APA as of January 1, 2001 to promote the professional interests of practicing

psychologists.  For more information and U.S. tax deductibility, see instructions." (Exhibit A at

A1).  Taking again the 2001 form as an example, the instructions, in turn, provided the following

description of the Practice Assessment:

> ASSESSMENT PHASE 1.  An annual assessment is applied to all
> licensed health care psychologists who provide services in the
> health or mental health field or who supervise those who do.
> Special Assessment monies are paid directly to APA's nonprofit
> companion organization, the APA Practice Organization.  Its
> mission is to promote the mutual professional interests of
> practicing psychologists in all settings through a wide range of
> advocacy activities focusing on policy makers, legislatures, the
> legal system, purchasers and consumers of services, and the overall
> healthcare marketplace.
>
> TAX INFORMATION.  The APA Practice Organization is
> designed as a 501(c)(6) non-profit organization by the IRS.  The
> Special Assessment is not deductible as a charitable contribution,
> but may be deductible in part as a business expense.  APA
> estimates that 9% of your total Special Assessment is allocable to
> lobbying activities of the APA Practice Organization, and therefore
> is not deductible for income tax purposes as ordinary and
> necessary business expenses.

---

[3]      The dues statements and their instructions were incorporated by reference into the
Complaint, (*see* Compl. ¶ 16, 25, 26), and may therefore be considered in connection with this
Motion.  They are attached, for each year since 2001, as Exhibit A.  All exhibits are attached to
the Declaration of Jonathan E. Paikin.

(Exhibit A at A3).  Plaintiffs do not allege that any of these statements was false or misleading.

To the contrary, the Complaint contains no allegation suggesting any confusion or

misunderstanding about the organization that would receive the Practice Assessment, the

purposes for which the money would be spent, or the information pertinent to the appropriate tax

treatment of Practice Assessment payments.

## III.   THE APA BYLAWS AND RULES

The relationship between APA and its members is governed by the organization's Bylaws

and Rules—both of which are publicly available and have been incorporated by reference in the

Complaint.[4]  APA's Bylaws set forth in detail the manner in which the organization is to be

operated and governed.  As just one example, the Bylaws set forth the duties, responsibilities,

and election procedures for APA's Council of Representatives, which serves as the legislative

body for the APA.  (Exhibit B at B4-7 (Articles IV-V)).  The Rules are "adopted and amended

by the APA Council of Representatives … [and] detail the operational and managerial authority

needed to conduct the affairs of the Association under the bylaws of the [APA]."  (Exhibit D at

D5 (Preface)).

Most relevant to this lawsuit, the Bylaws and Rules promulgate the requirements for

membership in APA, including enumerating the grounds upon which membership may be

terminated.  (*See* Exhibit B at B2-4, B15 (Articles II (Membership) and XIX (Dues and

Subscriptions); Exhibit D at D6-11 (Rule 10)).  Significantly, APA members are informed that

the failure to pay regular APA dues may result in termination of membership.  (Exhibit B at B15

(Article XIX(1), (3)); Exhibit D at D9 (Rule 10-10)).  In contrast, the Bylaws and Rules have

---

[4]      *See* Compl. ¶ 13 (addressing the governance of APA and APAPO).  The 2010 Bylaws for
the APA and APAPO are attached as Exhibits B and C, respectively, and the relevant portions of
the APA's Association Rules are attached as Exhibit D.

made clear by omission that failure to pay the Practice Assessment is not grounds for termination of APA membership.  (*Id*.)

IV.    **THE BILLING OF THE SPECIAL ASSESSMENT/PRACTICE ASSESSMENT**

Since 2001, APA's dues statements and its website have consistently stated that certain members "must pay" or are "required" to pay the Practice Assessment.  (Compl. ¶¶ 16, 17, 25, 26; *see also id*. at ¶ 19 ("The website stated that all practicing APA members were billed the practice assessment and were expected to pay that assessment.")).  It is these statements that plaintiffs allege were "fraudulent," "misrepresent[ations]," "deceptive," and "false."  (*E.g.*, *id*. ¶¶ 6, 16, 22, 26, 29).

Plaintiffs' pleadings are not clear as to why they claim that these statements were false, but they seem to assert that APA privately viewed the Practice Assessment as wholly "voluntary."  (*See* Compl. ¶¶ 4, 19, 20, 22, 27, 30, 52).  Plaintiffs do not point to any instance in which APA or APAPO suggested that payment of the Practice Assessment was "voluntary," and plaintiffs do not allege that APA or APAPO ever used that word or concept to describe the Practice Assessment.  Yet plaintiffs repeat the word at least nine times in the Complaint. (Compl. ¶¶ 4, 19, 20, 22, 27, 30, 52).[5]  Plaintiffs also point to no evidence that APA did not consider its practitioner-members duty-bound to pay the Practice Assessment as a matter of professional responsibility.

In places, plaintiffs' fraud allegations appear to be premised on the notion that APA could not impose a professional obligation on its membership unless it terminated the membership of those who failed to fulfill it.  (*See* Compl. ¶¶ 4, 27, 36, 41, 43, 44, 52).  Plaintiffs

---

[5]    Plaintiffs place quotation marks around the word "voluntary," (*see* Compl. ¶ 27), but do not purport to quote a statement made by APA or APAPO, much less offer any detail about who would have used the word "voluntary," or when, where, or under what circumstances such a communication would have taken place.

appear to contend that APA has committed fraud in its dues statements, on its website, and in public pronouncements that licensed practitioners "must pay" the Practice Assessment because it did not expel those who did not comply.[6]  (*See* Compl. ¶¶ 16, 17, 27, 29).

Thus, plaintiffs cite to a May 5, 2010 communication issued by APA's Board of Directors as an "admi[ssion]" that APA's previous statements that practicing psychologist "must pay" the Practice Assessment were "deceptive." (Compl. ¶ 23).  In the portion of the statement cited in the Complaint, APA's Board of Directors said:

> The manner in which the APA, APAPO, and Division dues have been combined on past dues statements does not make clear that the mandatory practice assessment payment is required for APAPO membership but not for APA membership.  The 2011 dues statement instructions will be modified to clarify this point.

(*Id.*; Exhibit E at E3).[7]  But even this snippet culled from the Board's statement reaffirms that the payment of the Practice Assessment was (and is) "mandatory."  (*Id.*)  And, in the same May 5, 2010 statement, the Board of Directors stated: "As the Board of Directors of both the APA and the APAPO we strongly believe that payment of the practice assessment is a *shared responsibility* the practice community places on itself to advance professional advocacy."  (*Id*. at E2  (emphasis added)).

These and every other statement the Complaint attributes to APA consistently reaffirm that payment of the Practice Assessment is a professional responsibility that APA expects its practitioner members to fulfill, and thus is *not* "voluntary."  For example, plaintiffs quote certain statements contained in a January 11, 2011 letter from APA Executive Director for Public and

---

[6]   Plaintiffs assert that the "motive" for this supposed fraud is to "skirt[] the rules applicable to tax-exempt non-profit entities."  (Compl. ¶15).  Plaintiffs never explain how this professional obligation violates any statutory or regulatory requirements, nor do they allege facts to support their conclusory contention.

[7]   The Complaint quotes from the May 5, 2010 Board Statement and thereby incorporates it into the Complaint.  It is attached as Exhibit E.

Member Communications, Rhea K. Farberman.  (Compl. ¶ 27).  In these statements, Ms.

Farberman confirmed that although "[n]on-payment of the practice assessment will not affect

your APA membership status," "all APA members who are licensed to provide health care

services are billed the practice assessment" and "[i]n general . . . *are expected to pay* the

assessment."  (*Id.* (emphasis added)).  And just as plaintiffs point to no instance in which APA or

APAPO suggested that payment of the Practice Assessment was "voluntary" for licensed

practitioners, plaintiffs point to no instance in which either APA or APAPO suggested that

payment of the Practice Assessment was a precondition for continued membership in APA or

that non-payment would result in termination of APA membership.

## V.   PROCEDURAL HISTORY

The Consolidated Complaint constitutes plaintiffs' fourth effort to plead their case.  The

first complaint was filed on October 21, 2010, identified Dr. Levine as the only named plaintiff,

and purported to assert claims for unjust enrichment, fraud and deceit, negligent

misrepresentation, and violations of Cal. Bus. & Prof. Code §§ 17200, 17500.  (Class Action

Complaint at 8-10, ECF No. 1).  Different counsel filed a second complaint on November 4,

2010, identifying Dr. Engum as the only named plaintiff, and purporting to assert claims for

misrepresentation, negligence, and unjust enrichment.  (Class Action Complaint at 9-11, *Engum*

*v. American Psychological Ass'n*, No. 10-cv-1898 (D.D.C. Nov. 4, 2010), ECF No. 1).  On

December 3, 2010, plaintiff in the *Levine* action filed a First Amended Complaint, adding five

named plaintiffs including Dr. Fallenbaum—allegedly residents of California, Florida, Ohio,

Illinois, and New York—and asserting new claims under Illinois and Florida statutory

provisions.  (First Am. Class Action Complaint at 2, 8-12, ECF No. 2).

On January 18, 2011, plaintiffs in the *Levine* action filed an unopposed motion seeking

consolidation of the pending *Levine* and *Engum* actions and appointment of interim lead counsel.

- 10 -

(ECF No. 13).  On January 31, the Court granted plaintiffs' unopposed motion.  (ECF No. 14).

On the same day, plaintiffs' Consolidated Complaint was filed pursuant to the Court's order.

(ECF No. 15).

The Consolidated Complaint no longer asserts any claims on behalf of four of the seven

plaintiffs that had been named in the *Levine* and *Engum* actions.  They are no longer named

parties in the case.[8]  Furthermore, the three remaining plaintiffs have abandoned any claims of

fraud, deceit, misrepresentation, negligent misrepresentation, and negligence contained in the

predecessor *Levine* and *Engum* complaints.  None of those tort theories appears in the

Consolidated Complaint.  Nor does the Consolidated Complaint contain statutory claims under

the Illinois and Florida state provisions, causes of action that had been added in the First

Amended Complaint filed in the *Levine* case, only to be dropped a few weeks later.

Plaintiffs now assert only three counts: Count I is brought on behalf of all three plaintiffs

and seeks recovery for unjust enrichment (Compl. ¶¶ 33-39); Counts II and III are brought on

behalf of the two California-resident plaintiffs (Drs. Levine and Fallenbaum) and seek recovery

for alleged violations of Cal. Bus. & Prof. Code § 17200 and § 17500, respectively.  (Compl.

¶¶ 40-53).  Plaintiffs purport to bring their action on behalf of a class and/or certain subclasses.

(*Id.* ¶¶ 31-33).

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

---

[8]      The amended complaint in the *Levine* matter also named Ellen Strot, Nicholas Gallo,
Frank Summers, and Ghislaine Boulanger as plaintiffs; none of them is a named plaintiff in the
Consolidated Complaint.

complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  As the Supreme Court has explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal alteration omitted).[9]

Furthermore, under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud … , a party must state with particularity the circumstances constituting fraud or mistake."  A plaintiff cannot circumvent this heightened pleading standard by couching allegations of fraud under a different legal theory, as plaintiffs (who have now dropped their count *denominated* "fraud" in the Consolidated Complaint) have done in this case: "[I]t is allegations of fraud, not claims of fraud, to which Rule 9(b) applies." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, __ F.3d __, No. 10-1686, 2011 WL 183163, at *10 (7th Cir. Jan. 21, 2011). Accordingly, the particularity requirement applies where, as here, plaintiffs assert allegations of fraud in support of unjust enrichment claims or alleged violations of state-law unfair trade provisions.[10]  And, under the Rule 9(b) standard, plaintiffs' claims must be dismissed unless they

---

[9]     All factual allegations are assumed to be true and all reasonable inferences are drawn in the plaintiff's favor, but the Court need not accept either inferences "unsupported by the facts set out in the complaint" or "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor must the Court accept factual allegations refuted by documents cited in the complaint. *See, e.g.*, *Oryszak v. Sullivan*, 565 F. Supp. 2d 14, 21-22 (D.D.C. 2008).

[10]     *See, e.g., Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997) (claims under District of Columbia Consumer Protection Procedures Act must be pled with particularity); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust.*, __ F.3d __, 2011 WL 183163, at *9 (applying Rule 9(b) to unjust enrichment claim predicated on allegations of fraud); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (Rule 9(b) applies to claims under California Unfair Competition Law where plaintiffs "allege[] a unified fraudulent course of conduct," such as "nondisclosure," and their "claims . . . are [therefore] grounded in fraud");

"state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278 (internal quotation marks omitted).

## ARGUMENT

**I.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS FORECLOSED BY THE PARTIES' MEMBERSHIP CONTRACTS AND BY PLAINTIFFS' FAILURE TO ALLEGE ANY FACTS SUPPORTING A REASONABLE INFERENCE OF UNJUST ENRICHMENT**

Plaintiffs' unjust enrichment claim must be dismissed because it suffers from three dispositive defects. *First*, it impermissibly seeks recovery under equitable *quasi*-contract principles of unjust enrichment where an actual contract already governs the parties' relationship and the full extent of the parties' respective obligations. *See infra* Part I.A. *Second*, on the face of plaintiffs' allegations, it is plaintiffs and the putative class they purport to represent—not APA or APAPO—that received the benefit of the Practice Assessment. There is no unjust enrichment here. *See infra* Part I.B. *Third*, plaintiffs' claim fails because—though based on the theory that APA and APAPO "caused Plaintiffs … to pay additional monies that were not mandatory" through culpable "representations and/or misleading statements," (Compl. ¶ 36)—the conclusory allegations of the Complaint fail to identify a single representation or statement that is inconsistent with the truth. *See infra* Part I.C.[11]

---

*Global Tech. & Trading, Inc. v. Satyam Computer Servs Ltd.*, No. 09-cv-5111, 2011 WL 308162, at *3 (N.D. Ill. Jan. 28, 2011) ("Plaintiffs' unjust enrichment claim is insufficiently pled under the heightened requirements of Rule 9(b)."); *Francis v. Mead Johnson & Co.*, No. 10-cv-701, 2010 WL 5313540, at *3 (D. Colo. Dec. 17, 2010) ("Plaintiff's [Colorado Consumer Protection Act] and unjust enrichment claims are also subject to the heightened pleading standards of Rule 9(b)."); *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) ("[P]laintiff's claim of … unjust enrichment … is also premised on fraud, and is subject to Rule 9(b).").

[11]     At this stage, the Court need not engage in a choice-of-law analysis with respect to the unjust enrichment claim; with respect to the dispositive issues and potential jurisdictions implicated by this motion on that claim, "the laws of the different jurisdictions are identical or

### A.   The Plaintiffs' Membership Contract With APA Precludes Plaintiffs' Unjust Enrichment Claim

Count I is squarely foreclosed by the District of Columbia Court of Appeals' decision in *Schiff v. American Association of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997).  The relationship between a membership organization (such as APA or APAPO) and its members (such as plaintiffs) is governed by contract.  When an agreement governs the subject matter of a dispute, that agreement defines the plaintiff's rights.  A plaintiff may not obtain extra-contractual remedies through a claim for unjust enrichment.  As the D.C. Court of Appeals held in *Schiff*, unjust enrichment claims by a member against her association must be dismissed because "there can be no claim for unjust enrichment when an express contract exists between the parties."  697 A.2d at 1194.[12]

---

would produce the identical result on the facts presented."  *USA Waste of Maryland, Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008).  The named plaintiffs are from Tennessee and California. (Compl. ¶¶ 10-12).  Under Tennessee and California law, as under District of Columbia law, a claim for unjust enrichment fails if (1) a contract governs the parties' relationship or (2) the defendant does not retain the benefit conferred by the plaintiff.  *See Doe v. HCA Health Servs of Tenn., Inc.*, 46 S.W.3d 191, 198 (Tenn. 2001) (unjust enrichment not available when there is an "existing, enforceable contract between the parties covering the same subject matter"; requiring showing that "it would be unjust for a party to retain the goods or services without payment"); *Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 323 (App. 2008) (holding that unjust enrichment claim requires "retention of the benefit"); *Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.*, 51 Cal. Rptr. 2d 622, 628 (App. 1996) (holding claim fails "where there exists between the parties a valid express contract covering the same subject matter").  Some California courts refuse to recognize a cause of action for unjust enrichment at all, which would be an additional ground to dismiss Count I as to Drs. Levine and Fallenbaum, if California law were to apply to them.  *See, e.g.*, *Levine v. Blue Shield of Cal.*, 117 Cal. Rptr. 3d 262, 278 (App. 2010) ("Although some California courts have suggested the existence of a separate cause of action for … unjust enrichment, this court has recently held that '[t]here is no cause of action in California for unjust enrichment.'" (alteration in original; citation omitted)).

[12]      *See Harrington v. Trotman*, 983 A.2d 342, 346 (D.C. 2009) ("[The duty to pay restitution for one's unjust enrichment] is an obligation which the law creates, *in the absence of any agreement*, when and because [the acts] of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it." (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63-64 (D.C. 2005)) (alterations and emphasis in *Harrington*));

"It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members, since the continuing relationship between the organization and its members manifests an implicit agreement by all parties concerned to abide by the bylaws." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005) (citations omitted); *see also Schiff*, 697 A.2d at 1194 & n.2 (membership in a non-profit organization constitutes a contract between the organization and its member and forecloses unjust enrichment claim); *Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973) (in order to claim a remedy for unjust enrichment, there must be *no* contract, "either express or implied in fact"), *cited in Schiff*, 697 A.2d at 1194 n.2.  Thus, here, the Bylaws and Rules of APA and APAPO constitute a valid and express contract that governs the parties' relationship. *See supra* pp.7-8; Exhibits B, C, D.

Applying these principles, in *Schiff*, the D.C. Court of Appeals affirmed a trial court's dismissal of a claim for unjust enrichment under circumstances that are indistinguishable from those presented here.  697 A.2d 1193.  In *Schiff*, as here, a member of a non-profit organization—there, the American Association of Retired Persons ("AARP")—brought a claim for unjust enrichment on behalf of a putative class of certain members of the organization.  *Id.* at 1194-1195.  There, as here, the plaintiff alleged that the organization had misrepresented certain facts about certain activities in which the organization had engaged.  *Id.*  The D.C. Court of

---

*Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996) (noting the "the well-established proposition that where the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties."); *4934, Inc. v. District of Columbia Dep't of Employment Servs*, 605 A.2d 50, 55 (D.C. 1992) ("From the beginning a quasi-contract has been openly acknowledged to be a '[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract.…'" (quoting Black's Law Dictionary 324 (6th ed. 1990)) (alterations in original)); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 51 (D.D.C. 2003) (finding no unjust enrichment where benefits were paid "merely pursuant to a contractual relationship or other legal obligation.").

Appeals affirmed the dismissal of plaintiff's unjust enrichment claim. *Id.* at 1194. In doing so, the Court of Appeals relied specifically on the rule that "there can be no claim for unjust enrichment when an express contract exists between the parties," and on the fact that "Schiff's AARP membership" constituted an "express contract between Schiff and AARP." *Id.* at 1194 & n.2. Plaintiffs' memberships in APA and APAPO are indistinguishable from Schiff's membership in AARP. Thus, the *Schiff* decision squarely forecloses an unjust enrichment claim in this case.

If anything, dismissal is even more clearly warranted here than in *Schiff*. In *Schiff*, "'the existence of an[] express contract[] ha[d] not been alleged' in [plaintiff's] complaint." 697 A.2d at 1194 n.2. In this case, by contrast, plaintiffs' early pleadings expressly recognized that the parties' relationships are governed by actual contracts. In the First Amended Complaint filed in the *Levine* action, plaintiffs characterized their membership in APA as "annual membership contracts." (First Am. Class Action Complaint at ¶ 4, ECF No. 2). Furthermore, in both the original and the First Amended Complaint, the *Levine* plaintiffs alleged that a question common to the purported class was "[w]hether Defendants breached their contracts[.]" (*Id.* ¶ 30; *see also* Class Action Complaint at ¶ 19, ECF No. 1 ¶ 19 (same)).

The parties' relationship is governed by a valid agreement whose terms are set forth in the APA and APAPO Bylaws and Rules. Accordingly, this Court should dismiss plaintiffs' *quasi*-contract unjust enrichment claim.

### B. Plaintiffs Fail To Allege Any Facts Suggesting That APA Or APAPO Retained The Benefit Of The Practice Assessment

Even if the parties' membership contracts did not foreclose plaintiffs' unjust enrichment claim as a matter of law, plaintiffs have not pled facts sufficient to support a reasonable inference of unjust enrichment. *See Iqbal*, 129 S. Ct. at 1949. "Unjust enrichment occurs when: (1) the

plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C. 2005).  As the D.C. Circuit has recognized, "it is not enough for … plaintiff[s] to prove merely that [they] ha[ve] conferred an advantage upon the defendant, but [they] must demonstrate that *retention* of the benefit *without compensating* the one who conferred it is unjustified." *Bloomgarden*,  479 F.2d at 211 (emphases added).

Here, plaintiffs allege no facts to support an inference that APA or APAPO "retains the benefit" of the Practice Assessment "without compensating" the practitioners who paid that assessment—much less that they did so unjustly. *Id.*  Plaintiffs plead no facts suggesting that any portion of the Practice Assessment moneys collected is not utilized in good faith in furtherance of APAPO's purpose of advancing the professional interests of the plaintiffs and other professional psychologists.  Therefore, plaintiffs fail to plead facts plausibly suggesting that APA or APAPO improperly retain any benefit from the collection of the Practice Assessment.  To the contrary, plaintiffs themselves acknowledge that APAPO's mission is to "conduct[] professional advocacy and lobbying *on behalf of [its] members*," (*see*  Compl. ¶ 3 (emphasis added)), and do not deny that APAPO's advocacy has, in fact, conferred significant benefits on those who, like themselves, practice psychology.  On the face of plaintiffs' own pleadings, it is therefore plaintiffs who, as practitioners of psychology, benefitted from APAPO's advocacy and from the Practice Assessment payments that fund APAPO's work.  Thus, not only is there no basis to allege that APA and APAPO have been unjustly "enriched" by the Practice Assessment; it is *plaintiffs* who would gratuitously benefit if, after receiving the benefits of APAPO's advocacy for many years, they obtained a refund, leaving the full burden of supporting APAPO's work on other beneficiaries.

### C.        Plaintiffs Fail To Point To Any Misstatements By APA Or APAPO

Plaintiffs also plead no *facts* whatsoever—much less with the particularity required under Rule 9(b)—making plausible their conclusory allegations that APA's and APAPO's statements were somehow misleading.

*First*, there is no factual support in the Consolidated Complaint for plaintiffs' conclusory contention that APA misrepresented the Practice Assessment as "mandatory" when, instead, APA allegedly viewed payment as "voluntary."  (*See* Compl. ¶¶ 4, 19, 20, 22, 27, 30, 52).  Only plaintiffs have ever made statements indicating that the Practice Assessment was "voluntary." (*Id.*)  At no point do plaintiffs cite any communication or manifestation in which APA or APAPO suggested that they viewed the Practice Assessment as "voluntary."   (*Compare* Compl. ¶¶ 4, 19, 20, 22, 27, 30, 52).[13]  To the contrary, all the APA and APAPO statements mentioned in the Complaint make clear that "licensed providers are expected to pay the assessment."  (*E.g.*, Compl. ¶ 27).  Plaintiffs' contention that APA considered the Practice Assessment to be "voluntary" is thus wholly unsupported by *factual* allegations.

*Second*, to the extent plaintiffs allege that APA and APAPO have falsely stated that non-payment of the Practice Assessment would result in termination of membership in APA, they fail to cite even a single communication to membership that actually says this.  Lacking such a communication, plaintiffs contend instead that APA and APAPO made statements that *implied* that expulsion would result.  In support of this contention, plaintiffs point to:

- APA dues statements stating that certain members of the APA "must pay" the Practice Assessment (Compl. ¶ 16), or that the Assessment is "required" (*id.* ¶¶ 25, 26);

---

[13]        As explained above, plaintiffs' use of quotation marks around the word "voluntary" misleadingly suggests that it was found in a statement made by APA or APAPO.  But plaintiffs cite no such statement.  *See supra* note 5.

- Statements on APA's website stating practitioner members "will be billed," (*id.* ¶ 18) or "must pay," (*id.* ¶ 17) the Assessment; and

- Statements published by the APA in 2010 stating members "were billed," (*id.* ¶ 19), were "expected to pay" (*id.*), or do "pay," (*id.* ¶ 20) the Assessment. [14]

But it is simply *not* misleading to describe a professional obligation as "required" or something that "must" be done, even if expulsion is not the consequence of failing to fulfill it.  To the contrary, the plain meaning of the statements at issue and the broader context of APA's and APAPO's relationships with their members, are entirely consistent with the professional obligation APA and APAPO imposed.[15]

      1.   <u>Plain Meaning</u>.   The language employed by APA to communicate its members' obligation to support APAPO—*i.e.*, the phrase "must pay," (*e.g.*, Compl. ¶¶ 16, 17)—is entirely consistent with an obligation to pay that would not result in termination of APA membership. The word "must" denotes an obligation or command, but not necessarily one backed by specific sanctions.  One leading dictionary, for example, defines the verb "must" as follows:

> 1a: is commanded or requested to (you must stop that noise)…[;]
> b: is urged to; ought by all means to (you must read that book)…[;]
>
> 2: is compelled by physical necessity to (man must eat to live); is required by immediate or future need or purpose to (we must hurry if we want to catch the bus) (must you take all that luggage along) (if you wish to see it you must queue—Leslie Eytle)

---

[14]    Inexplicably, and contrary to their fraud theory, plaintiffs also seem to contend that APA's statements (1) that the Assessment is "mandatory … but not [required] for APA membership," (*id.* ¶ 23), and (2) that members "are billed the [P]ractice [A]ssessment … but non-payment … will not affect … APA membership status," (*id.* ¶ 27), are misleading.

[15]    Any inference that the statements in question constituted a threat of termination from APA membership is particularly unreasonable in the context of the Bylaws and Rules governing membership, which do not include a failure to pay the Practice Assessment as one of the enumerated grounds for termination of APA membership and which APA members are assumed to know.  *See supra* pp.7-8; *Curtis v. Gordon*, 980 A.2d 1238, 1244 (D.C. 2009) ("'Generally, one who assents to a writing is presumed to know its contents[.]'") (quoting Restatement (Second) of Contracts § 157, cmt. b)).

> 3: is obliged to; is compelled by social considerations to (I must
> say you're looking much better)[;]
>
> 4: is required by law, custom, or moral conscience to (we must
> obey the rules) (you must respect your father's wishes) ….

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1492 (2002).  As these definitions make clear, the verb "must" can (and often does) properly reflect a command that is grounded exclusively in "social," "custom[ary]," or "moral" obligations, as well as a party's mere "urg[ing]" of another.  *Id.*  The consequences, if any, that attach are a separate consideration.  Here, APA expects its members to pay the Practice Assessment and views doing so as an aspect of members' professional responsibility as practicing psychologists, *see supra*.  There was no fraud in conveying that expectation by telling those members that they "must" pay the Practice Assessment.

Indeed, it is commonplace even for statutes to use "must" or "shall" without imposing a sanction for non-compliance.  Although such words convey an obligation, direction, or command, alone they do not necessarily entail information about the *consequences*, if any, of disobeying.  In the administrative law context, for example, the Supreme Court has considered whether a provision mandating that "the Secretary of Labor 'shall' issue a final determination as to the misuse of [certain federal] funds by a grant recipient within 120 days after receiving a complaint alleging such misuse" implied, as a consequence, that "the Secretary loses the power to recover [those] misused … funds [from the recipient] after that 120-day period has expired." *Brock v. Pierce County*, 476 U.S. 253, 254-255 (1986).  The Supreme Court declined to imply such a consequence, unanimously holding that—absent congressional intent to the contrary— "the mere use of the word 'shall' in [that provision], standing alone, is not enough to remove the Secretary's power to act after [expiration of the deadline]." *Id.* at 262.  In reaching this conclusion, the Court relied on "precedent in the Courts of Appeals to the effect that Government

- 20 -

agencies do not lose jurisdiction for failure to comply with statutory time limits unless the statute '*both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision.'"  *Id.* at 259 (citations omitted) (emphasis in original); *National Cable Television Ass'n., Inc. v. Copyright Royalty Tribunal*, 724 F.2d 176, 189 n.23 (D.C. Cir. 1983) (requirement that a tribunal "shall" render a decision within one year does not make later decision void).  There is therefore nothing "misleading" about omission of a consequence.

Similarly, this Court has interpreted an agency regulation to the effect that the agency "'*promptly shall* issue a written notice of the imposition of the monetary penalty to that person'" nevertheless to permit an agency action to proceed, "even where [the agency] has been less than prompt in issuing a penalty notice."  *OFAC v. Voices in the Wilderness*, 329 F. Supp. 2d 71, 78, 80 (D.D.C. 2004) (Bates, J.) (emphasis in original).  In so holding, this Court expressly relied on the fact that "the Regulations [do not] specify any consequences in the event that OFAC fails to act promptly."  *Id.* at 80.  The Court did not suggest that the statute in this respect was misleading.  Instead, the Court found properly that where no sanction was stated, the statute should be understood as imposing an obligation for which there was no direct sanction.

2.      Assessments Imposed By Social Organizations May Be "Mandatory" Without Resulting In Expulsion.  Precedent analyzing assessments levied by social clubs further confirms that there is nothing misleading about a voluntary association's decision to declare an assessment "mandatory" and enforce that mandate through the power of social compulsion or expectation, rather than expulsion.  Several decisions addressing the taxability of clubs' assessments underscore the soundness of this enforcement mechanism.  Under a tax statute in force between 1928 and 1965, Congress made taxable any assessment imposed by a social club on its

membership. *See* 26 U.S.C. §§ 4241-4242 (1964) (as amended and recodified by Internal Revenue Code of 1954, Pub. L. No. 83-591, ch. 736, 68A Stat. 501; repealed by Pub. L. No. 89-44, Title III, § 301, 79 Stat. 145 (June 21, 1965)). In interpreting this statute, courts were repeatedly confronted with the question whether special fees imposed by social clubs in addition to their ordinary membership dues were mandatory, and therefore taxable as "assessments" under the statute. In the leading decision on this point, the Second Circuit held that a social club's special-purpose assessment "for an amount over and the above the regularly collected dues" was properly considered mandatory as a matter of law. *City Athletic Club v. United States*, 242 F.2d 43, 43 (2d Cir. 1957). Tellingly, the assessment in question in that case was, similarly to the Practice Assessment, "billed to the members without the usual reference to suspension for nonpayment of indebtedness" and enforced only by "social or moral" compulsion. *Id.* at 43, 44. In reaching this holding, the court reasoned:

> It is the effective call for a definite contribution or payment from the members which should be held to characterize an assessment, as distinguished from a voluntary contribution or gift. Even a somewhat irregular and sporadic response to such a call … would not establish the voluntary character of the payments by the paying portion of the membership so as to make them not payments of assessments and so not taxable. *Such a call always carries with it some degree of compulsion, even if it be social or moral rather than legal.* The remarkably fine response in the case at bar is a good example of how effective such sanctions can be.

*Id.* at 44 (emphasis added).[16]

---

[16]   After *City Athletic Club* was decided, district courts adhered to its reasoning, even outside the Second Circuit. *See Louisville Country Club, Inc. v. Gray*, 178 F. Supp. 915, 916 (W.D. Ky. 1959), *aff'd*, 285 F.2d 532 (6th Cir. 1960) (rejecting a club's contention that "since it admittedly had no legal right under Kentucky law to levy an assessment and enforce its collection, payments made by the members, and no member refused to pay, were voluntary contributions or gifts and not taxable as 'dues'"); *The Benedicts v. United States*, 234 F. Supp. 1, 3 (W.D.N.C. 1964) ("That the 'advance' may not have been legally enforceable or that the by-laws specified no sanction to compel payment, such as suspension of membership in the club, would not necessarily make the payments voluntary from the standpoint of federal excise tax on

As this decision illustrates, an assessment made mandatory through expectation or professional obligation is nevertheless mandatory. There is nothing false or misleading about an association informing its members of their obligation, and characterizing it as something "required" or as something that they "must" do. Nor must they expel those who do not pay it. Payment of such assessments may be made an obligation of members without being a condition of membership.

II.    **APA'S AND APAPO'S CONDUCT IS CATEGORICALLY EXEMPT UNDER THE DISTRICT OF COLUMBIA STATUTE THAT GOVERNS PLAINTIFFS' CLAIMS AND, IN ANY EVENT, PLAINTIFFS HAVE FAILED TO STATE A CAUSE OF ACTION UNDER THE CALIFORNIA STATUTES**

A.    **District Of Columbia Law Governs Plaintiffs' Statutory Claims**

On behalf of two of the three plaintiffs, the Complaint also purports to assert claims under the California False Advertising and Unfair Competition Laws, Cal. Bus. & Prof. Code §§ 17200 and 17500 (Counts II and III). Contrary to plaintiffs' suggestion, however, applicable choice-of-law principles dictate that District of Columbia law, not California law, governs plaintiffs' statutory claims.

Because the Court's jurisdiction is based on diversity, the choice-of-law principles of the forum jurisdiction—here, the District of Columbia—determine which substantive law governs plaintiffs' claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For claims sounding in tort, the District of Columbia employs "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Moore v. Ronald Hsu Constr. Co.*, 576 A.2d 734, 737 (D.C. 1990) (internal quotations omitted). Accordingly, District of Columbia courts "evaluate the governmental policies

---

'dues.' The members were at least under a moral or social compulsion to make the payments." (citing *City Athletic Club*, 242 F.2d 43)).

underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995); *see also Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989).

"As part of this analysis, [D.C. Courts] also consider the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145: a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered." *Coleman*, 667 A.2d at 816.  Where, as here, plaintiff's case turns on allegations of "fraudulent misrepresentations," "'the place of injury is less significant' than 'in the case of personal injuries and of injuries to tangible things.'" *Washkoviak v. Student Loan Mktg Ass'n*, 900 A.2d 168, 181-182 (D.C. 2006) (citing Restatement (Second) of Conflict of Laws § 145 cmt. f).

Here, APA and APAPO are both Washington, D.C. non-profit corporations.  (Compl. ¶¶ 2, 3, 13).  The Consolidated Complaint acknowledges that they are "located in th[e] District"; that they are "citizens of … th[e] District"; that the "principal places of [their] business [are] in Washington, D.C."; and that "significant events giving rise to this case took place in th[e] District."  (Compl. ¶¶ 9, 13).  Furthermore, this Court has recognized that "[t]he District of Columbia, with its interest in protecting consumers and promoting fair business practices by corporate entities headquartered within the city limits, has the most significant relationship[.]" *Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 148 (D.D.C. 2007).

By contrast, plaintiffs have alleged no facts other than the residence of two of the three named plaintiffs suggesting *any* relation to California.  None of the statements is alleged to have

been targeted at California recipients; instead, the communications were national (or perhaps global) and emanated from a Washington, D.C. organization.  And, in any event, the place of the injury is a secondary consideration at best in fraud and misrepresentation claims.  *Washkoviak*, 900 A.2d at 181-182.

Thus, the District of Columbia has the most significant governmental interest and its law provides the substantive provisions governing plaintiffs' statutory claims.  *Coleman*, 667 A.2d at 816.  Accordingly, the California statute has no application here, and Counts II and III must be dismissed.

**B.      APA's And APAPO's Activities At Issue Here Are Categorically Exempt From The District Of Columbia Consumer Protection Procedures Act**

Plaintiffs do not plead a cause of action under the governing District of Columbia statute—presumably because they know that APA's and APAPO's billing and collection of the Practice Assessment are exempt from claims under the District of Columbia Consumer Protection Procedures Act ("CPPA").  Indeed, the CPPA does not apply to (1) activities related to "membership" in a non-profit organization and (2) a non-profit organization's "membership services."  D.C. Code § 28-3905(k)(5).

The CPPA applies only to "merchants."  *See Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 708-709 (D.C. 1981).  Before 2007, the D.C. Court of Appeals held that a nonprofit organization such as APA or APAPO, (Compl. ¶¶ 2, 4), *never* qualified as a "merchant" under the statute.  *See Schiff*, 697 A.2d at 1196-1197; *Save Imaculata/Dunblane, Inc. v. Imaculata Preparatory Sch.*, 514 A.2d 1152 (D.C. 1986).  In 2007, the D.C. Council amended the definition of "merchant" to apply to a business "whether organized or operating for profit or for a nonprofit purpose." Nonprofit Organizations Oversight Improvement Amendment of 2007, D.C. Act No. 17-33, 54 D.C. Reg. 4085 (May 4, 2007) (effective June 12, 2007) (hereinafter "2007 Amendment").  But

the 2007 Amendment also specifically limited the scope of the CPPA's applicability to non-

profits.  It provided that a suit against a

> nonprofit organization shall not be based on *membership in such
> organization*, *membership services*, training or credentialing
> activities, sale of publications of the nonprofit organization,
> medical or legal malpractice, or any other transaction, interaction,
> or dispute not arising from the purchase or sale of consumer goods
> or services in the ordinary course of business.

D.C. Code § 28-3905(k)(5) (emphasis added).  In other words, the applicability of the CPPA to

non-profit organizations has received specific legislative attention, and the D.C. Council has

unequivocally determined that non-profits may not be subject to suit under the CPPA except for

sales activities to third parties in the ordinary course of business.  *Id.*  A non-profit cannot be

sued under the D.C. statute for other activities, including membership-related activities and

membership services.  *Id.*

  The billing and collection of the Practice Assessment does not constitute the "purchase or

sale of consumer goods or services in the ordinary course of business."  D.C. Code § 28-

3905(k)(5).  Rather, it is part and parcel of the panoply of obligations and benefits that come

with membership in APA and APAPO.  It is, in short, a quintessential "membership service" or

"membership"-related activity that is categorically exempt from the CPPA.

  **C.**  **In Any Event, Plaintiffs' Allegations Do Not State A Cause Of Action Under
The California Statutes[17]**

  For the reasons discussed above, District of Columbia law governs—and forecloses—

plaintiffs' statutory claims.  But even if one assumed *arguendo* that California law applied,

---

[17]  Because these provisions are "equitable in nature" and "damages cannot be recovered,"
*Korea Supply Co. v. Lockheed Martin Co.*, 63 P.3d 937, 943 (Cal. 2003), plaintiffs' potential
remedies under these provisions are limited to "injunctive relief and restitution.'"  *Id.* (quoting
*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.*, 973 P.2d 527, 539 (Cal. 1999)).
Accordingly, even if they had pled a viable cause of action, plaintiffs' request for punitive
damages must be struck.  *See* Fed. R. Civ. P. 12(f).

plaintiffs would still fail to state a claim under the California unfair competition and false advertising statutes, Cal. Bus. & Prof. Code §§ 17200, 17500.  In Count II, plaintiffs assert a violation of Section 17200, which prohibits "three varieties" of practices: those that are (1) fraudulent, (2) unfair, or (3) unlawful, respectively.  *Daugherty v. American Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 128 (App. 2006).  In Count III, plaintiffs allege a violation of Section 17500, which prohibits "untrue or misleading" advertising.  Because California courts apply the same legal standard to claims brought under the "fraudulent business act or practice" prong of § 17200 and claims brought under § 17500, they are discussed together below.  *See, e.g.*, *Lavie v. Procter & Gamble Co*., 129 Cal. Rptr. 2d 486, 498 (App. 2003).

Plaintiffs have not stated a viable cause of action under any of the three varieties of practices covered by §§ 17200 or 17500.  *First*, plaintiffs' claim that licensed practitioner members were somehow fraudulently misled by the APA's and APAPO's statements—a theory applicable to both the "fraudulent business act or practice" prong of Count II and to Count III— fails for the reasons set forth below in Part II.C.1.  *Second*, plaintiffs' assertions that APA's and APAPO's conduct was somehow anti-competitive or unfair—the theory required to plead a claim under the "unfair business act or practice" of § 17200 (Count II)—fails for the reasons discussed below in Part II.C.2.  *Third*, as discussed below in Part II.C.3, plaintiffs have also alleged no facts to support a violation of § 17200 (Count II) on the theory that APA or APAPO somehow did something "unlawful."  Thus, for the reasons discussed below, even if the California statutes governed—and, as explained above, they do not—Counts II and III must be dismissed.

1.   *Plaintiffs Fail To State A Claim Under The "Fraudulent Business Act Or Practice" Prong Of § 17200 (Count II) Or Under § 17500 (Count III)*

In Count II, plaintiffs claim that APA and APAPO engaged in a "fraudulent business act or practice" because their collection and characterization of the Practice Assessment "was likely to deceive, and did in fact deceive, Plaintiffs and members of the Class." (Compl. ¶ 44). Similarly, in Count III, plaintiffs contend that APA and APAPO made statements "that were untrue or misleading." (*Id.* ¶ 50). Both counts fail unless plaintiffs can show that "members of the public are likely to be deceived." *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983), *superseded by statute on another point as stated in Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207, 209-210 (Cal. 2006). This requires much more than pleading conclusory allegations of fraud.

*First*, "'likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie*, 129 Cal. Rptr. 2d at 495.

*Second*, plaintiffs must plead facts to show that "a significant portion" of the sophisticated group subject to the Practice Assessment—all licensed psychologists with graduate degrees and many with an established practice—were "probabl[y]" misled, *Lavie*, 129 Cal. Rptr. 2d at 495. *See id.* at 498 ("Where the advertising or practice is targeted to a particular group or type of consumers, either more sophisticated or less sophisticated than the ordinary consumer, the question whether it is misleading to the public will be viewed from the vantage point of members of the targeted group, not others to whom it is not primarily directed.").

*Third*, as noted elsewhere, plaintiffs must meet this standard under the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Kearns*, 567 F.3d at 1127 (Rule 9(b) applies to claims under California Unfair Competition Law where plaintiffs "allege[] a unified fraudulent course of conduct" and their "claims … are [therefore] grounded in fraud").

For the reasons previously discussed, APA's statements that its members "must pay" the Practice Assessment—or that payment of the Practice Assessment was "required"—was an entirely proper communication regarding a professional obligation APA in fact imposed on its members.  *See supra* Part I.C.  Plaintiffs have not pled, with particularity or otherwise, facts supporting a plausible inference that a "significant portion" of licensed psychologists were somehow deceived in any way by an APA statement or publication.  *Lavie*, 129 Cal. Rptr. 2d at 495.

> **2.   *Plaintiffs Fail To State A Claim Under The "Unfair Business Act Or Practice" Prong Of § 17200 (Count II)***

Even if California law applied here—and it does not—plaintiffs also fail to state a claim under the "unfair business act or practice" prong of § 17200.  Plaintiffs assert that APA's and APAPO's conduct was "an unfair business act or practice because the practice was unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous" and because "whatever utility could be associated with Defendants' conduct is [outweighed] by the gravity of the consequences to Plaintiff and other Class members."  (Compl. ¶¶ 41, 42).  But plaintiffs' allegations merely recite—essentially *verbatim*—"the[] definitions" of "unfair[ness]" that the California Supreme Court has roundly criticized for being "too amorphous and provid[ing] too little guidance to courts and businesses."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 543 (Cal. 1999).

Thus, in *Cel-Tech*, the California Supreme Court adopted a "more precise test" whereby "the word 'unfair' in [§ 17200] means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 973 P.2d at 543, 544.  And while the *Cel-Tech* court applied the new definition specifically in the context of actions brought by competitors, *id.* at 544 n.12, several lower California courts have applied the *Cel-Tech* competition-based test in consumer cases as well. *See, e.g.*, *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 696 (App. 2010); *Byars v. SCME Mortg. Bankers, Inc.*, 135 Cal. Rptr. 2d 796, 804-805 (App. 2003).  Under the *Cel-Tech* test, plaintiffs fail to state a claim because they allege absolutely no conduct having any effect on competition.

Furthermore, even if the *Cel-Tech* test did not apply, plaintiffs nevertheless fail to state a claim under the "unfair" prong of § 17200 because it is predicated on the same flawed allegations of misrepresentation discussed in detail above.  *See supra* Parts I.C, II.C.1.  Plaintiffs have not pled, much less with Rule 9(b) particularity, that APA's directive to its licensed practitioner members to support advocacy of matters of interest to the profession was somehow "unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous."

### 3. Plaintiffs Fail To State A Claim Under The "Unlawful Business Act Or Practice" Prong Of § 17200 (Count II)

Finally, even if California law applied here, plaintiffs also fail to state a claim under the "unlawful business act or practice" prong of § 17200, which "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices

independently actionable under [S]ection 17200." *Farmers Ins. Exch. v. Superior Court*, 826

P.2d 730, 734 (Cal. 1992).

Plaintiffs conclusorily assert that the Practice Assessment was somehow unlawful

"because it was part of a subterfuge to defeat the restrictions on lobbying and lobbying fund

raising for a 501(c)(3) organization like APA in violation of the Internal Revenue Code."

(Compl. ¶ 43).  But plaintiffs do not articulate any actual violation of federal tax law, nor the

facts to establish one.  *See* HOPKINS, THE LAW OF TAX-EXEMPT ORGANIZATIONS 997-998 (9th

ed. 2007).  Plaintiffs do not allege, for example, that APA ever spent any of its funds on

activities that were not permitted by § 501(c)(3) or that APAPO ever violated §501(c)(6).

Plaintiffs' vague contention that APA and APAPO in any way violated the Internal Revenue

Code is unsupported by any allegations of fact and baseless as a matter of law.[18]

III.  **PLAINTIFFS ARE NOT ENTITLED TO A JURY TRIAL ON ANY OF THEIR CLAIMS AND THEIR REQUEST FOR A JURY TRIAL SHOULD BE STRICKEN**

APA and APAPO respectfully submit that, for all the reasons above, plaintiffs' claims

should be dismissed.  But, if this Court were to conclude otherwise, it should strike plaintiffs'

---

[18]     Furthermore, to the extent that plaintiffs purport to enforce the Internal Revenue Code through a private cause of action under California state law, they lack standing and their attempt would be preempted under the Supremacy Clause.  U.S. Const. art. VI, cl. 2.  *See* 26 U.S.C. § 7401 ("No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced.").  *Cf. United States ex rel. U.S.-Namibia (Sw. Africa) Trade & Cultural Council, Inc. v. Africa Fund*, 588 F. Supp. 1350, 1351 (S.D.N.Y. 1984) (26 U.S.C. § 7401 bars *qui tam* action challenging a party's tax-exempt status); *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 852 (9th Cir.), *amended*, 387 F.3d 966 (9th Cir. 2004) (California's claim that energy wholesalers violated § 17200 by failing to comply with their federal tariffs was preempted because it encroached upon the substantive provisions of the tariff, an area in which the Federal Energy Regulatory Commission had exclusive authority both to enforce and to seek remedies); *Perez v. Nidek Co.*, 657 F. Supp. 2d 1156, 1166 (S.D. Cal. 2009) (plaintiff's claim under § 17200 preempted because it required the court to determine whether the FDCA was violated, which "should be decided by the FDA"; the court would "not permit Plaintiffs to privately enforce the FDCA and its regulations under the guise of state law claims.").

request for a jury trial.  *See* Fed. R. Civ. P. 39(a)(2).[19]  The Supreme Court has established a two-part test to determine a party's right to a jury trial.  *First*, the cause of action at issue must be compared "to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity."  *Tull v. United States*, 481 U.S. 412, 417 (1987).  *Second*, the Court must "examine the remedy sought and determine whether it is legal or equitable in nature."  *Id.* at 417-418.  Because plaintiffs bring only equitable causes of action, they are not entitled to a jury.

Plaintiffs' unjust enrichment claim (Count I) does not meet the first prong of the test because it "has its roots in the common law concept of *quasi-contract*[, whereby] … the *courts*, in the absence of an actual contract, nevertheless imposed a duty … under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment."  *4934, Inc. v. District of Columbia Dep't of Employment Servs*, 605 A.2d 50, 55 (D.C. 1992) (internal quotation marks and citation omitted) (emphasis added).  Furthermore, plaintiffs do not purport to seek any *legal* remedy in connection with their unjust enrichment count; rather, they claim to be "entitled *in equity* to seek restitution and disgorgement from Defendants' wrongful profits." (Compl. ¶ 38 (emphasis added)).   Because these remedies are, by plaintiffs' own admission, grounded "in equity," (*id.*), the second prong of the Seventh Amendment inquiry also forecloses any right to a jury trial on plaintiffs' unjust enrichment count.  *See, e.g.*, *Roberts v. Sears,*

---

[19]     The Seventh Amendment provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved…."  U.S. Const. amend. VII.  The Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'"  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41-42 (1989) (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 434 (1830)).

*Roebuck & Co.*, 617 F.2d 460, 465 (7th Cir. 1980) ("Restitution for the disgorgement of unjust enrichment is an equitable remedy with no right to a trial by jury.").[20]

Similarly, the California statutory provisions invoked by plaintiffs (Counts II and III) provide only for equitable relief, *see* Cal. Bus. & Prof. Code §§ 17203, 17535,[21] and, accordingly, courts have repeatedly concluded that they are not subject to a jury trial. *See Steinberg Moorad & Dunn Inc. v. Dunn*, 136 Fed. Appx. 6, 9 (9th Cir. 2005) (unpublished) ("Statutory unfair competition is an equitable claim under California law, one that does not provide for damages or a jury trial."); *Okura & Co. v. Careau Grp.*, 783 F. Supp. 482, 491 (C.D. Cal. 1991) ("[U]nder section 17200 *et seq.* of the California Business and Professions Code, [the plaintiff] would only be entitled to equitable relief such as an injunction or restitution. Thus, no right of jury trial attaches to that cause of action.").

## CONCLUSION

For the reasons stated above, defendants' motion should be granted.

---

[20]    Plaintiffs' request that the Court impose a "constructive trust," (Compl. ¶ 39), also sounds in equity. "[A] constructive trust is not an independent cause of action." *Macharia v. United States*, 238 F. Supp. 2d 13, 31 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (D.C. Cir. 2003). Rather, it is "a remedy that a *court* devises *after* litigation," *United States v. BCCI Holdings*, 46 F.3d 1185, 1190 (D.C. Cir. 1995) (emphasis added), "to redress the injustice that would otherwise occur when one person has fraudulently or wrongfully obtained the property of another." *United States v. Taylor*, 867 F.2d 700, 703 (D.C. Cir. 1989).

[21]    *See also Bank of the West v. Superior Court*, 833 P.2d 545 (Cal. 1992) ("[D]amages are not available under section 17203."); *Korea Supply Co.*, 63 P.3d at 948 ("[T]he [California Unfair Competition Law] is not an all-purpose substitute for a tort or contract action. Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices") (internal quotation marks and citation omitted); *Colgan v. Leatherman Tool Grp.*, 38 Cal. Rptr. 3d 36, 59 (App. 2006) ("Damages are not available under [§§ 17200 and 17500] because restitution is the only available remedy under those statutes").

Dated:  March 2, 2011

Respectfully submitted,

/s/ David W. Ogden

David W. Ogden (D.C. Bar No. 375951)
Jonathan E. Paikin (D.C. Bar No. 466445)
Francesco Valentini (D.C. Bar No. 986769)
Natalie Hirt Adams (D.C. Bar No. 993439)
WILMER CUTLER PICKERING HALE AND
   DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: david.ogden@wilmerhale.com
*Attorneys for Defendants*