## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In re:  APA Assessment Fee Litigation

ELLEN G. LEVINE, *et al.*,

Plaintiffs,

v.

AMERICAN PSYCHOLOGICAL
ASSOCIATION, INC., *et al.*

Defendants.

Civil Action No. 1:10-CV-01780
(consolidated with Civil Action No. 1:10-CV-01898)

Hon. John D. Bates

---

ERIC S. ENGUM,

Plaintiff,

v.

AMERICAN PSYCHOLOGICAL
ASSOCIATION, INC. *et al.*,

Defendants.

---

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE PLAINTIFFS' REQUEST FOR A JURY TRIAL

Hassan A. Zavareei
Lorenzo B. Cellini
Tycko & Zavareei LLP
2000 L Street N.W., Suite 808
Washington, DC  20036
Telephone:  (202) 973-0900
Facsimile:  (202) 973-0950
hzavareei@tzlegal.com
lcellini@tzlegal.com

Mark J. Tamblyn (*pro hac vice*)
Ian J. Barlow (*pro hac vice*)
Wexler Wallace LLP
455 Capitol Mall, Suite 231
Sacramento, California  95814
Telephone: (916) 492-1100
Facsimile:  (916) 492-1124
mjt@wexlerwallace.com
ijb@wexlerwallace.com

*Co-Lead Counsel For Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………………………iii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND..................................................................................... 3

    I.  THE PARTIES................................................................................................. 3

    II.  DEFENDANTS' MISREPRESENTATIONS THAT THE ASSESSMENT WAS
        MANDATORY.............................................................................................. 4

LEGAL STANDARDS .............................................................................................. 9

ARGUMENT ............................................................................................................ 9

    I.  PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS NOT CONTRACTUALLY
       BARRED BY THE APA'S BYLAWS OR RULES AND IT ADEQUATELY ALLEGES
       THAT DEFENDANTS UNJUSTLY BENEFITTED FROM MISREPRESENTING
       THAT PAYMENT OF THE PRACTICE ASSESSMENT WAS MANDATORY FOR
       APA MEMBERSHIP................................................................................... 9

        A.  A Choice-of-Law Analysis For Plaintiffs' Unjust Enrichment Claim Is Premature
            And, In Any Event, Unnecessary Because The Parties Agree That The Laws Of The
            Different Potential Jurisdictions Are Identical ........................................... 9

        B.  Defendants' Reliance On The APA's Bylaws And Rules In Their Motion To Dismiss
            Is Improper Because These Documents Were Not Referenced In The Complaint. ... 11

        C.  The APA's Bylaws And Rules Do Not Govern The APAPO Practice Assessment
            And, Therefore, Cannot Create A Contractual Bar To Plaintiffs' Unjust Enrichment
            Claim............................................................................................. 12

        D.  Plaintiffs Have Properly Pleaded That They Conferred A Benefit On Defendants ... 18

        E.  Defendants' Statements Were Deceptive And Misleading Because They Represented
            That Payment Of The APAPO Assessment Was Mandatory For Membership In The
            APA When That Was Not True.......................................................... 21

    II.  CALIFORNIA LAW APPLIES AND PLAINTIFFS HAVE ADEQUATELY PLEADED
       VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION AND FALSE
       ADVERTISING LAWS ............................................................................... 23

        A.  California Law Applies To The California Plaintiffs' Statutory Claims.................... 23

1. Plaintiffs Are California Residents Seeking To Represent California Consumers Under California Law And, Therefore, A Choice Of Law Analysis Is Unnecessary ................................................................................................... 23

2. California Law Still Applies Under A Choice-Of Law Analysis Because Application Of California Law Would Substantially Advance California's Policies, Whereas The District Of Columbia's Policies Are Not Impacted ........ 24

B. Plaintiffs Have Properly Alleged Claims Under the UCL and FAL ......................... 28

1. Plaintiffs Have Adequately Pleaded Violations of the UCL's Fraudulent Prong and the FAL ................................................................................................ 29

   a. Plaintiffs' Allegations Satisfy the Applicable Pleading Requirements .......... 29

   b. The Reasonable Consumer Standard Applies to the Fraudulent Prong of the UCL and FAL ............................................................................................ 31

   c. Plaintiffs Have Adequately Pleaded Likelihood of Deception ....................... 33

2. Plaintiffs Have Properly Alleged A Claim Under The Unfair Prong ................... 35

3. Plaintiffs Have Properly Alleged A Claim Under The Unlawful Prong .............. 39

III. IT IS PREMATURE TO DETERMINE WHETHER PLAINTIFFS ARE ENTITLED TO A JURY TRIAL ................................................................................................... 41

CONCLUSION ................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**

*4934, Inc. v. Dist. of Columbia Dept. of Employment Services,*
    605 A.2d 50 (D.C. 1992) .................................................................. 21

*A.J.'s Automotive Sales, Inc. v. Freet,*
    725 N.E.2d 955 (Ind. App. 2000) ................................................... 26

*Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans, Inc.,*
    525 F.3d 8 (D.C. Cir. 2008) ........................................................... 18

*Alexander v. Washington Gas Light Co.,*
    481 F. Supp. 2d 16 (D.D.C. 2006) ................................................. 26

*America Online, Inc. v. Superior Court,*
    90 Cal. App. 4th 1 (2001) .............................................................. 24

*Aral v. Earthlink, Inc.,*
    134 Cal. App. 4th 544 (2005) ........................................................ 24

*Armenian Assembly of Am., Inc. v. Cafesjian,*
    597 F. Supp. 2d 128 (D.D.C. 2009) ................................... 13, 14, 17

*Aron v. U-Haul,*
    143 Cal. App. 4th 796 (2006) .................................................. 32, 34

*Asis Internet Servs.,* Case No. 09-3503 SC,
    2010 U.S. Dist. LEXIS 33645 (N.D. Cal. 2010) ...................... 32, 35

*Baas v. Dollar Tree Stores, Inc.,*
    No. C 07-03108 JSW, 2007 U.S. Dist. LEXIS 65979 (N.D. Cal. 2007) ......... 30

*Bloomgarden v. Coyer,*
    479 F.2d 201 (D.C. Cir. 1973) ...................................................... 19

*BMW of North America, Inc. v. Gore,*
    517 U.S. 559, 116 S.Ct. 1589, L.Ed.2d 809 (1996) ....................... 25

*Brannen v. Natl. R.R. Passenger, Corp.,*
    403 F. Supp. 2d 89 (D.D.C. 2005) ................................................. 26

*Byars v. SCME Mortgage Bankers, Inc.,*
    109 Cal. App. 4th 1134 (2003) ...................................................... 37

*C.B. Snyder Realty Co. v. Natl. Newark & Essex Banking Co.,*
14 N.J. 146 (1953) ........................................................................ 14

*Camacho v. Auto. Club of Southern California,*
142 Cal. App. 4th 1394  (2006) .................................................... 37

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
20 Cal. 4th 163 (1999) ...................................................... 36, 37, 38

*Chavez v. Blue Sky Natural Beverage Co.,*
No. C 06-6609 VRW, 2010 U.S. Dist LEXIS 60554 (N.D. Cal. 2010) .......... 35

*Cirulli v. Hyundai Motor Co.,* No. SACV 08-0854 AG (MLGx),
2009 U.S. Dist. LEXIS 125139 (C.D. Cal. 2009) ............................ 30

*Conley v. Gibson,*
355 U.S. 41 (1957) ......................................................................... 9

*County Com'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.,*
358 Md. 83, 747 A.2d 600 (2000) ............................................... 14

*CRST van Expedited, Inc. v. Werner Enters.,*
479 F.3d 1099 (9th Cir. 2007) ..................................................... 39

*Cureton v. U.S. Marshal Service,*
322 F.Supp.2d 23 (D.D.C. 2004) ................................................ 13

*Doe 1 v. AOL LLC,*
552 F.3d 1077 (9th Cir. 2009) ..................................................... 24

*Dohm & Nelke v. Wilson Foods Corp.,*
531 N.E.2d 512 (Ind.App.1988) ................................................. 26

*Durell v. Sharp Healthcare,*
183 Cal. App. 4th 1350 (2010) .................................................... 37

*Emerine v. Yancey,*
680 A.2d 1380 (D.C. 1996) ......................................................... 14

*Foman v Davis,*
371 U.S. 178 (1962 ...................................................................... 18

*Ghirardo v. Antonioli,*
924 P.2d 996 (1996) .................................................................... 10

*Gibson v. World Sav. And Loan Assn,*
103 Cal. App. 4th 1291(2002) ..................................................... 41

*Godfry v. State Farm Mut. Ins. Co.*,
    No. 08-4813, 2009 U.S. Dist. LEXIS 19123 (E.D. Pa. Mar. 4, 2009)...............................9

*Gowens v. Dyncorp*,
    132 F. Supp. 2d 38 (D.D.C. 2001) .................................................................................12

*Gray v. Universal Serv. Admin. Co.*,
    581 F. Supp. 2d 47 (D.D.C. 2008) ...................................................................................9

*Gutierrez v. Wells Fargo & Co.*,
    622 F. Supp. 2d 946 (N.D. Cal. 2009) ...........................................................................37

*Hartless v. Clorox Co.*,
    No. 06CV2705 JAH(CAB), 2007 U.S. Dist. LEXIS 81686 (S.D. Cal. 2007).................36

*Hodgson v. Man Fin. Inc.*,
    No. 06-1944, 2006 U.S. Dist. LEXIS 94307 (E.D. Pa. 2006) .........................................9

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002), .......................................................................................25

*In re Conagra Peanut Butter Prods. Liab. Litig.*,
    MDL Docket No. 1845 All Cases, 1:07-MD-1845-TWT,
    2008 U.S. Dist. LEXIS 40753 (N.D.Ga. 2008) ..............................................................10

*In re Del-Met Corp.*,
    322 B.R. 781 (Bankr. M.D. Tenn. 2005) ........................................................................17

*In re Grand Theft Auto Video Game Consumer Litig.*,
    251 F.R.D. 139 (S.D.N.Y. 2008) ....................................................................................26

*Infra-Pak (Dallas), Inc. v. Carlson Stapler & Shippers Supply, Inc.*,
    803 F.2d 862 (5th Cir. 1986)...........................................................................................15

*Jaffe v. Bolton*,
    817 S.W.2d 19 (Tenn. App. 1991)...................................................................................14

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ....................................................................................................40

*Keilholtz v. Lennox Hearth Prods. Inc.*,
    268 F.R.D. 330 (N.D. Cal. 2010).....................................................................................23

*Kinetic Co. v. Medtronic, Inc.*,
    672 F. Supp. 2d 933 (D. Minn. 2009)..............................................................................10

*Klein v. Arkoma Prod. Co.*,
    73 F.3d 779 (8th Cir. 1996) .............................................................................................14

*Kowal v. MCI Communs. Corp.,*
   16 F.3d 1271 (D.C. Cir. 1994) ............................................................................ 9

*Kramer Associates, Inc. v. Ikam, Ltd.,*
   888 A.2d 247 (D.C. 2005) ...................................................................... 12, 15

*Kwikset Corp. v. Superior Court,*
   51 Cal. 4th 310 (2011) ..................................................................................... 32

*Lance Camper Mfg Corp. v. Republic Indem. Co. of Amer.,*
   44 Cal. App. 4th 194 (1996) ........................................................................... 14

*Lavie v. Procter & Gamble Co.,*
   105 Cal. App. 4th 496 (2003) ..................................................................... 32, 33

*Lectrodryer v. Seoulbank,*
   77 Cal.App. 4th 723 (2000) ............................................................................ 10

*Lightfoot v. Union Carbide Corp.,*
   110 F.3d 898 (2nd Cir. 1995) ......................................................................... 15

*Long v. Sears Roebuck & Co.,*
   877 F. Supp. 8 (D.D.C. 1995) ........................................................................ 24

*Louisiana Pac. Corp. v. Beazer Materials & Servs.,*
   811 F. Supp. 1421 (E.D. Cal. 1993) ............................................................... 23

*Lozano v. AT&T Wireless Servs.,*
   504 F.3d 718 (9th Cir. 2007) ..................................................................... 36, 37

*Makaeff v. Trump Univ.,*
   *LLC,* No. 10-CV-940-IEG (WVG),
   2010 U.S. Dist. LEXIS 108467 (S.D. Cal. Oct. 12, 2010) .............................. 30

*Marks v. Ocwen Loan Servicing,*
   No. C 07-02-133 S, 2007 U.S. Dist. LEXIS 65590 (N.D. Cal. 2007) ............ 37

*McAdams v. Monier, Inc.,*
   182 Cal. App. 4th 174 (2010) ......................................................................... 32

*McKell v. Washington Mut., Inc.,*
   142 Cal. App. 4th 1457 (2006) .................................................................. 28, 29

*McWilliams Ballard, Inc. v. Level 2 Development,*
   697 F.Supp.2d 101 (D.D.C. 2010) ........................................................... 18, 21

*Menagerie Prods. v. Citysearch,*
   No. CV 08-4263 CAS (FMO), 2009 U.S. Dist. LEXIS 108768 (C.D. Cal. 2009) ........... 35

vi

*Meshel v. Ohev Sholom Talmud Torah*,
  869 A.2d 343 (D.C. 2005) ...................................................... 16

*Mobil Oil Corp. v. Dade County Esoil Mgmt. Co., Inc.*,
  982 F. Supp. 873 (S.D. Fla. 1997) .......................................... 17

*Mobile Satellite Communs., Inc. v. Intelsat USA Sales Corp.*,
  646 F. Supp. 2d 124 (D.D.C. 2009)........................... 26, 28, 30, 31

*Mortgage Bankers, Inc.*,
  109 Cal. App. 4th 1134 (2003) ............................................... 38

*Natl. Cmty. Reinvestment Coalition v. Accredited Home Lenders Holding Co.*,
  573 F. Supp. 2d 70 (D.D.C. 2008) ............................................ 9

*Neal v. Kelly*,
  963 F.2d 453 (D.C. Cir. 1992).................................................. 12

*New Kayak Pool Corp. v. Gerspach*,
  1995 WL 13257 (W.D.N.Y. 1995) ........................................... 41

*News World Commun. Inc. v. Thompsen*,
  878 A.2d 1218 (D.C. 1992) ..................................................... 18

*O'Donovan v. Cashcall, Inc.*,
  No. C 08-03174 MEJ, 2009 U.S. Dist. LEXIS 53895   (N.D. Cal. June 24, 2009).......... 34

*Partipilo v. Hallman*,
  156 Ill.App.3d 806, N.E.2d 8 (1987) ........................................ 21

*Pastoria v. Nationwide Ins.*,
  112 Cal. App. 4th 1490 (2003) ............................................... 37

*Patterson v. Whitman*,
  No. 02-2213 (ESH), 2003 U.S. Dist. LEXIS 26726 (D.D.C. June 9, 2003)...................... 9

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
  104 Cal. App. 4th 508 (2002) ................................................. 37

*People ex rel. Renne v. Servantes*,
  86 Cal. App. 4th 1081 (2001) ................................................. 37

*People v. Casa Blanca Convalescent Homes, Inc.*,
  159 Cal. App. 3d 509 (1984) .................................................. 37

*Peterson v. Cellco Partn.*,
  164 Cal.App. 4th 1583 (2008) ................................................ 10

*Polacsek v. Debticated Consumer Counseling, Inc.*,
    413 F. Supp. 2d 539 (D. Md. 2005) ................................................................. 41

*Puentes v. Wells Fargo Home Mortgage, Inc.*,
    160 Cal. App. 4th 638 (2008) ......................................................................... 36

*Reed v. Islamic Republic of Iran*,
    439 F. Supp. 2d 53 (D.D.C. 2006) ................................................................. 24

*Regan v. Taxation with Representation of Washington*,
    461 U.S. 540 (1983) ....................................................................................... 40

*Rodgers v. Roulette Records, Inc.*,
    677 F. Supp. 731 (S.D.N.Y. 1988) ................................................................ 15

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ........................................................................ 37

*S.E.C. v. Contl. Advisers*,
    1978 WL 1098 (D.D.C. 1978) ....................................................................... 41

*Samura v. Kaiser Found. Health Plan, Inc.*,
    17 Cal. App. 4th 1284  (1993) ....................................................................... 37

*Saunders v. Superior Court*,
    27 Cal. App. 4th 832 (1994) ........................................................................... 39

*Schiff v. American Ass'n of Retired Persons*,
    697 A.2d 1193 (D.C. 1997) ........................................................................... 16

*Schnall v. Hertz Corp.*,
    78 Cal. App. 4th 1144 (2000) ........................................................................ 35

*Siegel v. Shell Oil Co.*,
    256 F.R.D. 580 (N.D. Ill. 2008) *aff'd*, 612 F.3d 932 (7th Cir. 2010) ............... 26

*Singer v. AT&T Corp.*,
    185 F.R.D. 681 (S.D. Fla. 1998) ................................................................... 10

*Smartmetric Inc. v. Mastercard Inc.*,
    No. 2:10-cv-01864-JHN-FMOx, 2010 U.S. Dist. LEXIS 141976 (C.D. Cal. 2010) ........ 35

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    93 Cal. App. 4th 700 (2001) ..................................................................... 36, 37

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal. App. 4th 861 (1999) ..................................................................... 32, 33

*State Farm Fire & Cas. Co. v. Superior Court,*
   45 Cal. App. 4th 1093 (1996) ................................................................ 29, 36, 37

*Stevens v. Superior Court,*
   75 Cal. App. 4th 594 (1999) ............................................................................ 39

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,*
   17 Cal. 4th 553 (1998) .................................................................................... 40

*Thompson v. Amer. Gen. Life and Accident Ins. Co.,*
   404 F.Supp. 2d 1023 (M.D. Tenn. 2005) .......................................................... 14

*Thompson v. Islam,*
   No. 01-0585 (PLF), 2005 U.S. Dist. LEXIS 37114 (D.D.C. 2005) ............. 24, 27

*Tolliver v. Christina Sch. Dist.,*
   564 F.Supp.2d 312 (D. Del. 2008) ................................................................... 14

*Tracfone Wireless, Inc. v. Access Telecom, Inc.,*
   642 F. Supp. 2d 1354 (S.D. Fla. 2009) ............................................................ 15

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.,*
   685 F.Supp.2d 129 (D.D.C. 2010) ................................................................... 19

*United States v. Rosen,*
   487 F. Supp. 2d 721 (E.D. Va. 2007) .............................................................. 17

*Value House v. MCI Telecomms. Corp.,*
   917 F. Supp. 5 (D.D.C. 1996) .................................................................... 20, 27

*Vess v. Ciba-Geigy Corp. USA,*
   317 F.3d 1097 (9th Cir. 2003) ............................................................. 29, 30, 38

*Washkoviak v. Student Loan Mktg. Assoc.,*
   900 A.2d 168 (D.C. Cir. 2006) ........................................................................ 27

*Wellness Community-National v. Wellness House,*
   70 F.3d 46 (7th Cir. 1995) ............................................................................. 13

*Williams v. Gerber Prods. Co.,*
   552 F.3d 934 (9th Cir. 2008) ........................................................................... 32

## Statutes

California Business and Professions Code Sections 17200 and 17500 ...................... 35

District of Columbia Code § 28-3905(k)(5) ........................................................... 25

District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 .................... 25

False Advertising Law, CA Bus. & Prof. Code, § 17500 . .................................................. passim

Internal Revenue Code, 26 U.S.C. § 501(c)(3) ......................................................... 38, 39, 40, 41

Internal Revenue Code, 26 U.S.C. §501(c)(6) ....................................................................... 39

Unfair Competition Law, CA Bus. & Prof. Code, § 17200 ................................................ passim

## Other Authorities

66 Am. Jur. 2d Restitution and Implied Contracts § 25, *Existence of express contract—Exception for matters outside scope of existing contract terms* (2010) ................................................... 14

Modern Law of Contracts § 16:7 .......................................................................................... 15

Restatement (Second) Conflict of Laws § 145 ................................................................. 26, 28

Restatement (Second) Conflict of Laws § 148 ................................................................. 26, 27

## Rules

Federal Rule of Civil Procedure 9(b) .................................................................. 21, 29, 30, 31, 38

Federal Rule of Civil Procedure 12(b)(6) ......................................................................... 9, 12

Federal Rule of Civil Procedure 15(a) ................................................................................. 18

Federal Rule of Civil Procedure 56(d) ................................................................................. 12

Federal Rule of Civil Procedure Rule 8(a) ........................................................................... 30

Plaintiffs Ellen G. Levine, Ruth Fallenbaum and Eric S. Engum (collectively "Plaintiffs"), through their undersigned attorneys, on behalf of themselves and all others similarly situated, submit this Memorandum of Points and Authorities in Opposition to Defendants American Psychological Association, Inc. ("APA") and American Psychological Association Practice Organization's ("APAPO") (collectively "Defendants") Motion To Dismiss Or, In The Alternative, To Strike Plaintiffs' Request for a Jury Trial ("Motion To Dismiss," "Motion," or "Mot.").

## INTRODUCTION

This is a class action lawsuit brought on behalf of current and former APA members who paid special or practice assessment fees (the "Assessment"). Plaintiffs allege that the APA falsely told its members that payment of the Assessment was required for membership in the APA. *See* Plaintiffs' Consolidated Class Action Complaint ("Complaint" or "Compl.") ¶¶4-6. Plaintiffs allege that this conferred an unjust benefit on Defendants and seek certification of a nationwide class based on their claims of unjust enrichment. They also seek certification of a California-only class based on California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL"). In their Motion, Defendants argue that the Complaint should be dismissed for two reasons.

*First*, Defendants argue that the claims of unjust enrichment are barred because the bylaws of the APA and APAPO are express contracts between Plaintiffs and Defendants. According to Defendants, "there can be no claim for unjust enrichment where an *actual* contract exists. . . ." Mot. at 2 (emphasis in original). As discussed below, however, the existence of *any* contractual relationship between parties does not automatically foreclose a claim of unjust enrichment. Rather, that contract must govern the specific dispute that is at issue in the claim of unjust enrichment. Here (unlike the cases that Defendants rely upon), Defendants have conceded that the bylaws do not expressly govern the relationship between payment of the Assessment and membership in the APA. Mot. at 8 (claiming that the bylaws "have made clear by omission that failure to pay the Practice Assessment is not grounds for termination of APA membership"). To the extent that Defendants wish to try to prove somehow that the bylaws do indeed govern

1

whether payment of the Assessment is necessary for membership in the APA, clear precedent establishes that this is a question of fact that cannot be decided on a motion to dismiss.  In short, the bylaws do not foreclose the unjust enrichment claims because they do not expressly govern the question of whether the payment of the Assessment is a necessary condition to membership in the APA.

Defendants' peripheral arguments against the unjust enrichment claim fail as well.  For instance, Plaintiffs are not required to prove that they received no benefit from the payment of the Assessment.  All they must do is allege that the Defendants attained a benefit and that the retention was unjust.  Unrefuted authority establishes that the retention of money paid based on false representations is unjust.  Defendants spill a lot of ink arguing that they made no false representations because a "mandatory" obligation can include a mere moral compulsion.  This cryptic and counterintuitive argument, based mostly on the purported meaning of the word "shall" (which appears nowhere in the Complaint), has no bearing on Plaintiffs' actual allegations—namely, that Defendants falsely represented to Plaintiffs that they could not join the APA without paying the practice assessment.

*Second*, Defendants seek to dismiss the California plaintiffs' claims brought under specific California statutes based on their supposed "choice of law" analysis.  Under their analysis, the District of Columbia's Consumer Protection Procedures Act ("CPPA") would apply to the claims brought by California plaintiffs under the unfair competition and false advertising laws that California has enacted to its citizens.  Defendants prefer the CPPA because, unlike the laws of California, it does not actually govern the conduct at issue here.  There is absolutely no support for Defendants' position that they are permitted to engage in business in California and be insulated from liability for violating California's statutes because Defendants are based in the District of Columbia.  California has created broad rights for its citizens, and those rights protect the California plaintiffs and the putative California class.  On the other hand, the District of Columbia has not provided similar statutory rights to its citizens.  That does not mean that residents of the District of Columbia are free to engage in transactions in California that violate California law.  Instead, the courts have repeatedly held that the consumer protection statutes of

2

the various states govern transactions that occur in those states.  Thus, the claims of the California plaintiffs that were expressly brought under California law—based on transactions occurring in California—cannot be dismissed merely because the District of Columbia's legislature elected not to provide the same protections for its citizens.  There is no basis in law or reason for such a perverse result.

Again, Defendants' peripheral arguments regarding the California statutory claims are equally unavailing.  For instance, Plaintiffs are not required to satisfy the heightened pleading requirements under Rule 9(b) because the claims of "fraud" under the UCL are tantamount to claims of deception.  And Plaintiffs have adequately alleged such deception under any standard. Plaintiffs have also adequately pleaded that the Defendants' conduct was unfair (because any utility of Defendants' conduct is outweighed by the gravity of the consequences on Plaintiffs and other California class members) and unlawful (because Defendants' conduct amounted to unjust enrichment and/or violation of federal tax laws).  Finally, Plaintiffs' allegations that the Defendants' conduct was fraudulent and unfair under the UCL and FAL are not susceptible to challenge through a motion to dismiss.

## FACTUAL BACKGROUND

The facts set forth below are based upon the allegations contained in the Complaint and are accepted as true for purposes of Defendants' Motion To Dismiss.[1]

## I.   THE PARTIES

The APA, a Washington, D.C. based non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code, is the world's largest association of licensed psychologists with hundreds of thousands of members throughout the country.  The APAPO is a separate organization operated by the same leadership as APA from the same address in Washington, D.C.  The APAPO conducts professional advocacy and lobbying on behalf of its members.  *See* Compl. ¶¶ 2-3.

---

[1]  All Alphabetical Exhibits refer to those Exhibits attached to Defendants' Motion to Dismiss.

Plaintiffs Ellen G. Levine and Ruth Fallenbaum are residents of California and Plaintiff Eric S. Engum is a resident of Tennessee. *Id*. ¶¶ 10-12. Each of these Plaintiffs has paid the special or practice assessment as part of her or his APA dues as a result of Defendants' misrepresentation that this Assessment was a mandatory obligation in order to maintain membership in the APA. *Id*. ¶¶ 4, 10-12, 16-20.[2] The APAPO Assessment is not trivial. It amounts to over 50% of the amount of the APA dues. In 2009, for example, this Assessment was $137 per person, while the total annual APA dues themselves were $238. *Id*. ¶ 21. The mandatory Assessments collected from Plaintiffs and the class total approximately $6,000,000 per year. *Id*. ¶ 7.

## II.   DEFENDANTS' MISREPRESENTATIONS THAT THE ASSESSMENT WAS MANDATORY

Since at least 2002, the APA has falsely represented to its members that all practicing psychologists were required to pay a mandatory "Practice Assessment" or "Special Assessment" over and above the annual dues as a prerequisite to membership in the APA. Plaintiffs allege (and that allegation must be accepted as true), that since 2001, payment of the Assessment was not necessary for membership in the APA. *Id*. ¶ 22. And Plaintiffs allege that the Assessment is required solely for membership in the APA's 501(c)(6) organization, the APAPO. *Id*. ¶ 4.

Recognizing that many of its members would not want to voluntarily pay to fund this lobbying and advocacy organization, the APA deliberately sought to maximize lobbying funds by misrepresenting to its members that as part of their annual membership renewal there was a mandatory APA Assessment, which it then allocated to the purposes of the APAPO. *Id*. ¶ 6.

In their Motion To Dismiss, Defendants admit that they represented to APA members that they "must pay" the Assessment. Mot. at 8. They then go on to claim that this

---

[2]   Despite Defendants' protestations to the contrary, the term "Assessment" does not indicate that a payment is voluntary. Rather, the term "Assessment" is defined by Merriam-Webster free on-line dictionary as follows: "1 : the action or instance of assessing: Appraisal; 2: the amount assessed". The synonyms for assessment are "tax, duty, imposition, impost, levy." http://www.merriam-webster.com/dictionary/assessment; http://www.merriam-webster.com/thesaurus/assessment.

representation was in fact true.  *Id.* at 9.  Specifically, the APA contends that even though no member was ever expelled for failing to pay the Assessment, the Assessment was nevertheless mandatory because the members had a moral and professional obligation to pay it.  *Id.* at 18-22. While a novel defense at trial, this factual contention by Defendants must be disregarded entirely by the Court in deciding this Motion.  Rather, Plaintiffs' allegations that the Assessment was voluntary must be accepted as true.

The special or practice assessment fee came pre-printed on annual membership dues statement forms which deceptively indicated that the fee was actually required as part of annual APA dues.  Moreover, the dues statement instructions disseminated to members stated that any members who provide "ANY" health related services "MUST PAY" the Practice Assessment. Compl. ¶ 16.  The APA's website in 2002 stated that members "must pay the Special Assessment . . . ."  The APA used identical language on its website for a period of years.  *Id.* ¶ 17.

Moreover, through 2010, the APA's website never made any indication that the Assessment was voluntary, and never used any language stating or even suggesting that APA members were not required to pay the Assessment.  Instead, the website repeatedly stated that all practicing APA members were billed the Assessment and were expected to pay that Assessment. And when APA members tried to pay their dues online, the APA website did not allow them to pay the APA dues without also paying the Assessment.  *See id.* ¶ 19.

In April of 2010, the APAPO's "Practice Central" website (www.apapracticecentral.org) published a statement entitled, "The Practice Assessment: What You Need To Know."  That statement purports to provide "Answers to common member questions about the annual payment supporting the work of the APA Practice Organization."  That statement does not indicate or suggest in any way that the payment of the Assessment is voluntary.  To the contrary, the statement makes clear that all APA members who practice are expected to pay the Assessment: "In addition to APA dues, members who are licensed practitioners pay the annual 'Practice Assessment' that supports the Work of the APA Practice Organization (APAPO)."  *Id.* ¶ 20.

Until discovered and announced by some APA members in a list-serve discussion in 2010, it was unknown by the membership, and not reasonably capable of being known due to fraudulent concealment by Defendants, that the purportedly mandatory Assessment fee was purely voluntary.  *See id.*¶ 22.

On May 5, 2010, the APA and APAPO Boards of Directors admitted that the dues were never in fact required for membership in the APA.  Indeed, in the following statement, the Board admitted that the dues statements did not make it clear that payment of the Assessment was only required for membership in the APAPO, but not in the APA:

> The manner in which the APA, APAPO, and Division dues have been combined on past dues statements ***does not make clear*** that the mandatory practice assessment payment is ***required for APAPO*** membership ***but not for APA*** membership.  The 2011 dues statement instructions will be modified to clarify this point.

May 5, 2010 Memo from APA/APAPO Board of Directors to Members of the APAPO, "The APAPO Practice Assessment."  *Id.* ¶ 23; Ex. E at E3 (emphasis added).  Thus, in Defendants' own words, the dues statements made it appear that the Assessments were required (or mandatory) for membership in the APA, when in fact they were not required.

Days later, on May 8, 2010, one of the nine members of CAPP (the APA committee with responsible for governing the APAPO), Glenn Ally, Psy.D., made a statement on an official APA list-serve purporting to justify the imposition of a mandatory Assessment for a lobbying arm of the APA.  According to Dr. Ally, the APA decided to make the Assessment mandatory because the APA members would not make sufficient voluntary contributions to fund the APAPO's activities:

> I'm assuming you know the statistics that psychologist are at the bottom (AT THE BOTTOM) of the list of professions regarding voluntary contributions, even political advocacy contributions.  What you are suggesting here is to make the primary and largest advocacy arm of our organization dependent on the voluntary contributions of the cheapest profession around. . . Again, I don't mean to be offensive, but try running your practice on voluntary contributions and see if your family gets everything they want and deserve to have.  The PO is a business and they are in the business of advocating for practice.  WE have decided we need this, and we decided long ago that we were not getting enough advocacy when we had to depend on the larger "APA."  We wanted our own practice advocacy for a

6

variety of reasons.  That "business" has to depend on a relatively stable revenue source.  Would the lobbyist for your state organization represent you if you told him/her that you were going to pay him/her differently each year based on "voluntary donations?"

May 8, 2010 Post by Glenn Ally, List for APA members interested in discussing practice related issues, "Re: [PRACTICE] … and it gets nastier still. (Long)."  *Id.* ¶ 24.

After making these admissions, Defendants changed the APA Dues Statement in an effort to be less deceptive.  Originally, the Dues Statement described the Assessment in one column. In the next column, entitled "Action Required," the statement directed the members to "Pay $137 Practice Assessment."  Ex. A at A32.  On the 2011 statement, the APA removed the "Action Required" column.  They also removed the words "MUST PAY" from the instructions, which now state (for the first time) that "[n]on-payment of the Assessment does not affect membership in APA."  *Id.* ¶ 25; Ex. A at A61, A65.  Thus, the first time that the Dues Statements revealed that the Assessment was not mandatory was in the 2011 Dues Statement, which stated that "Non-payment of the practice assessment does not affect membership in the APA".  *See id.* ¶ 25.

The Complaint further alleges that Defendants recently admitted on at least two other occasions that the Assessments were not in fact required for membership in the APA.  *See id.* ¶¶ 26-27 (quoting revised 2011 Dues Statements and letter from APA Executive Director).

In response to recent complaints that members cannot pay their APA dues online without also paying the Assessment, the APA did not change its website to allow for a member to pay only their APA dues.  Instead, the APA's Practice Directorate issued a statement telling the member that they could opt-out of paying the Assessment "by calling the Membership Service Center." Timothy Tumlin, Ph.D. and John M. Grohol, Psy.D., *APA's Practice Assessment Fee: Part II*, Clinical Science, Society for the Science of Clinical Psychology, APA Division 12, Winter Issue*.  See id.* ¶ 28.  Moreover, the websites of the APA and APA Practice Central continue to falsely state in numerous places that practicing members of the APA must pay the Assessment.  *See id.*, ¶ 29.

In their Motion, Defendants complain that Plaintiffs repeatedly use the word "voluntary" even though that word was never used by Defendants to describe the payment of the assessment.

7

Mot. at 8 ("Plaintiffs do not point to any instance in which APA or APAPO suggested that payment of Practice Assessment was 'voluntary,' and plaintiffs do not allege that APA or APAPO ever used that word or concept to describe the Practice Assessment.  Yet plaintiffs repeat the word at least nine times in the Complaint.")  Defendants' argument on this point is baffling, as it ignores the entire foundation of the lawsuit.  Namely, Plaintiffs allege that Defendants endeavored to conceal from members that the Assessment was voluntary and, therefore, characterized it as mandatory.  Thus, Plaintiffs have alleged repeatedly that Defendants made concerted efforts to make it appear that the fees were mandatory—and to conceal from their members that they were in fact not required for membership in the APA.  It is for this reason that the Complaint does not allege that the Defendants ever claimed the Assessment was voluntary.  Defendants did not want the members to know that the Assessment was not required for membership in the APA.  But the Complaint alleges—clearly and repeatedly—that despite the representations to the contrary by Defendants, the assessment was in fact voluntary.  And through their own admissions in their Motion, Defendants have conceded both that they told their members that the dues were required and mandatory, but that there were no consequences whatsoever to a member's failure to pay those dues.  In short, Defendants admit that they repeatedly told APA members they were required or mandated to pay the Assessment even though the truth was they were not required to do so in order to be members of the APA.

And although the Defendants may not have used the word "voluntary," Defendants have admitted recently that the Assessments were not in fact required for APA membership.  Compl. ¶ 23; Mot. at 9 (Board statement that the manner in which the Dues Statements combined dues for APA and APAPO membership "does not make clear that the mandatory practice assessment is required for APAPO membership but not for APA membership").  In other words, the APA has conceded that the Assessment was only mandatory for membership in the APAPO, even though its dues statements represented that it was required for membership in the APA.  That is the critical factual allegation of the Complaint—which has been conceded by Defendants' own Board of Directors.

## LEGAL STANDARDS

"A motion to dismiss will not be granted unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Gray v. Universal Serv. Admin. Co.*, 581 F. Supp. 2d 47, 51 (D.D.C. 2008) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Indeed, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patterson v. Whitman*, No. 02-2213 (ESH), 2003 U.S. Dist. LEXIS 26726, at *4 (D.D.C. June 9, 2003) (citation omitted). When a complaint is challenged pursuant to Federal Rule of Civil Procedure 12(b)(6) "'the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor.'" *Gray*, 581 F. Supp. 2d at 51 (citation omitted). As a result, the plaintiff is "entitled to 'the benefit of all inferences that can be derived from the facts alleged.'" *Natl. Cmty. Reinvestment Coalition v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 73 (D.D.C. 2008) (quoting *Kowal v. MCI Communs. Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## ARGUMENT

I.  **PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS NOT CONTRACTUALLY BARRED BY THE APA'S BYLAWS OR RULES AND IT ADEQUATELY ALLEGES THAT DEFENDANTS UNJUSTLY BENEFITTED FROM MISREPRESENTING THAT PAYMENT OF THE PRACTICE ASSESSMENT WAS MANDATORY FOR APA MEMBERSHIP**

   A.  **A Choice-of-Law Analysis For Plaintiffs' Unjust Enrichment Claim Is Premature And, In Any Event, Unnecessary Because The Parties Agree That The Laws Of The Different Potential Jurisdictions Are Identical**

   In the first place, it is premature for the Court to decide choice of law matters at this early stage of the litigation. "Courts are hesitant to consider the merits of a choice of law issue at the motion to dismiss stage." *Godfry v. State Farm Mut. Ins. Co.*, No. 08-4813, 2009 U.S. Dist. LEXIS 19123, at *7 n.4 (E.D. Pa. Mar. 4, 2009) (citation omitted); *see also Hodgson v. Man Fin. Inc.*, No. 06-1944, 2006 U.S. Dist. LEXIS 94307, at **4-5 (E.D. Pa. Dec. 29, 2006) (withholding

9

choice of law determination until conclusion of discovery)); *In re Conagra Peanut Butter Prods. Liab. Litig.*, MDL Docket No. 1845 All Cases, 1:07-MD-1845-TWT, 2008 U.S. Dist. LEXIS 40753, at *35 (N.D. Ga. May 21, 2008) ("I agree that it is premature to conduct a rigorous choice of law analysis at this stage.  Such an analysis is more appropriate at the class certification stage."); *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 946 (D. Minn. 2009) (finding it "premature to consider choice of law issues or the claims of potential class members in other states" before class certification).  Choice of law analysis even at the class certification stage is "generally premature . . . [o]ften purported choice of law difficulties are found to be too distant and speculative."  *Singer v. AT&T Corp.*, 185 F.R.D. 681, 691 (S.D. Fla. 1998) (citations omitted).  The parties have not commenced discovery in this litigation and the Plaintiffs have not yet filed their motion for class certification.  Thus, the record at this nascent stage of the litigation is not yet robust enough to make an informed determination on choice of law matters.

Not only is a choice-of-law analysis premature, but it is also unnecessary since Plaintiffs agree with Defendants that with respect to "the dispositive issues and potential jurisdictions implicated by this motion on [the unjust enrichment] claim, 'the laws of the different jurisdictions are identical. . . .'"  Mot. at 13-14 n. 11.  Plaintiffs are residents of California and Tennessee and have alleged a nationwide class as well as California and Tennessee subclasses. Compl. ¶¶ 10-12, 31-32.  Plaintiffs agree with Defendants that the legal standards with respect to unjust enrichment are the same in these three jurisdictions.[3]

With respect to Counts II and III of the Complaint for violations of the California Unfair Competition and False Advertising Laws, the analysis is very different because those claims

---

[3] Defendants also note that "[s]ome California courts refuse to recognize a cause of action for unjust enrichment . . . which would be an additional ground to dismiss Count I as to Drs. Levine and Fallenbaum, if California law were to apply to them."  Mot. at 14 n. 11.  While some California courts apparently do not recognize a cause of action for unjust enrichment, many do recognize it, including, most importantly, the Supreme Court of California, which has explicitly recognized the existence of a cause of action for unjust enrichment.  *Ghirardo v. Antonioli*, 924 P.2d 996, 1002-03 (1996) (plaintiff "entitled to seek relief under traditional equitable principles of unjust enrichment"); *see also Lectrodryer v. Seoulbank*, 77 Cal.App. 4th 723, 726 (2000) (recognizing claim for unjust enrichment); *Peterson v. Cellco Partn.*, 164 Cal.App. 4th 1583, 1593 (2008) (same).

were alleged only by the California Plaintiffs and brought expressly under the statutory protections of their home state—on behalf of a putative class of California citizens. *See* Compl. ¶¶ 13, 14.  A review of the choice of law issues with respect to these claims is likewise premature at this juncture; however, should the Court decide to engage in such an analysis, the District of Columbia's choice of law rules require that California law apply to the California Plaintiffs' California statutory claims.  Doing otherwise would be tantamount to declaring that parties are not subject to the statutory prohibitions of the states that they conduct business in so long as they reside in a jurisdiction that does not outlaw their conduct.  Under the treatment proposed by Defendants, they are free to make misrepresentations directed to California residents and with impunity in violation of the rights of California citizens—as provided for by their legislature—merely because the legislature of the District of Columbia has not elected to provide its citizens with the same protection.  As detailed in the choice-of-law analysis regarding Counts II and in Section II., A. of this Opposition, that is not a permissible outcome.

**B.     Defendants' Reliance On The APA's Bylaws And Rules In Their Motion To Dismiss Is Improper Because These Documents Were Not Referenced In The Complaint.**

As Defendants admit, the Complaint does not allege a claim for breach of contract or allege that any express contract governs the payment of the Assessments.  Nonetheless, Defendants' first argument for why Plaintiffs' unjust enrichment claim should be dismissed is that the APA's Bylaws and Rules amount to an express contract between Plaintiffs and the APA and that the existence of this express contract precludes Plaintiffs from recovering under the quasi contractual theory of unjust enrichment.  Defendants support their argument by attaching a copy of the 2010 APA Bylaws ("Bylaws") and one section of the current APA Rules ("Rules").[4]

---

[4] The Declaration of Jonathan Paikin identifies the Exhibit B as a copy of the APA Bylaws, Exhibit C as the APA's Association Rules, and Exhibit D as the APAPO Bylaws.  Paikin Decl. ¶¶ 3-5.  But it appears that the APAPO Bylaws are Exhibit C and the APA's Association Rules are Exhibit D of the Paikin Declaration.  Although this is most likely an innocent mistake, it highlights the uncertainty and unreliability of considering documents that have never been authenticated by anyone other than Defendants' lawyers in a motion to dismiss prior to any discovery in the case.

As an initial matter, these extraneous documents, which were not referenced in the Complaint, cannot be considered as part of this motion to dismiss under Rule 12(b)(6). *See Gowens v. Dyncorp*, 132 F. Supp. 2d 38, 43 n. 2 (D.D.C. 2001) (noting that a motion to dismiss could rely on exhibits *if* they were referred to in the complaint and form the basis of the complaint).[5] And this motion cannot be converted to a motion for summary judgment without providing Plaintiffs notice and an opportunity to conduct appropriate discovery and provide counter-factual evidence. *See Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).[6] For this reason alone, the Bylaws and Rules provide no shelter for Defendants, are not subject to judicial notice, and may not be considered.[7]

> **C.**    **The APA's Bylaws And Rules Do Not Govern The APAPO Practice Assessment And, Therefore, Cannot Create A Contractual Bar To Plaintiffs' Unjust Enrichment Claim.**

---

[5] On the other hand, Plaintiffs have no objection to the Defendants' introduction or reliance upon the Dues Statements (Paikin Decl. Ex. A) or the May 5, 2010 memorandum  from Defendants' joint board of directors (Paikin Decl. Ex. E), as both were referenced in the Complaint.

[6] In an abundance of caution, Plaintiffs state that they do not believe that this motion has been converted to a motion for summary judgment, and therefore, are not relying on documents outside of the pleadings. If the Court wishes to treat the motion as a motion for summary judgment, Plaintiffs would respond appropriately by providing factual evidence or seeking necessary discovery pursuant to Federal Rule of Civil Procedure 56(d).  And by addressing Defendants' arguments relating to these extraneous factual claims, Plaintiffs are not in any way conceding that Defendants' factual contentions are the proper subject matter of this motion or that this motion may be treated as a summary judgment motion.  To the contrary, Plaintiffs wish to make it clear that they would strenuously contest the improper factual issues raised by Defendants through their own factual evidence, which would require discovery.

[7] Based on the allegations in the Complaint, the Court cannot conclude or presume that these documents were in place or effective during the entire 2001-2010 time frame for the proposed class.  Because the Complaint does not allege a contractual agreement between the parties—and does not make any reference to the Bylaws and Rules—it cannot properly be presumed that these Bylaws and Rules applied to the named Plaintiffs or members of the proposed class.  In short, Defendants are improperly asking the Court to infer a contractual arrangement on the basis of documents that cannot be considered at all in this Motion.  If Defendants wish to argue that an express contract exists that governs the payment of the Assessments, it has the burden of proving that.  *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251-52 (D.C. 2005) ("As the parties asserting the existence of a contract, appellants have the burden of proving that one existed.").

Even assuming, *arguendo*, that the Court can consider the Bylaws and Rules in deciding this Motion, they would not bar Plaintiffs' claim for unjust enrichment because they do not in any way purport to govern the subject of this lawsuit—the APAPO practice assessment.[8]  Indeed, Defendants' contract argument is premised on the counter-intuitive factual contention that because these documents do not say anything about the payment of the Assessment, they have "made clear by omission that failure to pay the Practice Assessment is not grounds for termination of the APA membership."  Mot. at 8.  This factual contention by Defendants (if accepted as true) would not provide them with any refuge here.  Instead, it merely shows that the purported "contract" says absolutely nothing about the Assessment, and therefore cannot govern the parties' relationship concerning the payment of the Assessments.  Notably, the APAPO Bylaws (Ex. C), say nothing at all about the payment of any dues or Assessments.  The purported APA Bylaws make no mention of the Assessments, but provide that the nonpayment of "basic Association dues" for one year "shall be considered as equivalent to a request for resignation from the Association."  Ex. B at B15.  And the purported Rules similarly do not address the payment of the APAPO practice assessment.  Instead they address the payment of APA dues, and provide that a "member is dropped from membership in the Association after nonpayment of dues. . . ."  Ex. D at D9.[9]

Because the payment of the Assessments is not a term of the purported contract between the APA and its members, the "contract" cannot govern claims of unjust enrichment relating to the Assessments.  An express contract only bars a claim for unjust enrichment if the express contract and the unjust enrichment claim cover the same subject matter.  *Armenian Assembly of*

---

[8] Again, Plaintiffs make this argument only in the alternative, and do not in any way waive their right to provide and produce evidence regarding the actual role of the Bylaws and Rules in this controversy.

[9] Defendants' failure to point to any contract governing the payment of the APAPO practice assessment is highlighted by the fact they resort to citing previous versions of Plaintiffs' Complaint.  Mot. at 16.  Plaintiffs' prior pleadings, however, provide no support for the argument that this is a breach of contract case since "[i]t is well established that the amended pleading supersedes the original pleading."  *Cureton v. U.S. Marshal Service*, 322 F.Supp.2d 23, 25 n. 6 (D.D.C. 2004) (quoting *Wellness Community-National v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995)).  Thus, only the allegations of the current Complaint are relevant here.

*Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 135 (D.D.C. 2009) ("'[a] claim of unjust enrichment may survive a motion to dismiss . . . when the validity of the contract is in doubt or uncertain' or 'where an express contract exists that does not govern exclusively the obligations or rights of the parties at issue'") (quoting *Tolliver v. Christina Sch. Dist.,* 564 F.Supp.2d 312, 315-16 (D. Del. 2008)); *see also, Emerine v. Yancey*, 680 A.2d 1380, 1383 (D.C. 1996) ("An implied contract cannot exist when there is an existing express contract about the ***identical subject***") (quoting *C.B. Snyder Realty Co. v. Natl. Newark & Essex Banking Co.,* 14 N.J. 146, 101 A.2d 544 (1953) (emphasis added)).[10]   Thus, even if a contract did exist, it can only preclude the claim of unjust enrichment if it exclusively governs the transaction at issue.  In *Armenian Assembly*, the parties disputed—in the pleadings—"whether the Grant and Transfer Agreements constitute valid express contracts that govern the parties' disputes, such that Defendants are precluded from asserting equitable claims in addition to their contractual claims."  597 F. Supp.2d at 13.  Under those circumstances, where there was dispute over whether or not the contractual agreement actually governed the dispute, the District Court denied the motion to dismiss the claims for unjust enrichment.  *Id.* at 136.  *See also Klein v. Arkoma Prod. Co.,* 73 F.3d 779, 786 (8th Cir. 1996) ("Normally, when an express contract exists between the parties, unjust enrichment is not available as a means of recovery.  However, when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice.  The leases in this case do not address whether a take-or-pay settlement fits within the definition of the "market value" of gas produced and sold under the leases.") (citations omitted); 66 Am. Jur. 2d Restitution and Implied Contracts § 25, *Existence of express contract—Exception for matters outside scope of existing contract terms* (2010) ("Although there can be no implied contract on a

---

[10] The law of California and Tennessee is in accord.  *Lance Camper Mfg Corp. v. Republic Indem. Co. of Amer.*, 44 Cal. App. 4th 194, 205 (1996) (as to claim of unjust enrichment "it is well settled that an action based on an implied-in-fact or quasi contract cannot lie where there exists between the parties a valid express contract covering the same subject matter"); *Thompson v. Amer. Gen. Life and Accident Ins. Co.*, 404 F.Supp. 2d 1023, 1029 (M.D. Tenn. 2005) (plaintiff cannot recover under an unjust enrichment theory "since a contract may not be implied where a valid contract exists on the same subject matter") (citing *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. App. 1991)).

point fully covered by an express contract and in direct conflict therewith, there may be an

implied contract on a point not covered by an express contract."); *County Commrs. of Caroline

County v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 100, 747 A.2d 600, 609 (2000) (noting

that the existence of an express contract does not bar unjust enrichment claims "when the express

contract does not fully address a subject matter").[11]

    The decision in *Kramer,* 888 A.2d at 251-52, is illustrative of why Defendants'

arguments regarding the Bylaws and Rules cannot lead to the dismissal of Plaintiffs' claims of

unjust enrichment.  After a trial, the trial court in *Kramer* rejected the defendant's argument that

there was a contract that governed the transaction at issue because the supposed contract was

unsigned and did not clearly govern the transaction.  *Id.* at 253 ("Vagueness of expression,

indefiniteness, and uncertainty as to any of the essential terms of the agreement have often been

held to prevent the creation of an enforceable contract") (quotation and citations omitted).

Because there was no clear contract governing the transaction, the trial court correctly ruled that

the plaintiffs were entitled to restitution under the doctrine of unjust enrichment.  *Id.* at 254.

Here, there has been no determination of whether the Bylaws and Rules are indeed a contract

between Plaintiffs and Defendants governing the Assessments, and at this stage of the

proceedings there can be no such determination.  At most, Defendants have prematurely raised a

---

[11] *See also, Rodgers v. Roulette Records, Inc.*, 677 F. Supp. 731, 740 (S.D.N.Y. 1988) (holding that contract did not preclude claim of unjust enrichment because plaintiffs are seeking remedies based on issues not expressly covered by the contract); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 905 (2nd Cir. 1995) (unjust enrichment claim barred only "where there is a valid express agreement between the parties which explicitly covers the same specific subject matter for which the implied agreement is sought"); *Modern Law of Contracts* § 16:7 (2010) (noting that a contract does not preclude a claim of unjust enrichment when the unjust enrichment was the result of "performance that is not specifically within the contract"); *Infra-Pak (Dallas), Inc. v. Carlson Stapler & Shippers Supply, Inc.*, 803 F.2d 862, 864 (5th Cir. 1986) (holding principal of *quantum meruit* applied where the "distributorship agreement made no provision" for the benefit provided by the Plaintiff); *Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354, 1366 (S.D. Fla. 2009) (denying motion to dismiss claims of unjust enrichment because "Plaintiff's allegations of unjust enrichment encompass specialty phones allegedly bought by Defendants that are not necessarily subject to the 'shrinkwrap' agreements that form the basis of Plaintiffs count for breach of contract").

factual issue regarding whether these documents govern the Plaintiffs' claims of unjust enrichment relating to the assessments.

Defendants' primary support for their claim that the Bylaws and Rules are contracts that preclude the unjust enrichment claims is *Schiff v. American Assn. of Retired Persons,* 697 A.2d 1193 (D.C. 1997). *See* Mot. at 15-16.  Defendants take the narrow set of facts in that case to fabricate a broad rule, never enunciated by the Court, that members of organizations cannot have claims of unjust enrichment because organization bylaws are contracts that preclude all such claims. *Id.*  In fact, *Schiff* held that plaintiffs in that case had no claim for unjust enrichment concerning allegedly excess costs for health insurance premiums for insurance obtained through AARP where in addition to their AARP membership the plaintiffs also knowingly entered into an express contract with the third party insurer covering the subject of premiums.[12]  Indeed, in *Schiff* the Court held that the "existence of two express contracts between Schiff and AARP can be determined from the allegations in the complaint." *Id.* at 1194 n. 2.  Here, however, the only reference to these supposed contracts comes not from the Complaint, but from Defendants' improper interjection of extraneous "evidence."  The most significant difference (completely ignored by Defendants) is that unlike here where Plaintiffs allege they bought the APAPO membership only because they were told they "must" do so in order to be a member of the APA, the *Schiff* plaintiffs actively sought to buy the insurance policy at issue. *Id.* at 1195.

Defendants try to buttress their arguments by making the unremarkable observation that "formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members. . . ." Mot. at 15 (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005)).  That would be an important issue (at a later stage of the proceedings) *if* the Bylaws or Rules actually governed the payments of the Assessments.  But, by Defendants' own admissions, they do not.  Instead, they are absolutely silent as to the payment of those Assessments.  Thus, these Bylaws and Rules do not govern this aspect of the Plaintiffs'

---

[12] *Schiff*, 697 A.2d at 1194 n. 2 ("The trial judge, however, correctly ruled that the existence of two express contracts between Schiff and AARP can be determined from the allegations in the complaint. The first is for Schiff's AARP membership, and the second is for Schiff's health insurance contract that he purchased through AARP.")

relationship with Defendants.  Indeed, that was the precise holding of the Eastern District of

Virginia, applying D.C. law, including *Meshel.  See United States v. Rosen*, 487 F. Supp. 2d 721,

729 (E.D. Va. 2007) ("Since no provision in the AIPAC bylaws is made for advancement of fees,

it is reasonable to conclude defendants have no contractual right to advancement of fees, as such

a right should not be inferred from a right to indemnification.").

　　　　Even if Defendants have indeed successfully introduced a contract issue into this case—

which Plaintiffs do not concede—the impact of that issue on Plaintiffs' claims for unjust

enrichment cannot be decided on a motion to dismiss.  Rather, courts have routinely held that

where a breach of contract claim is alleged together with an unjust enrichment claim, it would be

premature to dismiss the unjust enrichment claims based on Rule 12(b)(6).  *See, e.g., In re Del-

Met Corp.*, 322 B.R. 781, 826 (Bankr. M.D. Tenn. 2005) ("Whether that contract encompassed

the conduct for which a remedy may lie in unjust enrichment is a factual issue yet to be

developed in this adversary proceeding.  The First Amended Complaint alleges actions by the

Controlling Customers that broadly exceed the boundaries of any contract so far described. The

Controlling Customers are alleged to have unjustly enriched themselves by seizing the

management and operations of the debtors-facts not consistent with the ordinary contractual

relationship between a supplier and its customer.  Whether these Defendants will prove an

existing, enforceable contract sufficient in scope to preclude recovery for unjust enrichment

remains to be seen.  Dismissal of Count 8 under Rule 12(b)(6) is premature."); *Armenian

Assembly*, 597 F. Supp. 2d at 136 ("The Federal Rules of Civil Procedure expressly provide that

a party may assert alternative theories of liability, and it does not appear that Defendants'

assertion of both contractual and equitable claims for relief will require the parties to undertake

any additional discovery that would not otherwise have been contemplated.  Although

Defendants may ultimately have to decide whether to pursue their contractual or equitable claims

for relief, Defendants need not do so at the pleading stage."); *Mobil Oil Corp. v. Dade County

Esoil Mgmt. Co., Inc.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997) ("It is only upon a showing that an

express contract exists that the unjust enrichment or promissory estoppel count fails.  Until an

express contract is proven, a motion to dismiss a claim for promissory estoppel or unjust enrichment on these grounds is premature.") (citation omitted).

To the extent that any contract can be said to be pertinent to this lawsuit, it is the bylaws of APAPO—the organization which Plaintiffs allege they were coerced into joining via false representations that they "must" do so. However, even that "contract" does not govern the payment of the Assessments. But if the Court agrees with Defendants' argument that the mere existence of Bylaws preclude the unjust enrichment claim, Plaintiffs should be allowed to amend the Complaint to allege a count for fraudulent inducement and rescission of the APAPO membership "contract" since under Federal Rule of Civil Procedure 15(a) leave to amend should freely be given. *See Foman v Davis*, 371 U.S. 178, 182 (1962) (Federal district court abused its discretion in denying motion to amend complaint to assert right of recovery in *quantum meruit* after dismissal of complaint on ground that oral agreement, on which plaintiff sought to recover, was unenforceable under statute of frauds, where amendment would have done no more than state alternative theory for recovery).[13]

### D. Plaintiffs Have Properly Pleaded That They Conferred A Benefit On Defendants

In order to plead a claim for unjust enrichment, all Plaintiffs are required to allege is "1) the plaintiff conferred a benefit on the defendant; 2) the defendant retained the benefit; and 3) under the circumstances, the defendant's retention of the benefit is unjust." *McWilliams,* 697 F.Supp.2d at 106 (citing *News World Commun. Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 1992)). And "'[s]pecific facts are not necessary" at the pleading stage.'" *Id.* at 107 (quoting *Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 (D.C. Cir. 2008)). Plaintiffs allege, and Defendants do not dispute, that Plaintiffs conferred a benefit on Defendants by paying the practice assessment fees and that Defendants retained this benefit. Compl. at ¶¶ 35-

---

[13] In addition, even if there was an express contract between Plaintiffs and the APA covering the Assessments, Plaintiffs could still have an unjust enrichment claim against the APAPO, a third party to any such contract. *See McWilliams Ballard, Inc. v. Level 2 Development*, 697 F.Supp.2d 101 (D.D.C. 2010) (holding that there may be an unjust enrichment claim where moneys are obtained via deception and channeled to a third party (here APAPO) who is not a party to the alleged express contract).

37.  Furthermore, Plaintiffs allege that under the circumstances, Defendants' retention of the assessment fees was unjust because Defendants deceived Plaintiffs and members of the putative class into paying practice assessment fees that they otherwise would not paid by making misleading statements that payment of the practice assessment was required for APA membership.  *Id.*  That is all Plaintiffs are required to allege to plead a claim for unjust enrichment.  *See U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F.Supp.2d 129, 142 (D.D.C. 2010) (government adequately pleaded claim for unjust enrichment where it alleged that it paid money as a result of false statements by a defendant).

Defendants argue that the Court should dismiss the claim for unjust enrichment because Plaintiffs must also demonstrate that Defendants retained the benefit of the APAPO practice assessment without compensating the Plaintiffs in return.  Defendants provide no support for their contention that Plaintiffs need to make such a showing at the pleadings stage.  The only case they cite for the notion that a plaintiff must prove that he or she was not compensated in return for a benefit is *Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C. Cir. 1973).  *Bloomgarden*, however, is inapposite for two reasons.  First, the decision was rendered in the context of a motion for summary judgment after discovery had been completed.  It did not enunciate any standards for what must be alleged at the pleadings stage.  Indeed, the court specifically explained that it was determining whether the plaintiff could make a showing at trial that defendant's retention of the benefit was unjustified.  *Id.*  Second, the *Bloomgarden* court employed this additional test (whether the plaintiff received a benefit) in the limited context of a claim of unjust enrichment involving the provision of services rendered by plaintiff.  Indeed, the court noted that "the equitable principles of quasi contracts are more difficult to apply where the court must determine whether services rendered by one person to another are to go unrewarded than where it must make that determination with respect to money or property unjustly retained," necessitating the consideration of a number of "factual criteria" in order to determine "whether in a given case the defendant has undeservedly profited by the plaintiff's effort."  *Id.*  The instant case, by contrast, involves money conferred by Plaintiffs which they allege Defendants unjustly

19

retained.  And Defendants have cited no authority suggesting that the criteria that the court took into consideration in *Bloomgarden* would apply under those circumstances.

Even if Plaintiffs were required to prove that they did not benefit from the payment of the Assessments, there is still no basis for dismissal.  Defendants contend that because the Assessments paid for lobbying activity under the auspices of the APAPO, Plaintiffs received the benefits of that lobbying.  But this argument completely ignores Plaintiffs' allegations that they merely wanted to join the APA, not the APAPO.[14]  Specifically, Plaintiffs allege that the Defendant accepted payment of millions of dollars of the putative class members' money that "they would not have otherwise have had."  Compl. ¶ 35.  And Plaintiffs further allege that as a result of Defendants' conduct, Plaintiffs and the putative class "paid special or practice assessment fees they would not have otherwise paid."  *Id.* ¶ 37.  In the face of these allegations, Defendants are not entitled to ask the Court to presume that Plaintiffs actually benefited from paying for lobbying efforts when Plaintiffs contend that they would not have paid the Assessments if they knew they were not required.  It is a paternalistic and counter-intuitive argument that echoes the rant of Glenn Ally, Ph.D., who admitted that APA members (i.e., the putative class members) would not pay voluntary contributions because they were part of "the cheapest profession around."  *Id*. ¶ 24.  To the extent that Defendants wish to prove that Plaintiffs benefitted from being tricked into paying for something that they did not want, they will have to do that through facts at the appropriate stage of these proceedings.  *See Value House, Inc. v. MCI Telecommunications Corp.,* 917 F.Supp. 5, 8 (D.D.C. 1996) (whether or not phone company "benefited" from not using its network resources for placing "900" number calls to plaintiff from all calling areas was fact question not properly resolved on motion to dismiss).

---

[14] Indeed, the Consolidated Complaint alleges that it is unlawful for APA, a "501(c)(3)" organization, to carry on lobbying activities allowed for APAPO, a "501(c)(6)" organization.  It is perverse for Defendants to argue that the Court should find as a matter of law that it was a "benefit" for APA members to be coerced by deception (being told that they "must" pay in order to be an APA member) to pay to APA moneys to fund activities which would be illegal for the APA to conduct.

**E.**    **Defendants' Statements Were Deceptive And Misleading Because They Represented That Payment Of The APAPO Assessment Was Mandatory For Membership In The APA When That Was Not True**

The Complaint alleges that the APA, via its dues statements and website, represented that payment of the APAPO Practice Assessment was a necessary condition for membership in the APA and that based on these representations Plaintiffs paid the Assessment.  Compl. ¶¶ 4, 6, 16, 26, 27, 35-37.  As the Defendants concede, payment of the Assessment was not required for membership in the APA.  Accordingly, Plaintiffs paid money that they otherwise would not have paid had they been told that payment of the Assessment was not required for APA membership.  Complaint at ¶¶ 35-37.  Plaintiffs, therefore, have more than adequately alleged that Defendants' statements were deceptive and their retention of the Assessment fees under these circumstances were unjust.[15]

Defendants' Motion goes on for page after page with what amounts to legal double-talk—arguing that when Defendants told Plaintiffs they "must pay" they were not being deceptive because the APA believed that the payment was mandatory in the sense that there was some undefined  moral or professional obligation to make the payment.  Mot. at 18-23.  As an initial matter, whether the APA thought its members should make the payment is irrelevant.  *4934, Inc. v. Dist. of Columbia Dept. of Employment Services*, 605 A.2d 50, 56 (D.C. 1992) ("A claim of unjust enrichment does not require fault on the part of the recipient of the benefit. 'His innocence in receiving the benefit does not mean that his retention of that benefit without payment is just.'") (quoting *Partipilo v. Hallman,*156 Ill.App.3d 806, 510 N.E.2d 8 (1987)).  The relevant inquiry is whether the APA's statements were deceptive and misleading to its members.  The Complaint alleges that they were.

---

[15] Defendants suggest without citing to any authority that Rule 9(b) somehow applies to Plaintiffs' unjust enrichment claim.  Mot. at 18.  Plaintiffs have not alleged a fraud cause of action and Rule 9(b) does not apply to claims of unjust enrichment.  *See McWilliams,* 697 F. Supp. 2d 106-07.  And even if Rule 9(b) did apply, Plaintiffs' allegations are sufficiently detailed to satisfy the higher pleading standard as explained *infra* in Section II., B.

Nor is it relevant how certain dictionaries define the term "must" in the abstract, Mot. at 19-20, or how the term "shall" (which is not even a term that appears in the representations at issue) is treated by courts in the context of construing the meaning of a statute.  Mot. at 20-21. The Court should likewise disregard Defendants' extensive citations to completely irrelevant cases analyzing whether special assessments imposed by social clubs should be treated as taxable income or a tax-free gift according to a tax statute that has not been in effect for nearly five decades.  None of these authorities have anything to do with the salient issue here, which is whether the APA's statements regarding payment of the Assessment were deceptive to its members under the circumstances alleged in the Complaint.

Indeed, Defendants' argument is dramatically undermined by the fact that the APA admitted that the representations on the APA's dues statements were misleading in its May 5, 2010 Memo to members of the APAPO:

> The manner in which the APA, APAPO, and Division dues have been combined on past due statements ***does not make clear*** that the mandatory practice assessment payment is ***required for APAPO*** membership ***but not for APA*** membership.  The 2011 dues statement instructions will be modified to clarify this point.

Compl. ¶ 23; Mot. at Ex. E, E3 (emphasis added).  And the 2011 dues statement was changed to make clear, for the first time, that "[n]onpayment of [the APAPO Practice Assessment] does not affect membership in APA."  Compl. ¶ 25; Mot at Ex. A, A61.  Accordingly, Plaintiffs have alleged, and Defendants' conduct demonstrates, that the APA's representations with regard to the payment of the APAPO practice assessment were deceptive to APA's members and, therefore, the Defendants' retention of these payments is unjust.

So while Defendants' word-play regarding cases interpreting the words "shall" and "must" is interesting, it is not compelling.  Plaintiffs have alleged that the Defendants falsely represented that payment of the Assessment was necessary for membership in the APA, when it

was not in fact required.  That is enough to establish that it was not fair and just for Defendants to retain these payments.

**II.    CALIFORNIA LAW APPLIES AND PLAINTIFFS HAVE ADEQUATELY PLEADED VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION AND FALSE ADVERTISING LAWS**

**A.    California Law Applies To The California Plaintiffs' Statutory Claims**

**1.    Plaintiffs Are California Residents Seeking To Represent California Consumers Under California Law And, Therefore, A Choice Of Law Analysis Is Unnecessary**

As a threshold matter, "it is unnecessary to engage in a choice of law analysis in order to apply California law to California statutory claims, . . . ."  *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 340 (N.D. Cal. 2010).  Plaintiffs are residents of California, Compl. ¶¶ 10-11, seek to represent only California consumers, *id.* ¶ 32(a), and are asserting claims under California state statutes based on alleged misrepresentations directed to California residents and injuries that occurred in California.  *Id.* ¶¶ 10-11, 32(a), 35(d), 40-53.  Accordingly, this Court "*must apply California law to California statutory claims.*  Even if the consumer protection and unfair competition statute[] of [the District of Columbia] differ[s] considerably from those in California, *[the APA and APAPO] are in no position to force Plaintiffs or unnamed class members to sue under the statutes of [other] states.*"  *Keilholtz*, 268 F.R.D. at 340 (emphasis added).  Plaintiffs Levine and Fallenbaum ("California Plaintiffs"), who are the masters of their Complaint, have selected particular California statutes to bring against Defendants on behalf of the proposed California class.  *See e.g.*, *Louisiana Pac. Corp. v. Beazer Materials & Servs.*, 811 F. Supp. 1421, 1431 (E.D. Cal. 1993) ("As the master of its complaint, [the plaintiff] has the discretion to formulate the legal theories on which it will base its claim.").  Defendants cannot deprive the California Plaintiffs of these claims simply because it is particularly unfavorable, or because they prefer that their conduct be evaluated under District of Columbia law.

23

**2.**     **California Law Still Applies Under A Choice-Of- Law Analysis Because Application Of California Law Would Substantially Advance California's Policies, Whereas The District Of Columbia's Policies Are Not Impacted**

Should, however, this Court determine that a choice-of-law analysis is necessary, it must first determine whether the state laws at issue constitute a "true" or "false" conflict.  "If a true conflict exists, the court follows the District of Columbia's choice-of-law principles, . . . ."  *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 64 (D.D.C. 2006) (citation omitted).  If a false conflict exists, the court applies the "law of the state whose policy would be advanced by application of its law or forum law if no state's policy would be advanced by application of its law."  *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citations omitted).

"The true conflict test asks whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdiction is different."  *Reed*, 439 F. Supp. 2d at 64 (citation omitted).  In contrast, a "false conflict" exists in part if "the policies of one state would be advanced by the application of its law and the policies of the state whose laws are claimed to be in conflict would not be advanced by the application of that state's law."  *Thompson v. Islam*, No. 01-0585 (PLF), 2005 U.S. Dist. LEXIS 37114, at *11 (D.D.C. July 29, 2005) (citations omitted).

While the California and District of Columbia consumer protection statutes are different, *the District of Columbia's policies would in no way be advanced were its law applied*.  It is well-established that California has a "'strong public policy' to 'protect consumers against unfair and deceptive business practices.'"  *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1085 (9th Cir. 2009) (citing *America Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 14-15 (2001) ("*America Online*")).  Indeed, "the right to seek class action relief in consumer cases has been extolled by California courts."  *America Online*, 90 Cal. App. 4th at 17; *see also id.* at 17-18 (noting the "importance [that] class action consumer litigation has come to play in [California].").  In this case, "[t]he fundamental policy at issue is not simply the right to pursue a class action remedy, but ***the right of California*** to ensure that ***its citizens*** have a viable forum in which to recover minor amounts of money allegedly obtained ***in violation of the UCL***."  *Aral v. Earthlink, Inc.*, 134 Cal. App. 4th

24

544, 564 (2005) (emphasis added).   Applying District of Columbia law would not only prevent the California Plaintiffs from pursuing class-wide relief on behalf of a putative California class under the UCL, it would deny the right of California to protect its citizens from conduct occurring in California that the state has determined is unlawful.

As Defendants point out, it would be meaningless to apply the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.*, in this case.   Mot. at 25-26.   The District of Columbia's interests in applying its statutes  protecting consumers and regulating its business community cannot be advanced by this litigation.   Plaintiffs Levine and Fallenbaum are California consumers representing a putative California class, Compl. ¶¶ 10-11, 32(a) and, according to Defendants, do not constitute consumers of goods or services as defined under the CPPA.   Mot. at 26 (citing D.C. Code § 28-3905(k)(5)).   Moreover, the CPPA does not regulate membership activities of non-profit organizations.

As a result, a false conflict exists between California and the District of Columbia's consumer protection statutes.   The District of Columbia's interests would not be impacted by this case, whereas California's consumer protection policies would be substantially advanced through the application of California law.   California obviously has an interest in protecting its residents from misrepresentations made by businesses that reside in another state.   Indeed, the very purpose of the protections afforded to consumers by the California legislature would be thwarted if, as is the case here, out-of-state entities could make misrepresentations to California consumers in violation of California's consumer protection laws, but then claim that they are only subject to the consumer protection laws the state in which they reside where their conduct would not be deemed unlawful.   For this reason, numerous courts, including the Seventh Circuit in *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (J. Easterbrook), have held that a choice-of-law analysis dictates that the consumer protection laws of the territory where the consumers live, not the place of the defendants' headquarters apply:

> State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568-73, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).   We do not for a second suppose that Indiana

would apply Michigan law to an auto sale if Michigan permitted auto companies to conceal defects from customers; nor do we think it likely that Indiana would apply Korean law (no matter *what* Korean law on the subject may provide) to claims of deceit in the sale of Hyundai automobiles, in Indiana, to residents of Indiana, or French law to the sale of cars equipped with Michelin tires. Indiana has consistently said that sales of products in Indiana must conform to Indiana's consumer-protection laws and its rules of contract law. *See, e.g., A.J.'s Automotive Sales, Inc. v. Freet,* 725 N.E.2d 955, 963 (Ind. App. 2000) (consumer-protection law); *Dohm & Nelke v. Wilson Foods Corp.,* 531 N.E.2d 512, 513-14 (Ind.App.1988) (contract law).  It follows that Indiana's choice-of-law rule selects the 50 states and multiple territories where the buyers live, and not the place of the sellers' headquarters, for these suits.

*See also Siegel v. Shell Oil Co.,* 256 F.R.D. 580, 585 (N.D. Ill. 2008) *aff'd,* 612 F.3d 932 (7th Cir. 2010); *In re Grand Theft Auto Video Game Consumer Litig.,* 251 F.R.D. 139, 146 (S.D.N.Y. 2008).  Accordingly, California law should apply to the claims of the California Plaintiffs, who brought their claims on behalf of other residents of California under the statutory laws of their home state.

But even if the Court were to determine that a true conflict exists, the factors for determining "'which jurisdiction's policy would be more advanced by the application of its law to the facts of the case'" also favor California.  *Brannen v. Natl. R.R. Passenger, Corp.,* 403 F. Supp. 2d 89, 95 n.2 (D.D.C. 2005) (citations omitted).  In addition to analyzing choice of law issues under Restatement (Second) Conflict of Laws § 145,[16]  District of Columbia courts have also looked to Restatement (Second) Conflict of Laws § 148 in analyzing choice of law issues involving "'multi-state misrepresentation claims.'"  *Mobile Satellite Communs., Inc. v. Intelsat USA Sales Corp.,* 646 F. Supp. 2d 124, 131 (D.D.C. 2009) ("*Mobile Satellite*") (citation omitted).  The relevant factors under that test are:

> (1) the place, or places, where plaintiff acted in reliance on defendant's representations; (2) the place where plaintiff received the representations; (3) the place where defendant made the representations; (4) the domicile, residence,

---

[16] District of Columbia courts have considered the following factors under Restatement (Second) Conflict of Laws § 145 in undertaking a choice of law analysis:  "(1) place where the injury occurred; (2) place where the conduct causing the injury occurred; (3) domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) place where the relationship is centered."  *Alexander v. Washington Gas Light Co.,* 481 F. Supp. 2d 16, 34 n.10 (D.D.C. 2006) (citations omitted).

nationality, place of incorporation and place of business of the parties; . . . .

*Id.* (citation omitted).[17]

Defendants' argument that California Plaintiffs have provided no facts other than residence to connect this case to California is wrong.  Mot. at 24.  The California Plaintiffs have indicated that they and putative California class members have paid the assessment fees in California.  *See, e.g.*, Compl. ¶¶ 10-11, 30, 32(a), 36, 45, 50, 52.  Moreover, the California Plaintiffs specifically alleged that they were subject to Defendants' dues statements and other materials misrepresenting the mandatory nature of these assessments in California.  Compl ¶¶ 10-11, 32(a), 50.  California Plaintiffs have also expressly pleaded that they "relied" on misrepresentations disseminated to California.  *Id.* ¶¶ 50, 52.  These allegations are asserted in support of the California Plaintiffs claims under California statutes.  *Id.* ¶¶ 40-53.  For these reasons, California law applies.  *See, e.g.*, *Thompson*, 2005 U.S. Dist. LEXIS 37114, at *24 (applying Maryland law in part where plaintiff received representations in Maryland, relied on those representations in Maryland and in light of Maryland's policy interest of protecting its citizens from fraud); *see also Value House v. MCI Telecomms. Corp.*, 917 F. Supp. 5, 7 (D.D.C. 1996) ("Florida has the most significant relationship to the dispute.  While the Service Bureaus ('SBs') made the representations . . . in California, Virginia and elsewhere, plaintiffs received the negligent misrepresentations in Florida and plaintiffs acted in reliance on those misrepresentations there.").[18]

---

[17] By citing the test under Restatement (Second) Conflict of Laws § 148, Plaintiffs do not concede that their allegations *in the context of the UCL and FAL* are grounded in fraud and warrant Rule 9(b) analysis.  *See* sections II.C.1.a and II C.2.

[18] Defendants cite *Washkoviak v. Student Loan Mktg. Assoc.*, 900 A.2d 168 (D.C. Cir. 2006) to argue that in cases involving fraudulent misrepresentation, place of injury is less significant than in the personal injury context.  Mot. at 24-25.  However, in *Washkoviak*, despite assigning less weight to place of injury, the court still did not apply the state law advocated by the defendant.  The court held that because it was unable to "determine from the pleadings which jurisdiction has a greater interest," it was required to "resolve any uncertainty in [plaintiffs'] favor . . . the tie would appear to go to [plaintiffs] . . . ."  *Id.* at 182.  Moreover, the *Washkoviak* court's analysis of place of injury in cases involving claims of misrepresentation is based in part on Restatement (Second) Conflict of Laws § 145 cmt. f.  Comment f suggests that the location of the misrepresentation may be less significant in actions between business competitors, where the loss "will normally be felt most severely at the *plaintiff's headquarters or principal place of*

Conversely, Defendants' "sole connection to the District appears to be that it is the location of [their] principal place of business." *Mobile Satellite*, 646 F. Supp. 2d at 131.  While Plaintiffs have indicated that Defendants conduct business in the District and that events related to the case occurred in the District, these allegations do not by itself support the application of District of Columbia law.  Indeed, Plaintiffs' broad statement that "significant events giving rise to this case took place in this District" was pleaded for purposes of *venue*, not to support particular claims.  Compl. ¶ 9.  Plaintiffs have also not described what business practices *conducted in the District of Columbia* relate to Plaintiffs' California statutory claims.

Discovery may reveal that Defendants devised strategies to misrepresent the mandatory nature of special assessments outside of the District of Columbia.  Plaintiffs may also uncover evidence demonstrating that Defendants' dues statements and the representations on Defendants' websites were formulated or implemented outside of the District of Columbia.  Although Defendants proclaim that the conduct at issue in this case "emanated from a Washington, D.C. organization," Mot. at 25, Plaintiffs have never made such an allegation and have not yet had an opportunity to explore this issue through discovery.

For these reasons, California law is applicable to this case.

### B.      Plaintiffs Have Properly Alleged Claims Under the UCL and FAL

Plaintiffs bring claims under the Unfair Competition Law, CA Bus. & Prof. Code, § 17200 *et seq.* ("UCL"), which is a statute designed to prevent unfair competition.  The UCL defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited" by the False Advertising Law, CA Bus. & Prof. Code, § 17500 *et seq.*  ("FAL").  "The scope of the UCL is quite broad.  Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition."  *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1470-71 (2006)  (citations omitted).  Thus, Plaintiffs' claims

---

*business*.  But this place may have only a slight relationship to the defendant's activities and to the *plaintiff's loss of customers or trade*."  Restatement (Second) of Laws § 145 cmt. f (emphasis added).

under the UCL and FAL must survive if they properly alleged that Defendants' actions are (1) fraudulent, (2) unfair, *or* (3) unlawful.  Plaintiffs here have alleged that Defendants' conduct was fraudulent, unfair and unlawful.  And, therefore, their claims under the UCL and FAL may proceed if their allegations are sufficient under any of these three prongs.

With respect to the first two prongs, the question of whether or not a practice is fraudulent (which under the UCL means deceptive) or unfair is a question of fact that cannot be decided on a motion to dismiss (or demurrer).  *See McKell* 142 Cal. App. 4th at 1472 ("Whether a practice is deceptive or fraudulent 'cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer.' Rather, the determination is one question of fact, requiring consideration and weighing of evidence from both sides before it can be resolved.") (citation omitted); *id.*, at1473 ("As with the determination whether a practice is fraudulent, the determination whether it is unfair is one of fact which requires a review of the evidence from both parties.  It thus cannot usually be made on demurrer.") (citation omitted).

1.      **Plaintiffs Have Adequately Pleaded Violations of the UCL's Fraudulent Prong and the FAL**

a.      **Plaintiffs' Allegations Satisfy the Applicable Pleading Requirements**

Where fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). "Allegations of non-fraudulent conduct, even if they appear side-by-side with allegations of fraud, need satisfy only the ordinary notice pleading standards of [Fed. R. Civ. P. 8(a)]." *Id*.

Fraud is not an essential element of the UCL or FAL.  *See e.g.*, *Vess*, 317 F.3d at 1105. The fraud prong of the UCL "bears little resemblance to common law fraud or deception . . . a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage." *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1105 (1996) (citations omitted).  "Fraudulent"

under section 17200 "only requires a showing that members of the public 'are likely to be deceived.'" *Makaeff v. Trump Univ., LLC*, No. 10-CV-940-IEG (WVG), 2010 U.S. Dist. LEXIS 108467, at *18 (S.D. Cal. Oct. 12, 2010) (citations omitted).  Plaintiffs allege that Defendants' failure to disclose that payment of the practice assessment was not mandatory for membership in the APA constitutes deceptive and misleading conduct.  Compl. ¶¶ 1, 4, 16-20, 23, 25-26, 41-46, 50-52.  Plaintiffs' allegations do not rely on elements of common law fraud, nor are Plaintiffs' UCL and FAL claims "grounded in fraud."  *Vess*, 317 F.3d at 1105.  Therefore, Rule 8(a), not Rule 9(b), is applicable.

Even if the Court were to apply Rule 9(b), the Complaint more than satisfies the heightened pleading standard.  Rule 9(b)'s requirements must be read in conjunction with Rule 8(a)'s "requirement of a 'short and plain' statement of a claim.  Thus, the particularity requirement is satisfied if the complaint 'identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.'"  *Baas v. Dollar Tree Stores, Inc.*, No. C 07-03108 JSW, 2007 U.S. Dist. LEXIS 65979, at *5 (N.D. Cal. Aug. 29, 2007) (citations omitted).

Furthermore, Rule 9(b)'s requirements are relaxed with respect to "matters within opposing the opposing party's knowledge."  *Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG (MLGx), 2009 U.S. Dist. LEXIS 125139, at *11 (C.D. Cal. June 12, 2009) (allegations of fraudulent omission are subject to a relaxed standard because "'a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act.'") (citation omitted).  Plaintiffs properly allege that the Defendants violated the fraudulent prong of the UCL and the FAL and have pled their allegations with the particularity required under Rule 9(b), if it was to apply.

Rule 9(b) requires that plaintiffs "'state the time, place, and content of the false representations, the fact misrepresented and what was retained or given up as a consequence of the fraud[,] . . . and identify individuals allegedly involved in the fraud.'"  *Mobile Satellite*, 646 F. Supp. 2d at 131 (citation omitted); *see also Vess*, 317 F.3d at 1106 ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.")

30

(citation omitted).  Plaintiffs have expressly alleged that the APA and APAPO, each acting as the agent of the other, Compl. ¶¶ 3, 13-14,[19] violated the UCL and FAL by representing that the payment of practice assessments was mandatory for membership while concealing from their members that such payments were, in fact, voluntary.  *See e.g. id.* ¶¶ 1, 4, 6, 16-20, 22-23, 25-27, 29, 41, 44-46.  Moreover, Plaintiffs describe with detail the specific times and places of Defendants' misconduct and the content of their misrepresentations and omissions.  *See e.g. id.* ¶ 4 ("Since at least 2002"), ¶ 16 ("The special or practice assessment fee came pre-printed on annual membership dues statement[s] . . . [and] stated that any members who provide 'ANY' health related services 'MUST PAY' the Practice assessment'"), ¶ 17 ("The APA's website in 2002 stated that members '. . . must pay the Special Assessment . . . .'"), ¶ 18 (2004 statement by the APA in a specific edition of the *Monitor* indicating that "[b]eginning in 2005, 'all APA members who are licensed psychologists will be billed the assessment . . . .'"), ¶¶ 19-20, 22 (indicating that through 2010, including on the APAPO's "Practice Central" website in April 2010, Defendants concealed the purely voluntary nature of the practice assessments), ¶ 25 (stating that the APA included the term "Pay $137 Practice Assessment" under an "Action Required" column on members' dues statements), ¶ 26 (2011 dues statement indicating that payment of the Practice Assessment was required), ¶¶ 28-29 (indicating that  Defendants' websites continue to require payment of the practice assessment).  Furthermore, Plaintiffs allege what was "given up" as a result of Defendants' conduct—each member paid approximately $140 per year in special assessments.  *See e.g. id.* at ¶¶ 4, 10-11, 21, 25, 45.

Plaintiffs' well-pled allegations satisfy the requirements of Rule 9(b) and are abundantly sufficient to place Defendants on notice of the UCL and FAL claims that are being asserted against them.

> ### b.   The Reasonable Consumer Standard Applies to the Fraudulent Prong of the UCL and FAL

---

[19] *See*, *e.g.*, *Mobile Satellite*, 646 F. Supp. 2d at 131-32 ("By alleging an agency relationship, plaintiff is claiming that each defendant engaged in the alleged fraudulent representations through their identified representatives.  These allegations are sufficient under Rule 9(b).") (citation omitted).

"The Legislature framed the UCL's substantive provisions in 'broad, sweeping language' . . . and provided 'courts with broad equitable powers to remedy violations.'  The state's false advertising law (§ 17500 *et seq.*) is equally comprehensive within the narrower field of false and misleading advertising."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011) (internal citations omitted); *see also McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 187 (2010) ("The scope of the UCL is quite broad.") (citations omitted).  California courts have analyzed whether a misrepresentation or omission is "likely to deceive" under the UCL and FAL based on a "reasonable consumer" standard.  *See*, *e.g.*, *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *see also Aron v. U-Haul*, 143 Cal. App. 4th 796, 806 (2006).

Defendants, relying exclusively on *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003), incorrectly apply an elevated "reasonable consumer" standard in this case because the plaintiffs are educated professionals.  Mot. at 28.  First, the *Lavie* court *declined to apply an elevated "reasonable consumer" standard.  Id.* at 504, 513; *see also Asis Internet Servs.*, Case No. 09-3503 SC, 2010 U.S. Dist. LEXIS 33645, at *6 n.2 (N.D. Cal. Apr. 1, 2010) ("*Lavie didn't say that a more rigorous standard should apply where advertisements might target a sophisticated group*; rather, it held that 'unless the advertisement targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer.'") (emphasis added) (quoting *Lavie*, 105 Cal. App. 4th at 506-07).

In addition, the case that the *Lavie* court cited in its discussion of when courts might elevate the standard beyond that of a "reasonable consumer," *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999) ("GMAC"), is inapposite.  In *GMAC*, South Bay Chevrolet ("South Bay") asserted claims, in part, under the UCL and the FAL against General Motors Acceptance Corporation ("GMAC") for failing to disclose that the interest on GMAC's loans was calculated using a 365/360 method (where daily interest rates are calculated based on a 360-day year).  *GMAC*, 72 Cal. App. 4th at 869, 871-72.

The court held that, based in part on evidence of prior dealings and communications between the parties, South Bay knew of the 365/360 method for calculating interest and was aware that GMAC used this method to calculate interest on loans to South Bay.  *Id.* at 879, 889.

32

"South Bay's office manager calculated by hand the . . . interest owing to GMAC on each vehicle under the 365/360 method." *Id.* at 873.  Furthermore, experts indicated that the 365/360 method was common in the industry and appropriate if the borrower was made aware of the practice.  *Id.* at 882, 889.  As a result, the court held that, "*under these circumstances*," the method of calculation was not "likely to deceive South Bay or other members of the intended audience of reasonable GMAC-financed automotive dealerships."  *Id.* at 889 (emphasis added).  "South Bay knew, understood, agreed and expected that GMAC would use the 365/360 method." *Id.* at 884, 886.

This case bears no resemblance to *GMAC*.  Plaintiffs and putative Class Members were never involved in the calculation and apportionment of the practice assessment fee.  In addition, there is nothing about the practice of psychology, the psychology industry, or a psychology education that would have made Plaintiffs and putative Class Members aware, or reasonably allowed them to know the subtle linguistic gymnastics now argued by Defendants—that instructions that they "must pay" the  practice assessments were merely a suggestion of moral obligation.  In this case, Plaintiffs' profession and education were of little assistance in protecting them from Defendants' misrepresentations.  As a result, Plaintiffs' allegations do not call for a more rigorous application of the "reasonable consumer" standard.

      c.      **Plaintiffs Have Adequately Pleaded Likelihood of Deception**

Defendants also argue that, under an elevated "reasonable consumer" standard, Plaintiffs have not alleged that it was probable that a "significant portion" of "the sophisticated group" could be misled by Defendants' misrepresentations and omissions.  Mot. at 28-29, citing *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508, 512 (2003).  However, even if this was the applicable standard for analyzing the fraudulent prong of the UCL and FAL in this case (which it is not), these arguments ignore the plain allegations of the Complaint and suggest that Plaintiffs are required to prove their case at the pleadings stage.

Plaintiffs have pled not only that they and putative Class Members were "likely deceived," but, in fact, "*were deceived*" by Defendants' failure to disclose that payment of special assessments were voluntary and not mandatory for APA membership.  Compl. ¶¶ 44, 46,

33

51.  Defendants have quoted this core allegation in their Motion to Dismiss.  Mot. at 28,

"plaintiffs claim that APA and APAPO engaged in a 'fraudulent business act or practice' . . .

[that] '*was likely to deceive, and did in fact deceive, Plaintiffs and members of the Class*.'"

(emphasis added) (quoting Complaint ¶ 44).

Defendants' current position—that the special assessments were mandatory, *but not

mandatory for membership*, or that the APA considered such payments to be mandatory but only

to the extent members should feel compelled by a professional duty—is no less deceptive.

Indeed, this inscrutable argument illustrates Defendants' inconsistent and muddied policy for

charging practice assessments to APA members.  In any event, Plaintiffs' core allegations are

unchanged by Defendants' creative interpretation of their practice assessment policies:

Defendants violated the UCL and FAL in that APA members were deceived by Defendants'

misrepresentation of the practice assessment as mandatory when *it was not required* for APA

membership.

At the motion to dismiss stage, Plaintiffs need only allege a *likelihood of deception* based

on Plaintiffs *reasonable* interpretation of Defendants' representations.  It is of no moment

whether Defendants are able to devise an ad hoc explanation for them.  *See e.g. Aron*, 143 Cal.

App. 4th at 807 ("'A perfectly true statement couched in such a manner that it is likely to

mislead or deceive the consumer, such as by failure to disclose other relevant information, is

actionable [under the UCL].") (citation omitted).  Defendants cannot substitute their reading of

APA dues statements for Plaintiffs' allegations, which are taken as true.  *See e.g. O'Donovan v.

Cashcall, Inc.*, No. C 08-03174 MEJ, 2009 U.S. Dist. LEXIS 53895, at **31-32 (N.D. Cal. June

24, 2009) ("[F]or purposes of this motion to dismiss, all well-pled allegations must be accepted

as true.").

Furthermore, Plaintiffs have pled that *more than a significant portion* of members were

misled.  First, this is a proposed class action and Plaintiffs are alleging that among the issues that

are "common" to the *entire Class* is in part "[w]hether Defendants omitted, misrepresented,

concealed or manipulated material facts from Plaintiff and the Class regarding the special or

practice assessment fee," Compl. ¶ 35(a), and "[w]hether Defendant's [*sic*] conduct as described

34

herein violates California Business and Professions Code Sections 17200 and 17500 et seq." *Id.* ¶ 35(d).  In addition, Plaintiffs repeatedly allege that Defendants misrepresented to *all APA members* that payment of the special assessment was required for APA membership and that all putative Class Members were injured as a result.  *See e.g. id.* ¶¶ 18-20, 23, 27, 29, 30, 44-46, 52. Moreover, it is well-settled that Plaintiffs are not required to demonstrate individual class member reliance to assert a claim under the UCL and FAL.  *See, e.g., Chavez v. Blue Sky Natural Beverage Co.*, No. C 06-6609 VRW, 2010 U.S. Dist LEXIS 60554, at *29 (N.D. Cal. June 18, 2010) (relief under UCL is available without individualized proof of deception, reliance and injury); *Menagerie Prods. v. Citysearch*, No. CV 08-4263 CAS (FMO), 2009 U.S. Dist. LEXIS 108768, at *24 (C.D. Cal. Nov. 9, 2009) (same).

While Defendants would have Plaintiffs prove that they and a significant portion of APA members could be misled or were likely deceived by Defendants' misrepresentations, no such showing is necessary in these initial stages of litigation:

> [W]hether particular practices are likely to deceive members of the public is generally treated as a question of fact when it arises under [the UCL] . . . California Courts have therefore found that '[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides and which usually cannot be made on demurrer.'

*Asis Internet Servs.* 2010 U.S. Dist. LEXIS 33645, at *6 (citations omitted); *see also Smartmetric Inc. v. Mastercard Inc.*, No. 2:10-cv-01864-JHN-FMOx, 2010 U.S. Dist. LEXIS 141976, at *6 n.1 (C.D. Cal. July 8, 2010) ("Plaintiff needs only to plead adequately, not prove, its case at the pleading stage.").  Ultimately, the question of whether a reasonable person would have believed that the Assessments were a necessary condition to membership in APA is a question of fact that is not appropriate for resolution through a motion to dismiss.

## 2.    Plaintiffs Have Properly Alleged A Claim Under The Unfair Prong

Whether or not a party has engaged in unfair practices is a fact-intensive inquiry that is not susceptible to a ruling on a motion to dismiss.  *See Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000) ("Unlike "unlawfulness," "unfairness" is an equitable concept that cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or

overruling of a demurrer.")  In addition, "courts are given 'broad discretion to prohibit new schemes to defraud' under the unfair prong." *Hartless v. Clorox Co.*, No. 06CV2705 JAH(CAB), 2007 U.S. Dist. LEXIS 81686, at *21 (S.D. Cal. Nov. 2, 2007).  Defendants are incorrect to suggest that there is a single, universal test for analyzing the unfair prong of the UCL, and that the test articulated in *Cel-Tech Communs., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ("*Cel-Tech*") is the prevailing test.  Mot. at 29-30.  In that case, which involved a dispute between business competitors, the court held that unfair "means conduct that threatens an incipient violation of an antitrust law, or violates the spirit of one of those laws. . . ." *Id.* at 187.  The Ninth Circuit has correctly characterized the analysis under the unfair prong as "in flux" and noted that *Cel-Tech's* discussion of the unfair prong has been limited to actions between competitors involving anticompetitive conduct.  *See, e.g., Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 735-36 (9th Cir. 2007).  The California Supreme Court expressly held that

> This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context.  Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.'

*Cel-Tech*, 20 Cal. 4th at 187 n.12.  As a result, "California courts have not yet determined how to define 'unfair' in the *consumer* action context after *Cel-Tech*." *Lozano*, 504 F.3d at 736 (emphasis in the original) (citations omitted); *see also Puentes v. Wells Fargo Home Mortgage, Inc.*, 160 Cal. App. 4th 638, 646 (2008) (California appellate courts are "'divided over whether the definition of 'unfair' under the UCL as stated in *Cel-Tech* should apply to UCL actions brought by consumers.'" ) (citation omitted).

While some California appellate courts have applied the *Cel-Tech* test, another test was articulated for *consumer* cases by the court in *Smith v. State Farm Mut. Auto. Ins. Co.* ("*Smith*"), 93 Cal. App. 4th 700, 720 n. 23 (2001).  The *Smith* test weighs the competing interests of the impact of the practice or act on its alleged victim against the reasons, justifications and motives of the alleged wrongdoer.  *Id.*  This test was derived from previous decisions, including *State Farm Fire & Cas. Co. v. Superior* Court, 45 Cal. App. 4th 1093, 1104 (1996) ("*State Farm*") and

*People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (1984) ("*Casa Blanca*"). And the *Smith* test has been repeatedly applied in the consumer context by other California appellate courts. *See e.g.*, *People ex rel. Renne v. Servantes*, 86 Cal. App. 4th 1081, 1095 (2001); *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1498, (2003).[20] The allegations in the Complaint clearly satisfy the criteria of the *Smith* case. Compl. ¶¶ 41-42.

The Ninth Circuit has acknowledged that some California courts of appeal apply the *Cel-Tech* standard, while others apply the *Smith* (or *State Farm*) standard. *See, e.g.*, *Rubio v. Capital One Bank*, 613 F.3d 1195, 1205 (9th Cir. 2010) ("California appellate courts disagree on how to define an "unfair" act or practice in the context of a UCL consumer action")); *see also Lozano*, 504 F.3d at 736. Courts applying the *Cel-Tech* test in consumer actions have held that the alleged unfairness must only be "tethered" to an underlying law or policy. *See, e.g.*, *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 953 (N.D. Cal. 2009) (citing *Cel-Tech*, 20 Cal. 4th at 185-86); *see also Marks v. Ocwen Loan Servicing*, No. C 07-02-133 S, 2007 U.S. Dist. LEXIS 65590, at *7 (N.D. Cal. Aug. 21, 2007) ("'the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions . . . .'") (citation omitted).

Even if the *Cel-Tech* test were applied in this case, its application in the consumer protection context does not require that Defendants' conduct must have had "an[] effect on competition." Mot. at 30. Such an interpretation would foreclose an entire prong of the UCL from being applied in a host of consumer cases, and severely limit its application to the anti-competition context or cases involving direct competitors. Neither of the cases that Defendants cite in support of *Cel-Tech* interpret the test in this manner.[21]

---

[20] Yet another approach for analyzing the unfairness prong was set forth in *Camacho v. Auto. Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006). The *Camacho* test examines whether the injury to the consumer was substantial, whether the injury is outweighed by any countervailing benefits to consumers or competition, and whether the injury to the consumer could not have been reasonably avoided. *Id.* In addition, unfair conduct under the UCL has been defined as a "deceptive or sharp practice." *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515, 518 (2002) (citing in part *Samura v. Kaiser Found. Health Plan, Inc.*, 17 Cal. App. 4th 1284, 1299, n.6 (1993)).

[21] *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1366 (2010) upheld the denial of plaintiff's "unfairness" claim because he failed to address *Cel-Tech* altogether. *Byars v. SCME*

Plaintiffs, nevertheless, have pleaded sufficient allegations of "unfairness" regardless of which test is applied by this Court.  First, Plaintiffs have tethered their claims under the "unfair" prong to Defendants' efforts "to maximize lobbying funds outside of the proper lawful function of a 501(c)(3) entity."  Compl. ¶ 6; *see also id.* ¶¶ 5, 15, 24, 43.[22]  In addition, Plaintiffs alleged that their annual practice assessment payment of approximately $140 was not outweighed by any potential lobbying benefits, where payment for such activities was obtained by misrepresenting the assessments as being mandatory for membership in the APA.  *See e.g. id.* at ¶¶ 4, 24-25, 42.

Furthermore, despite Defendants' interesting musings on the meaning of the word "mandatory," Mot. at 19-20, they cannot deny that "'[n]on-payment of the practice assessment [does] not affect [] APA membership status.'"  Compl. ¶ 27 (citation omitted); *see also id.* ¶ 25.  This significant omission is precisely what makes Defendants' representations concerning the assessment deceptive and misleading.  Plaintiffs' specific allegations, which are taken to be true, demonstrate that APA members were deceived and misled in part where:  the APA dues statement and website indicated that members "must pay" the special assessment; Defendants were aware that these payments were not required for APA membership and concealed this fact from APA members; Defendants concealed the voluntary nature of these assessments to shore up funding for the APAPO and circumvent restrictions on lobbying activities; and Plaintiffs would not have paid the assessments had they known that non-payment would not affect their APA membership status.  *Id.* ¶¶ 4, 6, 15, 16-17, 19-20, 23-27, 43, 46, 50-52.  Plaintiffs expressly state that these practices were "unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous."  *Id.* ¶ 41.

For these reasons, Plaintiffs have adequately pled violations of the "unfair" prong under the UCL.

---

*Mortgage Bankers, Inc.*, 109 Cal. App. 4th 1134 (2003) held that the defendant did not violate the unfair prong of the UCL in part because the omissions at issue in the case were more appropriately asserted against an entity not named in the action.  Neither case held that plaintiffs failed to satisfy the *Cel-Tech* test because they failed to allege an effect on competition.

[22] To the extent allegations concerning Defendants' unlawful lobbying activities have no relationship to common law fraud nor sound in fraud, they are not subject to Rule 9(b).  *Vess*, 317 F.3d at 1105.

### 3.    Plaintiffs Have Properly Alleged A Claim Under The Unlawful Prong

The California "Supreme Court has observed that [the UCL's] 'sweeping language' . . . include[s] '*anything* that can properly be called a business practice and that at the same time is *forbidden by law*.' [Citation.]" . . . Hence, '[v]irtually any law—federal, state or local—can serve as a predicate for a section 17200 action. [Citation.]'" *Stevens v. Superior Court*, 75 Cal. App. 4th 594, 602 (1999) (emphasis added) (citations omitted); *see also Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994) ("The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.") (citation omitted).

Defendants argue that Plaintiffs' allegations under the unlawful prong are conclusory and fail to identify "any actual violation of federal tax law, nor the facts to establish one." Mot. at 31. As an initial matter, it must be made clear that Plaintiffs' "unlawful" allegations are not predicated only on alleged violations of tax law. Instead, the predicate violation also relates to Defendants' unjust enrichment, which is a violation of Plaintiffs' common law rights and is sufficient to establish the unlawful prong. *See CRST van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1112-13 (9th Cir. 2007) ("Under the California Supreme Court's interpretation of the UCL, an adequate claim for relief from a tortious business act or practice effects a violation of the UCL because the UCL is a 'borrowing' statute . . . It 'borrows' a common law 'wrong' to constitute a statutory 'unlawful' business practice.") Here, Plaintiffs' allegations under the UCL incorporate by reference all of the preceding allegations of the Complaint, including the allegations of unjust enrichment. *See* Compl. ¶¶ 35-40. Thus, Defendants' conduct is unlawful under the UCL because they were unjustly enriched under common law.

In any event, Plaintiffs describe in detail how the APA, as a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code, raised lobbying funds that it represented to be mandatory for membership in the APA and distributed such funds to the APAPO, a 501(c)(6) entity created for the purpose of conducting lobbying and advocacy activities. Compl. ¶¶ 2, 5-6, 15, 24, 43. The APA and APAPO consists of the same leadership and share "the same physical address, the same server hosting company, the same membership

list, and the same accounting and billing systems." *Id.* ¶ 13.  Indeed, the APA's involvement in such lobbying activities is "outside of the proper lawful function of a 501(c)(3) entity." *Id.* ¶ 6.

Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), in part provides tax exempt status to non-profit organizations, "*no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation . . . .*"  Thus, "[501(c)(3) organizations are not] permitted to engage in substantial lobbying to advance their exempt purposes." *Regan v. Taxation with Representation*, 461 U.S. 540, 542 n. 3 (1983).  In *Regan*, the Supreme Court indicated that while a 501(c)(3) may establish a separate lobbying affiliate under a different section of the Internal Revenue Code, the Internal Revenue Service ("IRS") requires that "the two groups be separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying. *Regan*, 461 U.S. at 544 n. 6.  The court added that "[t]his is not unduly burdensome." *Id.*

Defendants suggest that Plaintiffs have not alleged any unlawful conduct under the Internal Revenue Code in part because 501(c)(3) organizations can establish affiliates for lobbying purposes and the IRS ruled that "*when the grants are properly restricted*, the charitable organization may make grants to the noncharitable tax-exempt organization." Mot. at 31; emphasis added, quoting HOPKINS, THE LAW OF TAX-EXEMPT ORGANIZATIONS 997-98 (9th ed. 2007).  However, Plaintiffs are directly challenging whether the APA's involvement in lobbying activities are not substantial, whether its "grants [to the APAPO] are properly restricted," and whether the APA and APAPO are sufficiently segregated.  These are questions of fact that will be the subject of extensive discovery and cannot be properly resolved on a motion to dismiss.[23]

---

[23] Defendants argue that Plaintiffs lack standing to enforce the Internal Revenue Code and that any attempts at enforcement would be preempted under the Supremacy Clause.  Mot. at 31 n.18.  However, the California Supreme Court has held that "a private plaintiff may bring a UCL action even when 'the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action.'" *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002) (citing *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 565 (1998)).  Furthermore, Plaintiffs' action does not seek the "collection or recovery of taxes, or of any fine, penalty, or forfeiture" (Mot. at 31 n. 18 (citing 26 U.S.C. § 7401)), nor do they seek enforcement of section 501(c)(3) through the UCL or in a separate claim under section 501(c)(3).  Rather, Plaintiffs allege Defendants' violations of section 501(c)(3) to demonstrate that the APA and APAPO deliberately misrepresented the special assessments as being "mandatory" for the

For these reasons, Plaintiffs have adequately pled violation of the UCL's unlawful prong.

## III.   IT IS PREMATURE TO DETERMINE WHETHER PLAINTIFFS ARE ENTITLED TO A JURY TRIAL

Defendants correctly point out that Plaintiffs' causes of actions are predominantly equitable in nature.  And Plaintiffs agree that this impacts their right to a trial by jury.  At the same time, however, Defendants have introduced issues that could—if accepted by the Court— lead to Plaintiffs filing an amended complaint alleging different causes of action, including breach of contract.  In addition, discovery has not yet begun in this case.  Discovery could reveal facts that would call for the amendment of the Complaint to add additional causes of action.  And Defendants have cited no authority in support of their request that the Court "strike" Plaintiffs' request for a jury trial at this early stage of the proceedings.  For these reasons, Plaintiffs respectfully urge the Court to defer ruling on the motion to strike until after the end of discovery. *See S.E.C. v. Contl. Advisers*, 1978 WL 1098 (D.D.C. June 29, 1978) (noting that motions to strike are disfavored and ruling that "Plaintiff's motion to strike jury demand will be held in abeyance" pending outcome of related litigation "or until such time as the posture of this case necessitates resolution of the issue"); *New Kayak Pool Corp. v. Gerspach*, 1995 WL 13257 (W.D.N.Y. Jan. 11, 1995) (holding that motion to strike jury trial request was premature where discovery was still pending).

## CONCLUSION

Wherefore, for all the above reasons, Plaintiffs respectfully request that Defendants' Motion be denied.

---

purpose of maximizing contributions for lobbying activities.  Compl. ¶ 6.  These allegations, "[o]n their face, [] do not purport to regulate [501(c)(3) organizations] and are not specifically directed toward them."  *Gibson v. World Sav. And Loan Assn.*, 103 Cal. App. 4th 1291, 1302 (2002).  In addition, courts have analyzed an organization's 501(c)(3) status where the plaintiff asserted violations of the UCL and alleged that 501(c)(3) organizations misrepresented that credit counseling services were being performed by non-profit, and not for-profit, entities.  *See Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F. Supp. 2d 539, 540-43, 549-50 (D. Md. 2005) ("Plaintiffs submit that neither Debticated nor the non-Defendant [credit counseling agencies] actually operated as non-profits . . . *The Court is obliged to consider whether in operation the [credit counseling agencies] truly function as [501(c)(3) entities].*") (emphasis added).

Dated:  April 1, 2011                          /s/ Hassan A. Zavareei
                                               Hassan A. Zavareei
                                               Lorenzo B. Cellini
                                               TYCKO & ZAVAREEI LLP
                                               2000 L Street N.W., Suite 808
                                               Washington, DC  20036
                                               Telephone:  (202) 973-0900
                                               Facsimile:  (202) 973-0950
                                               hzavareei@tzlegal.com
                                               lcellini@tzlegal.com

                                               Mark J. Tamblyn (*pro hac vice*)
                                               Ian J. Barlow (*pro hac vice*)
                                               WEXLER WALLACE LLP
                                               455 Capitol Mall, Suite 231
                                               Sacramento, California  95814
                                               Telephone: (916) 492-1100
                                               Facsimile:  (916) 492-1124
                                               mjt@wexlerwallace.com

                                               *Co-lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this day, the PLAINTIFFS' MEMORANDUM

OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO

DISMISS OR, IN THE ALTERNATIVE, TO STRIKE PLAINTIFFS' REQUEST FOR A JURY

TRIAL was served via electronic delivery through the CM/ECF system, upon the following:


David W. Ogden, Esq.
Jonathan E. Paikin, Esq.
Francesco Valentini, Esq.
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
david.ogden@wilmerhale.com
jonathan.paikin@wilmerhale.com
francesco.valentini@wilmerhale.com
*Attorneys for Defendants*


Dated:  April 1, 2011

/s/Hassan A. Zavareei