**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**In re: APA Assessment Fee Litigation**

**Ellen G Levine, et al.,**

      **Plaintiffs,**

        v.

**AMERICAN PSYCHOLOGICAL**
**ASSOCIATION, INC. and AMERICAN**
**PSYCHOLOGICAL ASSOCIATION**
**PRACTICE ORGANIZATION,**

      **Defendants.**

---

**ERIC S. ENGUM,**

      **Plaintiff,**

        v.

**AMERICAN PSYCHOLOGICAL**
**ASSOCIATION, INC. and AMERICAN**
**PSYCHOLOGICAL ASSOCIATION**
**PRACTICE ORGANIZATION,**

      **Defendants.**

Civil Action No.  10-1780  (JDB)
(consolidated with Civil Action No. 10-
1898 (JDB))

---

## MEMORANDUM OPINION

This matter is before the Court on [16] defendants' motion to dismiss plaintiffs' claims for

unjust enrichment and violations of California consumer protection laws.  Plaintiffs, on behalf of

a proposed class, claim that they paid a "special assessment" or a "practice assessment" to the

American Psychological Association ("APA") for use by its lobbying arm, the American

1

Psychological Association Practice Organization ("APAPO"), under the mistaken belief that payment of that assessment was required for membership in the APA.  Compl. [ECF 15] ¶ 22. Plaintiffs contend that the APA intentionally misled its members by stating that payment of the special assessment was mandatory, when, in fact, the APA considered the payment of the assessment to be "purely voluntarily."  Id.  These misrepresentations, plaintiffs argue, unjustly enriched the APA and APAPO and violated California consumer protection laws.  Id. ¶¶ 33-53. Defendants argue that plaintiffs cannot bring the quasi-contract claim of unjust enrichment when an actual contract governs the relationship between the APA and its members; that the APA's statements were not misleading; and that choice of law principles dictate that District of Columbia law, not California law, applies to this dispute.  The Court agrees with defendants that plaintiffs' claims as currently stated suffer from fatal threshold flaws and therefore must be dismissed.

## I.  Background

These facts are drawn from [15] plaintiffs' complaint.  In the context of this motion to dismiss, the Court takes the allegations in the complaint as true.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

The APA is "the world's largest organization representing psychologists" and has "hundreds of thousands of members" throughout the United States.  Compl. ¶¶ 2, 15.  As a 501(c)(3) organization, the APA may not engage in significant lobbying.  Id. ¶ 15.  Hence, in 2001, the APA formed the APAPO, a 501(c)(6) organization, to "conduct[ ] professional advocacy and lobbying" on behalf of the APA's members.  Id. ¶¶ 3, 5, 15.  The APA and the APAPO have the same membership list, board of directors, physical address, and accounting and

billing system.  Id. ¶ 13.  Plaintiffs allege that at all relevant times "each of the Defendants was

the agent, servant, representative, officer, director, partner or employee of the other. . . . [and

was] engaged in a joint venture, partnership and common enterprise."  Id. ¶ 14.

Plaintiffs' complaint is based on payments made by APA members to support the

APAPO's activities.  According to plaintiffs, the "APA has been assessing clinicians – those

psychologists who actually practice clinical psychology and do psychotherapy – a special fee

with their APA dues, which is represented to those clinicians on their billing statements as a

mandatory practice assessment, which is then allocated by APA leadership to the APAPO."  Id. ¶

15.  Plaintiffs point to several statements that they claim misleadingly imply that the special

assessment was mandatory.  They assert that the APA's website stated in 2002 and for a number

of years thereafter that members "must pay" the special assessment.  Id. ¶ 17.  The annual dues

statement came pre-printed with the amount of the special assessment filled in, and the

instructions explained that members who provided "any" health services "must pay" the special

assessment.  Id. ¶ 16.  Additionally, the APA announced in 2005 that it would no longer exempt

new members from payment of the special assessment, but that instead "all APA members who

are licensed psychologists will be billed the assessment."  Id. ¶ 18 (internal quotation marks

omitted).  When the APA eventually began allowing online payment of dues, the website did not

allow members to forego payment of the special assessment.  Id. ¶ 19.

In 2010, some APA members discovered that "the purportedly mandatory APAPO

special or practice assessment fee was purely voluntary" and disseminated that information to

members of an APA email list.  Id. ¶ 22.  Thereafter, the APA made some efforts to clarify to

members that payment of the special assessment to fund the APAPO was not, in fact, a condition

of membership in the APA.  On May 5, 2010, members of the APA/APAPO board explained in

an APA newsletter that:

> The manner in which the APA, APAPO, and Division dues have been combined
> on past due statements does not make clear that the mandatory practice
> assessment payment is required for APAPO membership but not for APA
> membership. The 2011 dues statement instructions will be modified to clarify this
> point.

Id. ¶ 23 (internal quotation marks omitted).  The 2011 dues statement was then modified so that

it no longer said that members "must pay" the special assessment, and it specifically stated that

nonpayment of the assessment did not affect APA membership.  Id. ¶ 25.  The APA also clarified

that members could opt out of payment of the special assessment by paying their dues by phone,

although there was no option to pay only the basic dues online.  Id. ¶ 28.

In May 2010, Dr. Glenn Ally, a member of a committee that has "governance

responsibilities" for the APA and the APAPO, explained on an APA email list why the APA had

not previously characterized the special assessment as voluntary:

> I'm assuming you know the statistics that psychologists are at the bottom (AT
> THE BOTTOM) of the list of professions regarding voluntary contributions, even
> political advocacy contributions. What you are suggesting here is to make the
> primary and largest advocacy arm of our organization dependent on the voluntary
> contributions of the cheapest profession around. . . Again, I don't mean to be
> offensive, but try running your practice on voluntary contributions and see if your
> family gets everything they want and deserve to have. The PO is a business and
> they are in the business of advocating for practice. WE have decided we need this,
> and we decided long ago that we were not getting enough advocacy when we had
> to depend on the larger "APA." We wanted our own practice advocacy for a
> variety of reasons. That "business" has to depend on a relatively stable revenue
> source. Would the lobbyist for your state organization represent you if you told
> him/her that you were going to pay him/her differently each year based on
> "voluntary donations?"

Id. ¶ 24 (internal quotation marks omitted).

Other APA members, however, gave somewhat different explanations for the APA's

4

characterization of the special assessment as mandatory.  In January 2011, in response to a request to refund past dues, the APA's Executive Director for Public and Member Communications explained that "[i]n general, licensed providers are expected to pay the assessment" even though their APA membership would not be terminated if the assessment was not paid.  Id. ¶ 27.  In their briefing, defendants explain that the APA regards the payment of the special assessment as a moral and professional obligation, and hence mandatory, even though payment is not a condition of membership in the APA.  Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' MTD") at 1.

Plaintiffs are two California residents and a Tennessee resident who paid special assessment fees between 2001 and 2010.  Compl. ¶¶ 10-12.  They represent a proposed class of "current and former APA members who have paid special or practice assessment fees as part of their annual dues, which were misrepresented as being a mandatory part of those dues."  Id. ¶ 1.  According to plaintiffs, the putative class paid some $6,000,000 per year in special assessments.

Plaintiffs have reformulated their complaint several times and have now consolidated two cases brought on behalf of APA members.  After plaintiffs filed their consolidated class action complaint on January 31, 2011, defendants filed the instant motion to dismiss, and a hearing was held on the motion on August 11, 2011.

## II.  Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable

5

inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

In ruling on a motion to dismiss, "the allegations of the complaint should be construed favorably to the pleader."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Leatherman v. Tarrant Cnty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  Therefore, the factual allegations in the complaint must be presumed true, and plaintiff must be given every favorable inference that may be drawn from the allegations of fact.  Scheuer, 416 U.S. at  236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  The Court "need not, however, accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions."  Chandler v. W.E. Welch & Assoc., Inc., 533 F. Supp. 2d 94, 102 (D.D.C. 2008).

In addition to the facts alleged in the complaint, the Court may consider "any documents either attached to or incorporated by reference in the complaint, matters of which the court may take judicial notice, and matters of public record." Felder v. Johanns, 595 F. Supp. 2d 46, 58-59 (D.D.C. 2009) (citing EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997)).

### III.  Discussion

### A.  Unjust Enrichment

Plaintiffs contend that the putative class paid the special assessment in reliance on the APA's allegedly misleading statements, and that the APA and APAPO were unjustly enriched by those payments.  Defendants dispute both parts of that claim, arguing that the statements were not misleading and that an unjust enrichment claim is foreclosed here.  The Court will begin with

the latter argument.

Unjust enrichment is an equitable quasi-contract claim.  In other words, it is a "'[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract." 4934, Inc. v. D.C. Dep't of Employment Servs., 605 A.2d 50, 55 (D.C. 1992) (quoting Black's Law Dictionary 324 (6th ed. 1990)).  When an actual contract exists between the parties, an unjust enrichment claim is generally inappropriate, because a court should not "displace the terms of that contract and impose some other duties not chosen by the parties." Emerine v. Yancey, 680 A.2d 1380, 1384 (D.C. 1996).  An exception to this rule exists, however, if the contract does not cover the issue under dispute or if the contract's validity is in doubt.  See id. at 1383; Armenian Assembly of Am., Inc. v. Cafesjian, 597 F. Supp. 2d 128, 135 (D.D.C. 2009); see also Klein v. Arkoma Production Co., 73 F.3d 779, 786 (8th Cir. 1996).

Hence, the Court must determine whether a contract exists between plaintiffs and defendants and whether that contract covers the matter in dispute.  Defendants have provided the bylaws of the APA and the APAPO, as well as the APA Association Rules.  It is well-established that bylaws and rules of a membership organization can be "construed as a contractual agreement between the organization and its members." Meshel v. Ohev Sholom Talmud Torah, 869 A.2d 343, 361 (D.C. 2005).  Defendants contend that the Court can take judicial notice of the rules and bylaws, and that their mere existence forecloses defendants' claims.  Plaintiffs do not dispute the authenticity of the bylaws and rules, but vigorously argue that the Court cannot review them or even take notice of their existence in the context of this motion to dismiss.

Caselaw supports defendants' position that the Court can consider the bylaws and rules. In Schiff v. Am. Ass'n of Retired Persons, 697 A.2d 1193, 1194 n.2 (D.C. 1997), a case similar

7

in many ways to this one, the court held that "the existence of two express contracts between Schiff and AARP can be determined from the allegations in the complaint" and that those contracts could therefore be considered on a motion to dismiss, even though "the existence of any express contracts ha[d] not been alleged" specifically in the complaint.  Without rebutting Schiff, plaintiffs argue that the Court can only consider documents that are specifically referred to in their complaint.  See Plfs.' Opp. to Defs' Mot. to Dismiss [ECF 19] ("Plfs.' Opp.") at 11-12. But even putting aside Schiff – and plaintiffs have not offered any reason that the Court should do so – this Court agrees with those circuits that have held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  PBGC v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3rd Cir. 1993); see also Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997) (same).  Adhering to a more rigid rule would allow a plaintiff to avoid the dismissal of a deficient claim "simply by failing to attach a dispositive document on which it relied" to the complaint.  PBGC, 998 F.2d at 1196.  As the Third Circuit explained:

> [Considering these documents] will not undermine the rationale underlying Rule 12(b)(6)'s requirement that a motion to dismiss be converted to a summary judgment motion if a court considers matters outside the pleadings. The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. See Cortec, 949 F.2d at 48. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.

Id. at 1196-97.

Here, plaintiffs' claim revolves around whether payment of the special assessment was required for membership in the APA.  The bylaws and rules, which constitute the membership agreement between the APA and the plaintiffs, actually set out the membership requirements.

By definition, then, they are the basis for a claim that is fundamentally about membership requirements.  Indeed, it is difficult to see how plaintiffs could have realized that the special assessment was not required for membership in the APA other than by referring to the bylaws and rules.  It is unclear why plaintiffs did not attach those documents to their complaint, and it is similarly unclear what could be gained by denying the motion to dismiss due to a "simpl[e] failure to attach a dispositive document."  PBGC, 998 F.2d at 1196.  Hence, in light of Schiff, as well as the centrality of the membership contracts to plaintiffs' claims, the Court concludes that it can consider the bylaws and rules.[1]

The next question is whether the existence of the bylaws and rules, or their contents, preclude plaintiffs' unjust enrichment claim.  As noted above, defendants argue that the mere fact of a contract between defendants and plaintiffs forecloses any quasi-contract claim.  But as previously explained, the existence of an express contract between two parties only forecloses an unjust enrichment claim if the contract controls the relevant subject matter.  See supra at 7.  Hence, the Court must examine the bylaws and rules in order to determine whether plaintiffs' unjust enrichment claim can proceed.

Neither the APA bylaws, the APA rules, nor the APAPO bylaws specifically addresses the practice assessment.  They do, however, address membership in the APA and the APAPO.

---

[1] Plaintiffs argue in a footnote that "the Court cannot conclude or presume that these documents were in place or effective during the entire 2001-2010 time frame for the proposed class."  Plfs.' Opp. at 12.  But again, plaintiffs' claims are based on the contract or contracts in effect during the entire 2001-2010 period, and plaintiffs should not profit from their failure to attach dispositive documents on which they rely.  See PBGC, 998 F.2d at 1196.  Notably, plaintiffs do not show or even allege that the documents before the Court changed in any relevant way during the 2001-2010 time period.  A completely unsupported hypothetical in a brief cannot, standing alone, avert dismissal of an otherwise unsustainable unjust enrichment claim.

Article II of the APA bylaws describes different categories of membership, as well as the ethical, educational, and professional requirements for members.  Defs.' MTD, Ex. B at B2-B4.  Article XIX, entitled "Dues and Subscriptions," explains that "[t]he basic Association dues to be paid annually by Members and Associate Members shall be determined by Council . . . . In addition to the basic dues, each Member shall pay a fixed amount, to be determined by Council, for each Division over and above the one to which the Member belongs."  Id. at B15.  The special assessment is not mentioned.  Article XIX further states that "Nonpayment of dues for one year shall be considered as equivalent to a resignation from the Association."  Id.  The APA rules similarly describe the classes of members, see Defs.' MTD, Ex. D. at D6.  In a section entitled "Termination of Membership," the rules state that "membership in the Association may be terminated by the death of a member, resignation, dropping for nonpayment of dues, or as provided in the Ethics Committee's Rules and Procedures."  Id. at D9.  That section also states that "[a] member may resign from any division by not paying dues or assessment of that division in connection with the annual Association dues statement."  Id.  Lastly, the APAPO bylaws address membership and dues briefly, explaining in Article IV that the APAPO "shall have two categories of members.  One category of members, who are payers of the practice assessment, shall be known as 'Practice Constituents.'  The second category of members, who are payers to the Education Advocacy Trust, shall be known as 'Education Constituents.'" Defs.' MTD, Ex. C at C1.

The crux of plaintiffs' claim is that they were misled to believe that payment of the special assessment was required for membership in the APA, when in fact it was not.  The critical issue, then, is what the requirements of APA membership were.  The Court concludes

that the contract is controlling on that question.  The dues statements reminded members of their

obligations or opportunities to contribute to the APA, but the membership contract actually

explained which dues were required and the bases upon which membership could be terminated.

Even assuming arguendo that the dues statements were intentionally misleading, plaintiffs were

fully capable of noting the discrepancy between the statements and the membership contracts –

as, indeed, it appears that they eventually did – to determine which dues were truly mandatory.

That the bylaws and rules were not perfectly clear on whether "basic dues" included the special

assessment is irrelevant; such problems with the contract are the basis for a contract claim, not a

quasi-contract claim for unjust enrichment.  Hence, because the terms and conditions of APA

membership are defined in express contracts, the Court agrees with defendants that plaintiffs'

unjust enrichment claim must be dismissed.

Plaintiffs argue in a footnote that "even if there was an express contract between

Plaintiffs and the APA covering the Assessments, Plaintiffs could still have an unjust enrichment

claim against the APAPO, a third party to any such contract."  Plfs.' Opp. at 18 n.13 (citing

McWilliams Ballard, Inc. v. Level 2 Development, 697 F. Supp. 2d 101, 106-07 (D.D.C. 2010)).

Unfortunately, this footnote is the extent of the parties' briefing on this issue.  Although courts

have struggled with the question whether an unjust enrichment claim may be brought against a

third party to a contractual relationship, the trend is clearly against allowing such claims.  See,

e.g., Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC, 637 F. Supp. 2d 185, 196

(S.D.N.Y. 2009) (collecting cases).  That position is particularly persuasive where, as here, the

third party is functionally identical to one of the parties to the contract.  See Compl. ¶¶ 13, 14

(alleging that the APA and APAPO have the same board of directors and address, and that "each

of the Defendants was the agent . . . of the other").  The principle that a court should not displace agreed-upon contractual remedies would be meaningless if plaintiffs could simply bring their claims against the APA leadership by suing them in their role as the APAPO leadership.  See Emerine, 680 A.2d at 1384.

Plaintiffs' only caselaw in support of their third-party unjust enrichment claim is McWilliams, but that case is too different from this one to be helpful.  There, the plaintiff was permitted to bring an unjust enrichment claim against a corporate defendant with whom it had a contractual relationship; the defendant apparently did not raise the existence of the contract as a bar to the claim.  McWilliams, 697 F. Supp. 2d at 105-07.  The primary defendant had turned plaintiff's payment over to several other individual and corporate defendants, who shared a "unity of ownership and interest" with the primary defendant.  Id.  Hence, the court assumed that the unjust enrichment claim applied to all defendants.  Id.  But McWilliams never actually discussed whether and why the unjust enrichment claim could proceed against the third-party defendants despite the existence of the contract; indeed, as noted, the court did not even discuss whether the existence of the contract barred the unjust enrichment claim against the primary defendant.  The only clear principle that emerges from McWilliams, then, is that the primary defendant and any third-party defendants should be treated alike, at least when they share a "unity of ownership and interest."  Here, that means that if the claim against the APA is barred by the express contract, so too is the claim against the APAPO.

The remaining question is whether plaintiffs should have the opportunity to amend their complaint.  In their briefing, plaintiffs asked for leave to amend their complaint to allege fraudulent inducement and rescission of the APAPO membership contract if the Court found that

their unjust enrichment claim was foreclosed by the existence of express contracts.   See Plfs.'

Opp. at 18.  Defendants, however, argue that plaintiffs' claim is so fundamentally flawed that

repleading will be futile.  Defs.' Reply in Supp. of Mot. to Dismiss [ECF 21] ("Defs.' Reply") at

9 n.5.

Leave to amend should be "freely given" except in special circumstances, "such as undue

delay, bad faith or dilatory motive, . . . repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposition party by virtue of the allowance of the

amendment, [or] futility of the amendment."  Foman v. Davis, 371 U.S. 178, 182 (1962).  Here,

defendants argue that plaintiffs should not be allowed to amend the complaint because (1) the

current complaint is plaintiffs' fourth, and plaintiffs expressly chose to remove certain contract-

based claims they had asserted in past complaints, and (2) plaintiffs' misrepresentation claims,

however pled, are "fatally flawed" because the APA's statements were not misleading.  See

Defs.' Reply at 9; Tr. of Mot. Hearing (August 11, 2011) ("Tr.") at 17.  The Court will take these

arguments in order.

Although this is plaintiffs' fourth complaint, this is the first round of briefing on the case.

With the benefit of that briefing, the hearing in this case, and this Court's opinion, it is possible

that plaintiffs will be able to select a theory that better fits the facts of this case.  See Foman, 371

U.S. at 182.  As to the second argument, the Court is unpersuaded that plaintiffs' contract-based

misrepresentation claims are fatally deficient.  In both contract and tort cases, a court asks

whether a reasonable person would find the representation false or misleading, not whether it is

possible to construct an explanation for why the representation could be technically true.  See,

e.g., Whiting v. Am. Ass'n of Retired Persons, 637 F.3d. 355, 357-58 (D.C. Cir. 2011) (noting

that contract claims, as well as statutory fraud and unjust enrichment claims, depend on whether "a reasonable person would be led astray" by the representations).  In the context of a dues statement, a reasonable person could plausibly believe that an assessment labeled "must pay" was a condition of membership, not a simple professional obligation.

However, even if plaintiffs may be able to bring a viable claim based on defendants' statements, it is unclear how the facts of this case support a fraudulent inducement and rescission claim.  Accordingly, the Court will grant leave to amend the complaint only if plaintiffs can demonstrate that allowing amendment will not be futile.  A separate order will outline the procedure for providing additional briefing on that issue.

### B.  Consumer Protection Laws

Drs. Levine and Fallenbaum, who are residents of California, bring additional claims under California's unfair competition law and false advertising law.  See Compl., ¶¶ 40-53; see also Cal. Bus. & Prof. Code §§ 17200 et seq. (unfair competition) & 17500 et seq. (false advertising).  Defendants argue that the District of Columbia's Consumer Protection Procedures Act ("CPPA"), rather than California's consumer protection laws, applies to this action brought in the District of Columbia.  Both parties agree that the APA and APAPO are exempt from suit under the CPPA, so the question is whether the CPPA applies.  See Defs.' MTD at 25-26; Plfs.' Opp. at 25; see also D.C. Code § 28-3905(k)(5).

The District of Columbia's choice-of-law principles determine which state's substantive law applies in this diversity suit.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  The District of Columbia employs a "modified governmental interests" analysis, under which a court "evaluate[s] the governmental policies underlying the applicable laws and

14

determine[s] which jurisdiction's policy would be more advanced by the application of its law to

the facts of the case under review." Hercules & Co. v. Shama Rest. Corp., 566 A.2d 31, 43

(D.C.1989) (internal quotation marks omitted); Moore v. Ronald Hsu Constr. Co., 576 A.2d 734,

737 (D.C. 1990).  As part of that evaluation, the Court considers the factors set out in the

Restatement (Second) Conflict of Laws § 145, which apply to tort cases generally:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of
> business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) Conflict of Laws § 145 (1971 & Supp. 2011).  In addition, § 148 of the

Restatement sets out a lengthier list of factors courts should consider in fraud and

misrepresentation cases:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's
> representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of
> business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction
> between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which
> he has been induced to enter by the false representations of the defendant.

Restatement (Second) Conflict of Laws § 148 (1971 & Supp. 2011).

The D.C. Court of Appeals has held that § 148 "provides a useful framework for

selecting the law which applies to multi-state misrepresentation claims," Hercules, 566 A.2d at

43, but in a recent fraud and misrepresentation case similar to this one, the Court of Appeals

relied primarily on § 145 and considered § 148 only in a footnote.  See Washkoviak v. Student

Loan Mktg. Ass'n, 900 A.2d 168, 182 & n.18 (D.C. 2006).

Washkoviak provides useful background for this case.  There, the plaintiffs alleged that the defendant, Sallie Mae, had employed deceptive practices in the disclosure and collection of late fees on student loans.  Id. at 173.  Plaintiffs, Wisconsin residents who made their loan payments in Wisconsin, alleged that Sallie Mae's deceptive practices were "formulated and conceived . . . in the District of Columbia, . . . directed . . . in the District of Columbia, and emanated from . . . the District of Columbia."  Id. at 181 (internal quotation marks omitted).  Sallie Mae, by contrast, denied that the policies were created or carried out in Washington, D.C.  Id. at 175.

The Washkoviak court began by asking whether "the policies of either jurisdiction would be more advanced than the policies of the other by the application of its law to [the] complaint."  Id. at 180.  The court concluded that Wisconsin's interest in protecting its residents and the District of Columbia's interest in "ensuring that its corporate citizens refrain from fraudulent activities" were "equally strong."  Id. at 180-81.  Hence, the court turned to the factors enumerated in § 145.  It found that the injuries occurred in Wisconsin, where the misrepresentations were received and the payments made; that the conduct causing the injury occurred in Washington, D.C.; that the plaintiffs were domiciled in Wisconsin and Sallie Mae was headquartered in Washington, D.C.; and that the relationship was "centered" in Wisconsin.  Id. at 181.  Hence, two of the factors tipped in favor of Wisconsin, one tipped in favor of the District of Columbia, and one was split.  Id.  But, cautioning that "mere counting of contacts is not what is involved," the court weighed the contacts "on a qualitative rather than quantitative scale."  Id. (internal quotation marks and citation omitted).  In doing so, the court noted that "'the place of injury is less significant in the case of fraudulent misrepresentations'" and accordingly

"discounted" that factor.  Id. at 182 (citing Restatement (Second) Conflicts § 145 cmt. f).  Hence, the court found that the § 145 analysis did not point strongly in either direction.  In a footnote, the court applied the § 148 factors and concluded they did not change the relatively even balance of interests.  Id.

 Given that equality of interest, the Washkoviak court relied on two tiebreakers.  First, the record contained conflicting evidence about the connections between the parties and the two jurisdictions, but the court had to "resolve any uncertainty in [plaintiffs'] favor" in the context of a motion to dismiss.  Id. at 182.  Second, the court held that "'[w]hen both jurisdictions have an interest in applying their own laws to the facts of the case, the forum law will be applied unless the foreign jurisdiction has a greater interest in the controversy.'"  Id. (quoting Logan v. Providence Hosp., Inc., 778 A.2d 275, 278 (D.C. 2001)).  Since both tiebreakers favored using District of Columbia law, the court held that that law should be applied.  Id.

Here, the complaint alleges that both the APA and the APAPO are based in the District of Columbia, have their principal place of business in the District of Columbia, and are "operated" from an address in the District of Columbia.  Compl.  ¶¶ 2-3, 13.  In a section of the complaint entitled "jurisdiction and venue," plaintiffs allege that "[v]enue is proper in the District . . . because Defendants are citizens of and are located in this District and significant events giving rise to this case took place in this District."  Id. ¶ 9.  The complaint further alleges that Drs. Levine and Fallenbaum are residents of California, and that the APA and APAPO "disseminated throughout California and the United States, advertising, publications, statements, and/or other materials that were untrue or misleading."  Id. ¶¶ 10, 11, 50.

Here, as was the case in Washkoviak, this Court must begin with the question whether

"the policies of either jurisdiction would be more advanced than the policies of the other by the application of its law to [the] complaint."  And here, as in <u>Washkovkiak</u>, the two jurisdictions' interests are "equally strong."  California has an obvious interest in protecting its residents.  The District of Columbia, on the other hand, has an interest in regulating the behavior of the corporations headquartered in the District.  In this case, the District has chosen to exempt non-profit organizations from its consumer protection laws, except in circumstances not applicable here.  <u>See</u> D.C. Code § 28-3905(k)(5).  An explicit decision to limit liability for certain types of organizations is a regulatory decision; therefore, plaintiffs' assertion that "[t]he District of Columbia's interests in regulating its business community cannot be advanced by this litigation" is incorrect.  <u>See</u> <u>Travelers Ins. Co. v. SCM Corp.</u>, 600 F. Supp. 493, 497 (D.D.C. 1984) (describing a limitation on liability as "an obvious policy choice").

Given the "equally strong" interests of the two jurisdictions, the Court must consider the § 145 factors.  The injury occurred in California, where the materials were received and the payments were presumably made.  Here, unlike in <u>Washkovkiak</u>, the plaintiffs did not explicitly allege that the purportedly misleading statements were "formulated and conceived" in the District of Columbia.  <u>See</u> 900 A.2d at 181.  However, plaintiffs did allege that defendants had their principal place of business in Washington, D.C., and that "significant events giving rise to this case took place in this District."  Compl. ¶¶ 2-3, 9, 13.  The clear implication of these allegations is that at least some of the conduct causing the injury took place in Washington, D.C., and nothing in the complaint or plaintiffs' briefing suggests any other location where the conduct could have occurred.  As to the third factor, the plaintiffs' domicile is in California and the defendants' place of business is in the District of Columbia.  And as to the fourth and final factor,

it is unclear where the relationship between the parties is "centered."  In the context of a

borrower and a lender, the relationship is centered where the borrower lives; in the context of a

"fraternal beneficial organization," however, the relationship is centered where the organization

is headquartered.  Washkoviak, 900 A.2d at 181; Modern Woodmen of America v. Mixer, 267

U.S. 544, 551 (1925).  The APA is neither a national financial institution nor a fraternal benefit

organization, but rather has aspects of each.  Turning to the Restatement itself, the illustrative

examples in the Restatement suggest that this factor may be more applicable when the parties

conduct at least some of their activities in the same jurisdiction.  See Restatement (Second)

Conflicts § 145, cmt. e.  Because that is not the case here, the Court concludes that the fourth

factor does not weigh strongly in favor of either party.[2]

Hence, one factor favors application of District of Columbia law; one factor favors

application of California law; one factor is split; and one factor does not tip in either direction.

Given that inconclusive result, the Court is left with the baseline principle that "'when both

jurisdictions have an interest in applying their own laws to the facts of the case, the forum law

will be applied unless the foreign jurisdiction has a greater interest in the controversy.'"

Washkoviak, 900 A.2d at 182 (quoting Logan, 778 A.2d at 278).[3]  Here, that rule points to

---

[2]    The analysis under § 148 is similar.  Plaintiffs received and acted upon the
representations in their state of residence, California; defendants engaged in the allegedly illegal
conduct from their principal place of business, Washington, D.C.; and the last two factors are
inapplicable here.  See Washkoviak, 900 A.2d at 182 & n.18.

[3]    Unlike in Washkoviak, drawing all reasonable inferences in favor of the plaintiffs here
does not advance their case.  There, the parties disputed where the challenged policy had been
conceived and carried out; adopting plaintiffs' view of that dispute supported the plaintiffs' view
of the choice-of-law question.  See 900 A.2d at 175.  Here, by contrast, the only reasonable
inference that can be drawn from plaintiffs' complaint is that the challenged actions took place in
the District of Columbia.  Plaintiffs have made no allegations suggesting otherwise, and the
Court cannot draw inferences in plaintiffs' favor that are "unsupported by facts alleged in the

application of the District of Columbia's law.   And in this case, that rule works no unfairness to

plaintiffs, because they chose to pursue their claim in the District of Columbia – a jurisdiction

that enacted a law providing that suits under the CPPA against a nonprofit organization "shall

not be based on membership in such organization, membership services, . . . or any other

transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or

services in the ordinary course of business."   D.C. Code § 28-3905(k)(5).

     As noted above, the parties agree that the APA and APAPO are both exempt from the

coverage of the CPPA.  Defs.' MTD at 25-26; Plfs.' Opp. at 25.  The Court concurs in that view.

Plaintiffs' claims are clearly based on "membership in such organization [and] membership

services," not "the purchase or sale of consumers goods or services in the ordinary course of

business."  Hence, because the CPPA applies to plaintiffs' claims, those claims must be

dismissed.

### C.  Jury Trial

     Defendants have asked the Court to strike plaintiffs' request for a jury trial because

plaintiffs raise only equitable claims.  Defs.' MTD at 31-33.  The Court has now dismissed

plaintiffs' claims, so this issue is moot.  If plaintiffs' reformulated claims raise the issue anew, the

Court will address the issue at the appropriate time.

### IV.  Conclusion

     For the reasons explained above, [16] defendants' motion to dismiss will be granted.  A

separate Order accompanies this opinion.

---

complaint."  <u>Chandler v. W.E. Welch & Assocs., Inc.</u>, 533 F. Supp. 2d 94, 102 (D.D.C. 2008).

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated: May 30, 2012