UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re: APA Assessment Fee Litigation** | |
| **ELLEN G. LEVINE, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 10-1780 (JDB)** |
| **AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., et al.,** | |
| **Defendants.** | |
| **ERIC S. ENGUM,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 10-1898 (JDB)** |
| **AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., et al.,** | **(consolidated with Civil Action No. 10-1780 (JDB))** |
| **Defendants.** | |
| **IRA GROSSMAN,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 13-2034 (JDB)** |
| **AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., et al.,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

Before the Court are plaintiffs' unopposed motion for final approval of the class action

settlement and certification of the proposed settlement class, and plaintiffs' unopposed motions

for attorney's fees, costs, and incentive awards.  On February 12, 2015, this Court entered an Order preliminarily approving the parties' proposed settlement and preliminarily certifying the settlement class.  Following entry of that Order, the parties sent notice to the settlement class.  No class members have filed objections, timely or otherwise, to the proposed settlement, or to plaintiffs' request for attorney's fees.  The Court held a fairness hearing on August 13, 2015, at which it heard argument from the parties on the pending motions.  Thereafter, the Court requested and received supplemental briefing on one issue.  For the reasons discussed below, the Court concludes that final certification of the class and final approval of the settlement are warranted, and it grants plaintiffs' request for fees, costs, and incentive awards.

## BACKGROUND

Plaintiffs in these cases are members of the American Psychological Association ("APA") who claim that for many years that organization misled members into overpaying their dues.  Specifically, they allege that the APA falsely represented on annual dues statements and on the organization's website that practicing clinical psychologists were required to pay an annual "Practice Assessment" to remain APA members—when, in fact, the assessment was required only for membership in a sister organization, the APA Practice Organization (also a defendant here).  Plaintiffs say that if APA members had understood the truth about the assessment—which ran between $110 and $140 in the years in question—they would not have paid it.

Plaintiffs filed the first two of these class actions (Levine and Engum) in late 2010, seeking to represent all APA members who had paid the assessment since 2000.  Before these consolidated cases reached the class certification stage, however, this Court granted the APA's motion to dismiss, concluding that plaintiffs had failed to state viable claims.  In re APA Assessment Fee Litig., 862 F. Supp. 2d 1 (D.D.C. 2012); see also In re APA Assessment Fee Litig., 920 F. Supp.

2d 86 (D.D.C. 2013) (denying leave to amend).  The D.C. Circuit reversed in part, concluding that

some claims could go forward.  In re APA Assessment Fee Litig., 766 F.3d 39 (D.C. Cir. 2014).

On remand, plaintiffs filed an amended class action complaint that put forth claims of unjust

enrichment, fraudulent inducement, and negligent misrepresentation.  See Am. Compl. [ECF No.

39].[1]  A third case (Grossman), which was transferred to this Court while the first two were pending

on appeal, raised essentially identical claims premised on the same facts.  In October 2014, the

Court granted the parties' joint request to stay all three cases while they pursued settlement

negotiations.

 The parties' successful negotiations generated the Settlement Agreement and Release.  See

Settlement Agreement [ECF No. 43-1].  The Settlement Agreement defines the settlement class as

"all persons in the United States who are current or former members of APA and paid the APAPO

Practice Assessment for APA dues years 2001 through [February 12, 2015]," except for certain

interested parties.  Id. at 6.  The APA agrees to establish a settlement fund of $9,020,000.00, and

to pay an additional $200,000 toward the costs of providing notice and claims administration.  Id.

at 8, 15.  After attorney's fees, litigation costs, and incentive awards are deducted from the

settlement fund (as well as any notice and administration costs above the $200,000 mark), the

remainder will be paid to class members who file a claim.  Id. at 14–15, 27–28.  Claimants will

receive a pro rata share of the fund based on the amount of Practice Assessment fees they paid

during the class period.  Id. at 26–28.  No portion of the settlement fund will revert to the APA.  If

after an initial distribution of funds to the class there remain residual funds that cannot feasibly or

practically be redistributed, those funds will be given to Mental Health America, a nonprofit

organization dedicated to promoting mental health and chosen by the parties.  Id. at 28–29.  The

---

[1] Docket numbers in this memorandum opinion refer to the filings in Levine, Civil Action No. 10-1780.

APA also agrees to rename the Practice Assessment the "APAPO Membership Dues" and to clarify that its payment is not required for APA membership.  Id. at 12.  In exchange for these benefits, members of the class—except any who choose to opt out of the settlement—release the APA from all claims relating to plaintiffs' allegations.  Id. at 33–34.

On February 12, 2015, the Court preliminarily certified the settlement class and preliminarily approved the settlement.  See Order [ECF No. 44].  Shortly after, the parties' claims administrator began sending notice of the proposed settlement to the roughly 75,000 class members.  See Borges Decl. [ECF No. 48-1] ¶¶ 4–5.  Email notice was successfully sent to roughly 51,000 class members; the remainder were mailed postcard notices.  See id. ¶¶ 5–8.  The administrator also established a website and telephone number that APA members could visit and call for information about the settlement.  See id. ¶¶ 11–12.  As of September 17, 2015, the administrator had received 21,750 claims forms, representing 29% of the class.  Borges Supp. Decl. [ECF No. 51-1] ¶ 4.  Based on these numbers—and assuming the Court grants plaintiffs' requested attorney's fees, costs, and incentive awards—the estimated average payout per class member claimant would be roughly $303, which in turn is 27% of the average amount of Practice Assessment fees paid by class members during the class period.  See id. ¶ 5.

To date, no member of the class has objected to the terms of the proposed settlement, or to plaintiffs' request for attorney's fees, costs, and incentive awards.  Nor has any member of the class chosen to opt out of the settlement.  On August 13, 2015, the Court held a fairness hearing at which counsel for both parties urged final certification of the class and approval of the settlement. No members of the class requested to speak at the hearing.

**LEGAL STANDARD**

A class can be certified for "settlement purposes only," and such practice has become increasingly common.  Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 50 (D.D.C. 2010) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 618 (1997)).  Class actions seeking certification and settlement at the same time, however, require "closer judicial scrutiny" than settlements that are reached after class certification.  Manual for Complex Litigation, Fourth, § 21.612 (2004).  Class actions that settle early in the case "sometimes make meaningful judicial review more difficult and more important."  Id.; see also Amchem, 521 U.S. at 620.  Plaintiffs bear the burden of convincing the court that the requirements of Federal Rule of Civil Procedure 23 are satisfied, except that "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal [in the settlement-only certification context] is that there be no trial."  Amchem, 521 U.S. at 620 (citation omitted).

A proposed class action settlement requires the Court's approval.  Fed. R. Civ. P. 23(e).  The Court has the discretion to approve or reject the proposed settlement.  In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 375 (D.D.C. 2002).  When deciding whether to grant approval, "the Court must strike a balance between a rubber stamp approval and the detailed and thorough investigation that it would undertake if it were actually trying the case."  Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 565 F. Supp. 2d 49, 54 (D.D.C. 2008) (internal quotation marks omitted).  Although the Court should undertake careful scrutiny of the settlement terms, the discretion to reject a settlement is "restrained by the 'principle of preference' that encourages settlements."  In re Lorazepam, 205 F.R.D. at 375 (quoting Pigford v. Glickman, 185 F.R.D. 82, 103 (D.D.C. 1999)); see also United States v. District of Columbia, 933 F. Supp. 42, 47 (D.D.C. 1996) ("The trial court in approving a settlement need not inquire into the precise legal rights of

the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." (internal quotation marks omitted)).

## DISCUSSION

### I. CLASS CERTIFICATION

Before examining whether the proposed settlement should be finally approved, the Court examines whether the proposed class meets the requirements of Rule 23. The class must first satisfy the four requirements of Rule 23(a). It must then satisfy one of the three requirements of Rule 23(b)—in this case, Rule 23(b)(3). For the following reasons, the Court concludes that these requirements are met.

#### A. Rule 23(a)

The proponent of class certification has the burden of establishing that each of the requirements of Rule 23(a) are satisfied. See Richards v. Delta Air Lines, Inc., 453 F.3d 525, 529 (D.C. Cir. 2006). Those requirements are that: (1) the class is so numerous that joinder of all members is impractical ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) claims/defenses of representative parties are typical of the claims common to the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). All of these requirements are met here.

**1. Numerosity** — Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In this district, courts have found that numerosity is satisfied when a proposed class has at least forty members. See, e.g., Coleman ex rel. Bunn v. District of Columbia, 306 F.R.D. 68, 76 (D.D.C. 2015). It is undisputed that the settlement class here contains more than 75,000 members, so the numerosity requirement is met.

**2. Commonality** — Questions of law and fact must be common to the class under Rule 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). The class's "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. In other words: "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (internal quotation marks omitted).

Here, a central question for each of plaintiffs' claims is whether the APA's dues statements (and other communications) omitted or misrepresented material facts about the Practice Assessment. Because all class members received the same statements, the answer to this question will be common to the class. Rule 23(a)(2) is therefore satisfied. Cf. Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998) (holding Rule 23(a)(2) was satisfied where defendants "engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents").

**3. Typicality** — Rule 23(a)(3) requires that the representative parties' claims or defenses "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality" is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 192 (D.D.C. 2011) (internal quotation marks omitted). The facts and claims of each member of the class need not be

identical, Daskalea v. Wash. Humane Soc'y, 275 F.R.D. 346, 358 (D.D.C. 2011), but the class representatives should have "suffered injuries in the same general fashion as absent class members," In re Vitamins Antitrust Litig., 209 F.R.D. 251, 260 (D.D.C. 2002) (internal quotation marks omitted).  Here, typicality is satisfied because the claims of the named plaintiffs and of absent class members are based on the same core set of facts and underlying legal theories: namely, that the APA's dues statements and other communications were materially misleading about the assessment.

   **4. Adequacy** — Under Rule 23(a)(4), the class representative must fairly and adequately protect the interests of the class.  "Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative[s] must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative[s] must appear able to vigorously prosecute the interests of the class through qualified counsel."  Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997) (internal quotation marks omitted).  As the Court will describe in the context of assessing the settlement's fairness, there is arguably some divergence of interests between those class members (including the named plaintiffs) who primarily paid the assessment in dues years 2001 through 2010, and those who primarily paid it after 2010.  See infra pp. 18–19.  But that divergence is not great enough to cast doubt on the adequacy of these representatives, especially in light of the favorable relief they have secured for all members of the class.  And the Court has no concerns about the quality or vigor of class counsel, who have an extensive background in complex litigation and class actions, and have been appointed class counsel in prior cases.

**B.  Rule 23(b)(3)**

In addition to the Rule 23(a) requirements, proponents for class certification must establish that the class can be maintained under Rule 23(b).  Here, plaintiffs have asserted Rule 23(b)(3) as the basis for this class action; therefore, they must demonstrate (1) the predominance of common questions of law and fact to the entire class, and (2) the superiority of the class action method to other methods of adjudication for the controversy.  See Fed. R. Civ. P. 23(b)(3).  The proposed class satisfies these two elements.

**1.  Predominance** — The predominance inquiry—which ultimately "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," Amchem, 521 U.S. at 623—poses the highest hurdle for plaintiffs in this case.  Indeed, out of initial concern that this hurdle could not be surmounted, the Court asked the parties for additional briefing.  See Sept. 9, 2015 Order [ECF No. 49]; Pls.' Supp. Mem. [ECF No. 51]; Defs.' Notice [ECF No. 50].  Informed by those submissions, the Court now concludes that plaintiffs have satisfied this requirement.

The Court's concerns derived from the fact that plaintiffs' claims, if tried, might require individualized proof of reliance or causation elements.  "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184 (2011).  Plaintiffs' claims of fraudulent inducement and negligent representation both require reliance on a material misrepresentation as an element of liability.  See Sundberg v. TTR Realty, LLC, 109 A.3d 1123, 1131 (D.C. 2015); Hercules & Co. v. Shama Rest. Corp., 613 A.2d 916, 923 (D.C. 1992); see also APA Assessment Fee Litig., 766 F.3d at 47–48, 55–56 (applying D.C. law to plaintiffs' claims).  Reliance is not inherently an element of unjust enrichment, a claim that covers

a wide range of scenarios and need not involve misrepresentation.  See <u>News World Commc'ns,
Inc. v. Thompsen</u>, 878 A.2d 1218, 1222 (D.C. 2005) ("Unjust enrichment occurs when: (1) the
plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under
the circumstances, the defendant's retention of the benefit is unjust.").  But a claim of unjust
enrichment that is premised on misrepresentation (as plaintiffs' is) generally requires a showing
of causation, which will often take the form of reliance.[2]  <u>See</u> Restatement (Third) of Restitution
and Unjust Enrichment § 13 cmt. c (2011) ("A transfer is not subject to invalidation for
misrepresentation, fraudulent or otherwise, unless the misrepresentation induced the transfer.");
<u>see also</u> <u>In re Light Cigarettes Mktg. Sales Practices Litig.</u>, 271 F.R.D. 402, 418 (D. Me. 2010)
("Although the Plaintiffs are correct that injury and causation are not elements of claims for unjust
enrichment in Maine and Washington D.C., they have not established why, absent injury and
causation, the Defendants' 'retention of the benefit is unjust.' "); <u>Kelley v. Microsoft Corp.</u>, 251
F.R.D. 544, 559 (W.D. Wash. 2008) (similar).  And if reliance (or causation) must be proven on
an individualized basis, then common issues likely do not predominate under Rule 23(b)(3).  <u>See,
e.g.</u>, <u>Erica P. John Fund</u>, 131 S. Ct. at 2185 (noting in securities context that "requiring proof of
individualized reliance from each member of the proposed plaintiff class effectively would prevent
such plaintiffs from proceeding with a class action, since individual issues would overwhelm the
common ones"  (internal quotation marks and brackets omitted)); 2 William B. Rubenstein,
Newberg on Class Actions § 4:58, at 221 (5th ed. 2012) ("[C]ourts often deny Rule 23(b)(3) class

---

[2] Though not necessarily.  Suppose Jung wishes to join the APA and so asks his friend Freud, already a
member, what this year's dues are.  Freud, misled by his APA dues statement into thinking that both $200 of normal
dues and a $100 Practice Assessment are necessary for membership, tells Jung to send the APA a check for $300.
Jung pays, but later learns that only $200 was necessary for membership.  Jung has no common law fraud claim against
the APA, for he did not <u>rely</u> on the misrepresentation in the dues statement, even if it was the <u>cause</u> of his overpayment.
<u>See</u> John C.P. Goldberg et al., <u>The Place of Reliance in Fraud</u>, 48 Ariz. L. Rev. 1001, 1004–07 (2006) (distinguishing
the concepts of reliance and causation).  He can, however, recover the extra $100 through a claim of unjust enrichment.

certification in basic fraud cases (and other reliance-related cases) on the grounds that the individualized nature of the reliance inquiry means the predominance test cannot be met." (footnote omitted).[3] For two independent reasons, however, the Court concludes that this reliance issue is not fatal to class certification.

To start, this is a case in which plaintiffs could offer evidence of reliance on a class-wide basis. See CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d 1076, 1089 (10th Cir. 2014) ("[W]here circumstantial evidence of reliance can be found through generalized, classwide proof, then common questions will predominate . . . ."). In a recent decision affirming the certification of a class under Rule 23(b)(3), the Second Circuit explained:

> In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed. Fraud claims of this type may thus be appropriate candidates for class certification because "while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."

In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 120 (2d Cir. 2013) (quoting Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004)). A similar logic applies here. APA sent class members standardized "Membership Dues Statements" on which it both preprinted the

---

[3] Quoting a district court decision from this circuit, plaintiffs suggest that " 'reliance goes to the issue of damages rather than to the underlying, predominant, common issue of liability.' " Pls.' Supp. Mem. [ECF No. 51] at 12 (quoting Johns v. Rozet, 141 F.R.D. 211, 218 (D.D.C. 1992)). In support of this proposition, Johns cited an earlier edition of the late Professor Newberg's treatise, which said that predominance "[c]hallenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected . . . because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability." 1 Herbert B. Newberg, Newberg on Class Actions § 4.26, at 326 (2d ed. 1985) (emphasis added). With respect to common law fraud and the element of reliance, however, this statement's distinction between "the right . . . to recover" and "liability" appears nonsensical. Unlike a statute of limitations, which can foreclose a plaintiff's recovery even when a defendant is otherwise liable, reliance is itself an element of fraud liability. See, e.g., Restatement (Second) of Torts § 525 (1977) ("Liability for Fraudulent Misrepresentation"). Reliance thus "go[es] to the right . . . to recover" only in the tautological sense that a plaintiff cannot recover from a defendant who is not liable. Perhaps recognizing the problematic nature of the statement, the latest edition of Newberg on Class Actions has removed this sentence and acknowledges that reliance, unlike statutes of limitation, often does pose a problem for predominance. See 2 William B. Rubenstein, Newberg on Class Actions § 4:53, at 204–05 (5th ed. 2012).

Practice Assessment and included the assessment in the preprinted total amount due.  See, e.g., 2010 Membership Dues Statement [ECF No. 16-11].  APA's website also automatically included the assessment in the total amount due.  Am. Compl. ¶ 19.  If plaintiffs convinced the trier of fact that the dues statements and website were materially misleading about the nature of the assessment—a common question clearly susceptible to class-wide proof—they would also effectively prove that APA had sent out "inflated invoice[s]."  See In re U.S. Foodservice, 729 F.3d at 120.  The fact that class members then paid those inflated invoices would "constitute circumstantial proof of reliance" on the misleading dues statements (or website).  See id.  APA, of course, might try to rebut this proof with evidence that the misrepresentations were not the cause of class members' payments, but the fact that plaintiffs might not succeed on the merits is not a sufficient reason to deny certification when there is at least a plausible method of showing common reliance.  See CGC Holding, 773 F.3d at 1093 (affirming class certification while noting that "plaintiffs will still have to prove RICO causation by a preponderance of the evidence to win on the merits").

The foregoing indicates that the predominance inquiry would be satisfied even were the case proceeding toward trial.  But, of course, if the Court finds the settlement fair and reasonable, there will be no trial.  That points to a second reason the reliance issue is not fatal.  Although settlement does not eliminate the requirements of Rule 23(a) and (b), it "is relevant to a class certification."  Amchem, 521 U.S. at 619.  On the one hand, settlement requires a court to pay "undiluted, even heightened, attention" to those requirements of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions."  Id. at 620.  But on the other, it obviates the need to ask "whether the case, if tried, would present intractable management problems."  Id. (citing Fed. R. Civ. P. 23(b)(3)(D)).  Hence, insofar as an apparent threat to

12

predominance is only a matter of unmanageability at trial, that should not foreclose certification of a settlement-only class.  <u>See</u> 2 Rubenstein, <u>supra</u>, § 4:63, at 246–47 ("[I]n settlement class actions, because manageability need not be a concern, predominance—the main focus of manageability—recedes in importance as well.").

The Second Circuit applied this reasoning in a securities fraud case to conclude that individualized issues of reliance were not fatal to settlement-class certification under Rule 23(b)(3).  <u>See</u> <u>In re Am. Int'l Grp., Inc. Sec. Litig.</u>, 689 F.3d 229, 239–44 (2d Cir. 2012).  The so-called "fraud-on-the-market" theory, which in many securities actions provides the basis for a class-wide presumption of reliance, <u>see, e.g.</u>, <u>Amgen Inc. v. Conn. Ret. Plans & Tr. Funds</u>, 133 S. Ct. 1184, 1191–93 (2013), was inapplicable on the facts of the case, leading the district court to deny certification on predominance grounds, <u>see</u> <u>In re Am. Int'l Grp.</u>, 689 F.3d at 236–37.  The Second Circuit vacated the denial, concluding that the district court had given inadequate weight to the settlement context: whereas "a litigation class's failure to qualify for [the fraud-on-the-market] presumption typically renders trial unmanageable, precluding a finding that common issues predominate," the same problem does not exist "with a settlement class, [where] the manageability concerns posed by numerous individual questions of reliance disappear."  <u>In re Am. Int'l Grp.</u>, 689 F.3d at 241 (citing <u>Amchem</u>, 521 U.S. at 620).  In short, "the existence of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis."  <u>Id. at 242.</u>

The potential reliance problem here is one of unmanageability at trial: this case could not be tried efficiently if evidence of reliance had to be shown for each of the thousands of class members.  By contrast, the potential reliance problem does not suggest that the class is "[in]sufficiently cohesive to warrant adjudication by representation," <u>Amchem</u>, 521 U.S. at 623,

or that absentee members are threatened by an "unwarranted or overbroad class definition[]," id. at 620. This is not a case where "individual stakes are high and disparities among class members great." Id. at 625. To the contrary, the stakes here are low enough—an individual who paid the assessment every year of the class period would have lost less than $2000—that individualized litigation would be impractical, and hence absentee "class members' interests in individually controlling the prosecution . . . of separate actions" is minimal. Fed. R. Civ. P. 23(b)(3)(A). Nor are there great disparities among class members. All were allegedly injured in the same way by the same course of conduct by the APA, and while the extent of their alleged damages vary, they are all of the same order of magnitude. See Sullivan v. DB Invs., Inc., 667 F.3d 273, 338 (3d Cir. 2011) (Scirica, J., concurring) (finding predominance in settlement-only class where "[a]ll claims arise out of the same course of defendants' conduct; all share a common nucleus of operative fact, supplying the necessary cohesion"). The Court therefore concludes that—even if reliance could not be shown through class-wide proof—the predominance requirement is satisfied here.

**2. Superiority** — Rule 23(b)(3) also requires a court to ensure that a class action is superior to other available forms of adjudication. Vista Healthplan, Inc. v. Warner Holdings Co. III, 246 F.R.D. 349, 359–60 (D.D.C. 2007). This requirement, along with the predominance requirement, ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." Amchem, 521 U.S. at 615. Here, the size of the class, the uniformity of issues regarding defendants' liability, and the impracticability—as a matter of cost versus reward—of individualized prosecution of these claims all weigh in favor of finding that class action adjudication is superior to other forms of adjudication. See, e.g., Trombley, 826 F. Supp. 2d at 194 (applying these considerations).

## II. THE PROPOSED SETTLEMENT

Because the Court has concluded that class certification is appropriate, it now considers whether the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). There is no single test in this Circuit for determining whether a proposed class action settlement should be approved, and the relevant factors may vary depending on the circumstances. In re Lorazepam, 205 F.R.D. at 375 (citing Pigford, 185 F.R.D. at 98 & n.13). Generally, however, courts have examined the following factors: "(a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relation to the strength of the plaintiffs' case; (c) the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel." In re Lorazepam, 205 F.R.D. at 375; see In re Vitamins Antitrust Litig., 305 F. Supp. 2d 100, 104 (D.D.C. 2004). Here, these factors lead the Court to conclude that the settlement is fair, reasonable, and adequate, and should therefore be approved.

### A. Arm's-Length Negotiations

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." Meijer, 565 F. Supp. 2d at 55 (internal quotation marks omitted). Class counsel's description of the negotiating process convinces the Court that such a presumption should apply here. In the wake of the Court of Appeals' decision reinstating some of plaintiffs' claims, the parties hired an experienced neutral mediator to facilitate negotiations. After exchanging large amounts of data and mediation statements, the parties held a 13-hour session with the mediator, at the end of which they agreed to settle the litigation. The parties then spent an additional two months hammering out the details. See Zavareei Decl. [ECF No. 43-2] ¶¶ 40–42. The Court has

no reason to doubt the adversarial, arm's-length nature of these negotiations or to suspect collusion between the parties.  Hence, this factor weighs in favor of settlement approval.

###    B.  Settlement Terms in Relation to Strength of the Case

The Court must evaluate the relief provided in the proposed settlement against the relative strength of plaintiffs' case, including their ability to obtain recovery at trial.  See Equal Rights Ctr. v. Wash. Metro. Area Transit, 573 F. Supp. 2d 205, 211 (D.D.C. 2008) (citing Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998)).  This factor has been called the most important factor a court considers when evaluating a proposed settlement.  See, e.g., Blackman v. District of Columbia, 454 F. Supp. 2d 1, 8 (D.D.C. 2006).

The proposed settlement provides the class with a recovery of roughly $9 million. Plaintiffs say this is about 20% of their best possible recovery: namely, "all Assessment Fees paid by any APA members from 2001 through 2010, an amount totaling $47,000,000.00."  Pls.' Mot. [ECF No. 48] at 17.  This $47 million figure is not quite the right denominator, however.  The class period runs through early 2015, not 2010, see Settlement Agreement at 6, so the sum of all fees (including the additional four dues years) must be higher—perhaps near $70 million.  And that in turn means that the settlement represents closer to 13% of plaintiffs' best possible recovery. But 13% is hardly a damning figure.  Settlements representing a similar percentage of best case recovery have been approved.  See, e.g., In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig., 4 F. Supp. 3d 94, 103 (D.D.C. 2013) ("4–8%"); Trombley, 826 F. Supp. 2d at 198 ("approximately 12% to 30%"); In re Baan Co. Sec. Litig., 284 F. Supp. 2d 62, 65 (D.D.C. 2003) ("over 16%").

Moreover, this percentage must be considered in conjunction with the likelihood of ideal recovery.  Here, there are several reasons to think a full recovery is unrealistic.  First, the trier of

fact might ultimately conclude that the APA did not actually make material misrepresentations on which a reasonable person would rely, cutting the legs out from under most if not all of plaintiffs' claims. Cf. APA Fee Litigation, 766 F.3d at 48 (leaving open the possibility that unjust enrichment claim could succeed even if plaintiffs' reliance was unreasonable).   Second, as noted above in the discussion of predominance, even if the trier concludes that the APA did make such material misrepresentations, the APA might be able to proffer evidence that undermines plaintiffs' case for actual reliance.   See Wallace & Zavareei Joint Decl. [ECF No. 46-1] ¶ 26 (indicating that the APA believes it has such evidence).   But see Pls.' Supp. Mem. [ECF No. 51] at 10–11 (disputing that the APA's evidence undermines reliance).   And third, even if plaintiffs were generally successful at trial, there is reason to doubt that their success would cover the entire class period.   The APA significantly modified its dues statements beginning in dues year 2011, making it clearer that payment of the assessment was not required for APA membership.   See 2011 Membership Dues Statement [ECF No. 16-12].   Although plaintiffs contend that the APA continued to mislead members in certain ways, the Court thinks plaintiffs would have had serious difficulty prevailing at trial on their claims with respect to the last four dues years of the class period.   In light of the risk that plaintiffs' case might have failed in whole or part, a settlement representing 13% of plaintiffs' best possible recovery is fair, reasonable, and adequate.

It is also appropriate to consider what claimants will actually receive under the settlement. From that perspective, the Court's 13% figure and even plaintiffs' 20% figure undersell the value of the settlement.   Based on data supplied by the claims administrator, it appears that those members of the class who file a claim will receive on average at least 25% of the Practice Assessment amounts they paid during the class period.   See Borges Supp. Decl. ¶ 5.   Given the effectiveness of notice, the simplicity of the claims process, and the meaningful cash incentive to

file a claim in this case, the Court gives this 25% figure serious weight in considering the value of the settlement to those class members who felt deceived by the APA's conduct. It further bolsters the Court's view that the settlement should be approved.

The Court notes one wrinkle, though, which it adverted to in discussing Rule 23(a)'s adequacy requirement: namely, the fact that the settlement treats all class members the same, regardless of when during the class period they paid the assessment. At first blush, equal treatment of all class members hardly seems like an indictment. Indeed, <u>un</u>equal treatment is usually considered the red flag. <u>See, e.g.</u>, <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 808 (3d Cir. 1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others."). But, in fact, the overarching principle is "to ensure that similarly situated class members are treated similarly <u>and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated</u>." 4 Rubenstein, <u>supra</u>, § 13:59, at 500 (5th ed. 2014) (emphasis added). As the Court just noted, it views the claims with respect to the final four years of the class period as considerably weaker than the others. To be maximally fair, then, the settlement ought to discount the recovery of those who paid the assessment in those later years in order to prevent dilution of the recovery of those who paid in the earlier years.[4]

But Rule 23 requires a settlement to be "fair, reasonable, and adequate"—not ideal. <u>See In re Baby Prods. Antitrust Litig.</u>, 708 F.3d 163, 173 (3d Cir. 2013) ("The role of a district court is not to determine whether the settlement is the fairest possible resolution . . . ."). The strength of individuals' claims within a class action will almost always vary, and so, insofar as a settlement

---

[4] To be clear, the settlement does account for the fact that different class members paid the assessment for a different number of years. A claimant who paid the assessment in ten of the years during the class period will get a much larger settlement check than one who paid in only three. But the settlement treats each dollar of assessment paid the same, regardless of whether it was paid in, say, 2002 or 2012.

establishes a uniform rate of compensation, there will also be some dilution with respect to the stronger claims and over-recovery on the weaker ones.  The Court does not think any dilution here is great enough to impugn the overall fairness of the settlement.  The compensation rate provided by the settlement would be reasonable even if the class period ended at 2010—and extending that same rate to those with post-2010 claims does not change that determination.  Moreover, there does not in fact appear to be a sharp break between "early" and "late" class members: the parties indicated at the fairness hearing that most members paid the assessment both pre- and post-2010, which minimizes the concern that any set of absentee class members faces systematic dilution of their claims.  Finally, the Court's concern about dilution is further diminished by the fact that no objections have been raised by members of the class.

### C.  Stage of the Litigation Proceedings at the Time of Settlement

"In determining whether a proposed class action settlement is fair, adequate, and reasonable, courts consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." Vista Healthplan, 246 F.R.D. at 362 (internal quotation marks omitted).  This case did not proceed to formal discovery, but the Court is not troubled by that fact.  See Trombley, 826 F. Supp. 2d at 199–200 (formal discovery not a prerequisite to settlement approval).  The factual heart of the case lies in APA's yearly dues statements and its other public communications with its members, all of which were available to plaintiffs at the outset of litigation.  The parties gained a sense of the strength of the case during the protracted litigation in this Court and the D.C. Circuit at the motion-to-dismiss stage.  And the parties conducted extensive informal discovery in connection with the mediation and settlement negotiations.  The Court finds that settlement has come neither "too early to be suspicious nor too late to be a waste of resources," but rather "at a

desirable point in the litigation for the parties to reach an agreement and to resolve these issues without further delay, expense, and litigation." In re Vitamins, 305 F. Supp. 2d at 105.

### D.  Reaction of the Class

A positive reaction from the class weighs in favor of approving a settlement, see, e.g., Trombley, 826 F. Supp. 2d at 200, though it should not always weigh very much.  As a leading treatise observes, "most class actions involve such small individual interests . . . that most class members have little incentive to invest either time or money in responding to a class notice. . . . Moreover, a low objection rate could be ascribed to a poor notice program."  4 Rubenstein, supra, § 13:54, at 480, 482–83.  But these concerns illustrate why the absence of a single objector or opt-out in this case deserves more weight than usual.  The individual interests here, while too low to make individual litigation practicable, are still in the hundreds of dollars—enough to make class members sit up and pay attention.  Moreover, as a result of the APA's possession of accurate contact information for a vast majority of the class, the notice program here was especially effective.  The claims administrator reports that notice was known to be undeliverable (by either mail or email) to only 187 individuals—out of a class of more than 75,000.  See Borges Decl. ¶ 9. In short, more so than in many a class action, the members were aware of the settlement and had incentive to opt-out or object if they deemed it unfair.  Nonetheless, none did so.  And on the flipside, roughly 29% of class members have filed claims, a very high participation rate.  See Borges Supp. Decl. ¶ 4.

### E.  The Opinion of Experienced Counsel

The opinion of experienced counsel could in theory impact a court's view of whether a class settlement is fair; in practice, however, the experienced counsel offering their opinions are usually the very lawyers arguing for approval, making this factor of little significance.  See

Richardson v. L'Oreal USA, Inc., 991 F. Supp. 2d 181, 205 (D.D.C. 2013) ("[T]his factor never weighs against settlement: the lawyers who negotiated the settlement will rarely offer anything less than a strong, favorable endorsement." (internal quotation marks omitted)).  No surprise, plaintiffs' counsel here—certainly experienced in class action litigation—believe the settlement should be approved.  Counsel's opinion plays little role in the Court's analysis, but the Court does ultimately agree: for all of the foregoing reasons, the Court finds that the settlement is fair, reasonable, and adequate, and will therefore approve it.

### III. ATTORNEY'S FEES, EXPENSES, AND INCENTIVE AWARDS

Having concluded that the settlement should be approved, the Court turns to plaintiffs' accompanying request for fees, expenses, and incentive awards, noting at the outset that no members of the class have objected to any part of this request.  First, plaintiffs seek $2,706,000 in attorney's fees.  In a common fund case like this, "a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award."  Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993).  Plaintiffs' request for roughly 30% of the settlement fund is within the range generally considered acceptable, see Hardy v. District of Columbia, 49 F. Supp. 3d 48, 51 (D.D.C. 2014), and the Court finds that it is reasonable here.  Likewise reasonable is plaintiffs' request for reimbursement of expenses in the amount of $43,126.27.  Finally, class counsel seek incentive awards of $5,000 for each of the named plaintiffs, who assisted in the prosecution and settlement of the case.  While the named plaintiffs' level of participation does not seem extensive here, the Court has approved incentive awards of this magnitude in similar situations, see, e.g., Trombley, 826 F. Supp. 2d at 207–08, and will do so here as well.

## **CONCLUSION**

For the foregoing reasons, the Court grants final certification of the class and final approval of the settlement, which it finds fair, reasonable, and adequate.  The Court also grants plaintiffs' request for attorney's fees of $2,706,000, costs and expenses of $43,126.27, and incentive awards of $5,000 to each of the four representative plaintiffs: Ellen G. Levine, Ruth Fallenbaum, Eric S. Engum, and Ira Grossman.  A separate Order and Final Judgment in each case has issued on this date.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  October 14, 2015